**THIS PROPOSED DISCLOSURE STATEMENT IS A DRAFT THAT REMAINS SUBJECT TO REVISION AND APPROVAL BY THE BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE JOINT PLAN OF REORGANIZATION OF THE DEBTORS AND DEBTORS IN POSSESSION.**

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| SWIFT ENERGY COMPANY, *et al.*,[1] | Case No. 15-_____ (____) |
| Debtors. | (Joint Administration Requested) |

**JOINT DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE JOINT PLAN OF REORGANIZATION OF THE DEBTORS AND DEBTORS IN POSSESSION**

Daniel J. DeFranceschi (DE 2732)
Zachary I. Shapiro (DE 5103)
Brendan J. Schlauch (DE 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

Gregory M. Gordon (TX 08435300)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

Thomas A. Howley (TX 24010115)
Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600

PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

December 31, 2015

---

[1] The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Swift Energy Company (0661); Swift Energy International, Inc. (6721); Swift Energy Group, Inc. (8150); Swift Energy USA, Inc. (8212); Swift Energy Alaska, Inc. (6493); Swift Energy Operating, LLC (2961); GASRS LLC (4381); SWENCO-Western, LLC (0449); and Swift Energy Exploration Services, Inc. (2199).  The address of each of the Debtors is 17001 Northchase Drive, Suite 100, Houston, Texas 77060.

DISCLOSURE STATEMENT DATED [__]<sup>2</sup>

**SOLICITATION OF VOTES WITH RESPECT TO
THE JOINT PLAN OF REORGANIZATION OF
THE DEBTORS AND DEBTORS IN POSSESSION**

---

**The only Classes entitled to vote on the Joint Plan of Reorganization of the Debtors and Debtors in Possession, dated [__] and attached hereto as Exhibit I (the "Plan") are Classes 4A, 4B, 4E and 4F (Senior Notes and Rejection Claims).  All creditors holding Claims in Classes 4A, 4B, 4E and 4F are encouraged to read and carefully consider this Disclosure Statement, including the Plan and the matters described under "Risk Factors" in Section VI prior to submitting ballots in response to this solicitation.  Other than Classes 4A, 4B, 4E, 4F and 8A (Stock Interests of Swift), all Classes of Claims and Interests are unimpaired under the Plan; i.e., the Plan does not modify, other than by curing defaults and reinstating maturity, the legal, equitable or contractual rights of the holders of such Claims or Interests.  This Disclosure Statement is being delivered to you because you are the holder of, or have otherwise asserted, either a Claim or Claims against, or an Interest or Interests in, Swift Energy Company; Swift Energy International, Inc.; Swift Energy Group, Inc.; Swift Energy USA, Inc.; Swift Energy Alaska, Inc.; Swift Energy Operating, LLC; GASRS LLC; SWENCO-Western, LLC; and Swift Energy Exploration Services, Inc. (collectively, the "Debtors").**

---

**The boards of directors of the Debtors believe that the Plan is in the best interests of creditors and other stakeholders.  All claimants in Classes 4A, 4B, 4E and 4F (Senior Notes and Rejection Claims) are urged to vote in favor of the Plan.  A summary of the voting instructions is set forth in Section II of this Disclosure Statement.  More detailed instructions are included in the ballots distributed to the creditors entitled to vote on the Plan.  To be counted, your ballot must be duly completed, executed and received by the Debtors' voting agent by 5:00 p.m., prevailing Eastern Time, on [__] (the "Voting Deadline"), unless extended.**

---

**The Confirmation and the Effective Date of the proposed Plan are subject to material conditions precedent.  See Section II.  There is no assurance that these conditions will be satisfied or waived.**

---

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein.  If such information or representation is given or made, it may not be relied upon as having been authorized by any of the Debtors.  The Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline.

---

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto and documents described therein.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.

---

<sup>2</sup>    Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Joint Plan of Reorganization of the Debtors and Debtors in Possession, dated [__], 2016.

_____

Except as otherwise indicated, the Debtors will File all exhibits to the Plan with the Bankruptcy Court and make them available for review on the website of Kurtzman Carson Consultants LLC at www.kccllc.net/swiftenergy, no later than 10 days before the Voting Deadline.  The Debtors also will serve the exhibits to the Plan on the parties on the general service list being maintained in the Reorganization Cases on or before 10 days prior to the Voting Deadline.

_____

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the historical and projected financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

_____

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' or the Reorganized Debtors' businesses.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section VI.  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  Neither the Debtors nor the Reorganized Debtors undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

_____

**This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

_____

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ....................................................................................... 1

II.     OVERVIEW OF THE PLAN ......................................................................................... 1

    A.      Introduction ........................................................................................................ 1

    B.      Summary of Classes and Treatment of Claims and Interests ............................. 2

    C.      Voting on and Confirmation of the Plan ............................................................ 6

        1.      Voting Procedures and Requirements ..................................................... 6

        2.      Confirmation Hearing ............................................................................. 7

        3.      Confirmation ........................................................................................... 7

        4.      Acceptance .............................................................................................. 8

        5.      Feasibility ............................................................................................... 8

        6.      Best Interests Test; Liquidation Analysis .............................................. 8

            a.      Generally .................................................................................... 8

            b.      Liquidation Analysis ................................................................. 9

        7.      Alternatives to Confirmation and Consummation of the Plan ............... 9

        8.      Compliance with Applicable Provisions of the Bankruptcy Code ......... 9

        9.      Alternatives to Confirmation and Consummation of the Plan ............... 9

    D.      Conditions Precedent to Confirmation and Consummation of the Plan ............. 9

        1.      Conditions to Confirmation .................................................................... 9

        2.      Conditions to the Effective Date .......................................................... 10

        3.      Waiver of Conditions to Confirmation or the Effective Date .............. 10

        4.      Effect of Nonoccurrence of Conditions to the Effective Date ............. 11

III.    HISTORY OF THE DEBTORS ................................................................................... 11

    A.      Historical Overview ......................................................................................... 11

    B.      Corporate Structure .......................................................................................... 12

    C.      Operations ........................................................................................................ 12

    D.      Saka Energi Joint Venture ............................................................................... 13

    E.      Prepetition Indebtedness .................................................................................. 13

IV.     RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE
        COMMENCEMENT OF THE REORGANIZATION CASES ................................ 14

    A.      Industry Overview and the Company's Recent Performance ........................... 14

    B.      The Company's Cost-Reduction Initiatives ..................................................... 14

    C.      The Debtors' Refinancing, Drill-Co and Sale Efforts ..................................... 15

    D.      The Company's Negotiations with Certain Noteholders .................................. 15

    E.      The Restructuring Support Agreement ............................................................ 16

**TABLE OF CONTENTS**
(continued)

Page

F.    Debtor in Possession Financing ........................................................................ 17

V.    EVENTS DURING THE REORGANIZATION CASES ............................................. 17

    A.    Commencement of the Reorganization Cases ..................................................... 17

    B.    First Day Relief .................................................................................................. 17

    C.    DIP Financing .................................................................................................... 18

    D.    Sale to Texegy LLC ........................................................................................... 18

    E.    Expected Timeline of the Reorganization Cases ................................................ 18

VI.    RISK FACTORS .............................................................................................................. 18

    A.    Bankruptcy Specific Considerations .................................................................. 19

        1.    The Plan is Based Upon Assumptions That May Prove Incorrect ................. 19

        2.    Plan Confirmation may not occur .................................................................. 19

        3.    Parties in interest may object to the Debtors' classification of Claims and
            Interests ......................................................................................................... 19

        4.    Allowance of Claims may differ from the Debtors' current estimates ........... 19

        5.    The Effective Date may not occur .................................................................. 19

        6.    If the Effective Date is delayed or projected proceeds are not timely received,
            the Debtors may need to seek additional postpetition financing .................... 20

        7.    The Restructuring Support Agreement could be terminated ........................... 20

        8.    The Reorganization Cases may impact the Debtors' relationships with
            counterparties ................................................................................................ 20

        9.    The Restructuring of the Debtors may adversely affect the Debtors' tax attributes ........ 20

        10.    The Debtors may not be successful in discharging or satisfying prepetition
            claims ............................................................................................................ 21

        11.    Historical financial information of the Debtors may not be comparable to the
            financial information of the Reorganized Debtors ........................................ 21

        12.    The Projections set forth in this Disclosure Statement may not be achieved ....... 21

    B.    Risk Factors Related to Stock Interests in Swift and Reorganized Swift ...................... 22

        1.    Swift's common stock has been delisted from trading on the NYSE ............. 22

        2.    Holders of Stock Interests of Swift may not receive any distribution if the Plan is
            not confirmed ................................................................................................ 22

        3.    Certain holders of New Swift Common Stock could have a significant degree of
            influence on Reorganized Swift and matters presented to holders of New Swift
            Common Stock ............................................................................................... 22

        4.    The transfer of New Swift Common Stock will be restricted ......................... 23

         5.    There will be a lack of an established market for New Swift Common Stock and
            the Warrants .................................................................................................. 23

        6.    Future issuances of New Swift Common Stock may cause holders to incur
            substantial dilution ........................................................................................ 23

-ii-

**TABLE OF CONTENTS**
(continued)

7.      Resolution of Claims outstanding under the DIP Facility may cause the Senior Noteholders to incur further dilution ............................................................... 23

8.      Reorganized Swift does not expect to pay dividends in the near future ...................... 23

C.      Risk Factors Related to the Reorganized Debtors' Exit Financing................................................ 24

1.      [To come] ................................................................................................................ 24

2.      Resolution of the Reorganized Debtors' exit financing and the RBL Facility could materially impact the Debtors' DIP Financing and support for the Reorganization Cases................................................................................................... 24

D.      Risk Factors Related to the Debtors' and the Reorganized Debtors' Businesses ............................ 24

1.      Oil and natural gas prices are volatile ...................................................................... 24

2.      Federal legislation and state legislative and regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays ............................................................................................... 24

3.      If the Debtors cannot replace their reserves, their revenues and financial condition will suffer.................................................................................................... 25

4.      The Debtors' business depends on oil and natural gas transportation facilities, some of which are owned by others.............................................................................. 25

5.      Estimates of proved reserves are uncertain, and revenues from production may vary significantly from expectations............................................................................ 26

6.      A worldwide financial downturn or negative credit market conditions may have lasting effects on the Debtors' liquidity, business and financial condition that they cannot control or predict .................................................................................... 26

7.      The Debtors' oil and natural gas exploration and production business involves high risks and they may suffer uninsured losses.......................................................... 27

8.      Drilling wells is speculative and capital intensive ..................................................... 27

9.      The Debtors may incur substantial losses and be subject to substantial liability claims as a result of their oil and natural gas operations................................................ 27

10.     Prospects that the Debtors decide to drill may not yield oil or natural gas in commercially viable quantities ................................................................................... 27

11.     The Debtors may have difficulty competing for oil and gas properties, equipment, supplies, oilfield services, and trained and experienced personnel ............. 28

12.     Governmental laws and regulations relating to environmental protection are costly and stringent ................................................................................................... 28

13.     Enactment of legislative or regulatory proposals under consideration could negatively affect the Debtors' business ...................................................................... 28

14.     Certain federal income tax deductions currently available with respect to natural gas and oil exploration and development may be eliminated, and additional state taxes on natural gas extraction may be imposed, as a result of future legislation........... 29

15.     The recent adoption of derivatives legislation by the U.S. Congress could have an adverse effect on the Debtors' ability to hedge risks associated with their business.................................................................................................................... 29

**TABLE OF CONTENTS**
(continued)

Page

16.  Legal proceedings could result in liability affecting the Debtors' results of operations..................................................................................................... 29

17.  A cyber incident could result in information theft, data corruption, operational disruption, and/or financial loss......................................................................... 30

VII.  REORGANIZED DEBTORS ................................................................................................ 30

A.  Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors ................... 30

B.  Issuance of New Swift Common Stock and Warrants ........................................................... 30

1.  Issuance of Securities .......................................................................................... 30

2.  Exemption from Registration................................................................................ 31

3.  SEC Reporting Requirements and Listing of New Swift Common Stock.................... 31

4.  Warrants............................................................................................................. 31

a.  Issuance ................................................................................................ 31

b.  Anti-Dilution Protection ........................................................................ 31

c.  Form ..................................................................................................... 31

C.  Cancellation of Certain Indebtedness, Agreements, and Existing Securities ............................. 32

D.  Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action ................................................................... 32

1.  Certificates of Incorporation and By-Laws of the Reorganized Debtors..................... 32

2.  Directors and Officers of the Reorganized Debtors ................................................. 32

3.  Employee Arrangements of the Reorganized Debtors ............................................. 33

4.  Corporate Action ................................................................................................ 33

5.  Management Incentive Program ........................................................................... 33

6.  Indemnification of Directors, Officers and Employees ............................................ 34

E.  Effect on Royalty Interests and Oil and Gas Leases ............................................................. 34

1.  Royalty Interests ................................................................................................. 34

2.  Oil and Gas Leases .............................................................................................. 34

F.  Intercompany Stock Interests............................................................................................. 34

G.  Cash for Plan Distributions .............................................................................................. 35

H.  Waiver of Recovery Actions ............................................................................................. 35

I.  Preservation of Rights of Action; Settlement of Claims and Releases.......................................... 35

1.  Preservation of Rights of Action by the Debtors and the Reorganized Debtors ............ 35

2.  Comprehensive Settlement of Claims and Controversies.......................................... 35

3.  Releases ............................................................................................................. 35

a.  Release by the Debtors and Reorganized Debtors ........................................ 35

b.  Release by Holders of Claims or Interests.................................................. 36

c.  Injunction Related to Releases ................................................................. 36

NAI-1500705234v4

**TABLE OF CONTENTS**
(continued)

**Page**

J.     Reinstatement and Continuation of Insurance Policies ................................................. 37

K.     Release of Encumbrances ............................................................................................ 37

L.     Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ........... 37

VIII.   DISTRIBUTIONS UNDER THE PLAN ................................................................... 37

A.     Unclassified Claims .................................................................................................... 37

    1.     Payment of Administrative Claims ................................................................ 37

        a.     Administrative Claims in General ..................................................... 37

        b.     Statutory Fees ...................................................................... 38

        c.     Ordinary Course Liabilities ............................................................ 38

        d.     DIP Facility Claims .............................................................. 38

        e.     Bar Dates for Administrative Claims ................................................ 38

            (i)     General Bar Date Provisions ..................................................... 38

            (ii)     Bar Dates for Certain Administrative Claims ................................. 38

                (a)     Professional Compensation ................................................ 38

                (b)     Ordinary Course Liabilities ................................................ 39

                (c)     DIP Facility Claims .......................................................... 39

    2.     Payment of Priority Tax Claims ................................................................... 39

        a.     Priority Tax Claims in General ......................................................... 39

        b.     Other Provisions Concerning Treatment of Priority Tax Claims ................... 39

B.     Classified Claims ........................................................................................................ 39

    1.     Priority Claims (Classes 1A through 1I) are unimpaired .................................... 39

    2.     RBL Secured Claims (Classes 2A, 2F, 2G and 2H) are unimpaired ....................... 39

    3.     Other Secured Claims (Classes 3A through 3I are unimpaired ............................. 40

    4.     Senior Notes and Rejection Claims (Classes 4A, B, E and F) are impaired .............. 40

    5.     General Unsecured Claims (Classes 5A through 5I) are unimpaired ...................... 40

    6.     Intercompany Claims (Classes 6A through 6I) are unimpaired ............................ 40

    7.     Intercompany Stock Interests (classes 7B through 7I) are unimpaired .................... 40

    8.     Stock Interests of Swift (Class 8A) are Impaired ............................................ 40

C.     Insurance .................................................................................................................... 41

D.     Distributions for Claims Allowed as of the Effective Date ............................................ 41

E.     Method of Distributions to Holders of Claims in General ............................................. 41

F.     Distributions of New Swift Common Stock and Warrants ............................................. 41

G.     Unclaimed Distributions of New Swift Common Stock and Warrants ............................ 41

H.     Fractional New Swift Common Stock and Warrants and De Minimis Distributions ......... 42

I.     Compensation and Reimbursement for Services Related to Distributions ....................... 42

# TABLE OF CONTENTS
(continued)

| | | | | |
|---|---|---|---|---|
| J. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions | | 42 |
| | 1. | Delivery of Distributions | | 42 |
| | 2. | Undeliverable Distributions Held by Disbursing Agents | | 42 |
| | | a. | Holding and Investment of Undeliverable Distributions | 42 |
| | | b. | After Distributions Become Available | 42 |
| | | c. | Failure to Claim Undeliverable Distributions | 42 |
| K. | | Distribution Record Date | | 43 |
| | 1. | No Recognition of Transfers After the Distribution Record Date | | 43 |
| | 2. | Treatment of Certain Transfers | | 43 |
| L. | | Means of Cash Payments | | 43 |
| M. | | Timing and Calculation of Amounts to Be Distributed | | 43 |
| | 1. | Timing of Distributions Under the Plan | | 43 |
| | 2. | Allowed Claims | | 43 |
| | 3. | Compliance with Tax Requirements | | 43 |
| | | a. | Withholding and Reporting | 43 |
| | | b. | Backup Withholding | 44 |
| | | c. | Obligations of Distribution Recipients | 44 |
| | 4. | Compliance with Domestic Relations Orders | | 44 |
| N. | | Time Bar to Cash Payments | | 44 |
| O. | | Setoffs | | 44 |
| P. | | Allocation of Payments | | 45 |
| Q. | | Prosecution of Objections to Claims | | 45 |
| | 1. | Objections to Claims | | 45 |
| | 2. | Authority to Prosecute Objections | | 45 |
| | 3. | Authority to Amend Schedules | | 45 |
| R. | | Treatment of Disputed Claims | | 45 |
| S. | | Distributions on Account of Disputed Claims Once Allowed | | 45 |
| T. | | Discharge of Claims and Interests | | 46 |
| U. | | Injunctions | | 46 |
| | 1. | General Injunctions | | 46 |
| | | a. | No Actions on Account of Discharged Claims | 46 |
| | | b. | No Actions on Account of Released Claims | 46 |
| | | c. | Recipients of Distribution Deemed to Consent | 46 |
| V. | | Term of Injunctions or Stays | | 47 |
| W. | | Subordination Rights | | 47 |

**TABLE OF CONTENTS**
(continued)

IX.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................... 47

   A.   Executory Contracts and Unexpired Leases to Be Assumed ......................................... 47

      1.   Assumption Generally ................................................................... 47

      2.   Assumptions of Executory Contracts and Unexpired Leases ......................................... 47

      3.   Approval of Assumption and Assignment Procedures ........................................ 47

   B.   Payments Related to the Assumption of Executory Contracts and Unexpired Leases ................ 48

   C.   Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures ............... 48

   D.   Obligations to Indemnify Directors, Officers and Employees ....................................... 49

   E.   Contracts and Leases Entered Into After the Petition Date ....................................... 49

X.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN ......................................................................................... 49

   A.   General .......................................................................... 49

   B.   U.S. Federal Income Tax Consequences to the Debtors ........................................... 50

      1.   Cancellation of Debt Income ................................................................ 50

      2.   Limitation on NOL Carryforwards ........................................................ 51

         a.   General ................................................................. 51

         b.   Bankruptcy Exception ............................................................ 51

      3.   Alternative Minimum Tax ................................................................. 52

   C.   U.S. Federal Income Tax Consequences to U.S. Holders of Claims in Classes 4A, 4B, 4E and 4F ..................................................................................... 53

      1.   Definition of Securities .................................................................... 53

      2.   Tax Treatment of Exchange of Securities for Equity ........................................ 53

   D.   Certain Other Tax Considerations for U.S. Holders of Allowed Claims .............................. 54

      1.   Medicare Surtax ......................................................................... 54

      2.   Accrued but Unpaid Interest ............................................................... 54

      3.   Bad Debt and/or Worthless Securities Deduction ............................................ 54

      4.   Market Discount ......................................................................... 54

      5.   Information Reporting and Backup Withholding ............................................ 55

   E.   Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims in Classes 4A, 4B, 4E and 4F ................................................... 55

      1.   Tax Treatment of Exchange of Securities for Equity ........................................ 55

      2.   Accrued but Untaxed Interest .............................................................. 55

      3.   Sale, Redemption or Repurchase of Stock Interests of Reorganized Swift ................... 56

      4.   Distributions Paid to Non-U.S. Holders ................................................... 56

      5.   FATCA ................................................................................. 57

   F.   The Importance of Obtaining Professional Tax Assistance ......................................... 57

**TABLE OF CONTENTS**
(continued)

**Page**

XI.    APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS ................................. 58

    A.    Stock Interests of Reorganized Swift ......................................................................... 58

        1.    Initial Offer and Sale ................................................................... 58

        2.    Subsequent Transfers Under Federal Securities Law ..................................... 59

            a.    Non-Affiliates ................................................................... 59

            b.    Affiliates ................................................................... 59

        3.    Subsequent Transfers Under State Law ......................................... 60

XII.   ADDITIONAL INFORMATION .................................................................................. 60

XIII.  RECOMMENDATION AND CONCLUSION ........................................................... 60

**TABLE OF EXHIBITS**

EXHIBIT I          Joint Plan of Reorganization of Debtors and Debtors in Possession

EXHIBIT II         Voting Procedures

EXHIBIT III        Projections

EXHIBIT IV        Liquidation Analysis

EXHIBIT V         Restructuring Support Agreement

## I.      PRELIMINARY STATEMENT

The Debtors are seeking approval of the Plan, a copy of which is attached hereto as Exhibit I.  The purpose of this Disclosure Statement is to provide to creditors who have a right to vote on the Plan adequate information to make an informed determination as to whether to accept (i.e., vote in favor of) or reject (i.e., vote against) the Plan.

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Reorganization Cases, events that have occurred during the Reorganization Cases and the anticipated organization, operations and capital structure of the Reorganized Debtors on or after the Effective Date.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors, certain alternatives to the Plan and the manner in which distributions will be made under the Plan.  The Confirmation process and the voting procedures that holders of Claims entitled to vote on the Plan must follow are also discussed herein.

The Plan and this Disclosure Statement are the result of extensive and vigorous good faith negotiations among the Debtors and certain holders of Senior Notes Claims (the "Restructuring Support Parties").  As further described below, these arm's-length negotiations culminated in the Restructuring Support Agreement, a copy of which is attached hereto as Exhibit V.  The Restructuring Support Agreement sets forth the agreement of the Debtors and the Restructuring Support Parties to support the terms of the Plan, and also sets out certain mutually agreed milestones in the Debtors' Reorganization Cases.  In particular, Restructuring Support Agreement requires the Debtors to obtain Confirmation of the Plan within ninety days of the Petition Date.

The Debtors' Boards of Directors, with the assistance of their advisors, and the Restructuring Support Parties believe that the Plan is in the best interest of the Debtors' creditors and other stakeholders as a whole.  Five classes are impaired under the plan:  Classes 4A, 4B, 4E and 4F (Senior Notes and Rejection Claims) and Class 8A (Stock Interests of Swift).  All other classes of creditors and interest holders of the Debtors are unimpaired by the Plan because it does not modify the legal, equitable or contractual rights of the holders of the claims or interests in those classes, other than by curing defaults and reinstating maturities.  The specific treatment of other classes of creditors and interest holders of the Debtors are set forth in the Plan and summarized later in this Disclosure Statement.

The only Classes entitled to vote on the Plan are Classes 4A, 4B, 4E and 4F (Senior Notes and Rejection Claims).  All holders of Senior Notes and Rejection Claims are urged to vote in favor of the Plan by no later than [__], prevailing Eastern Time, on [__].  See Section II below for voting instructions.

## II.     OVERVIEW OF THE PLAN

### A.     Introduction

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as Exhibit I, and the exhibits thereto, as amended from time to time.  **In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.**  All exhibits to the Plan not presently attached to the Plan will be Filed by the Debtors, with the consent of the Required Consenting Noteholders, with the Bankruptcy Court and made available for review on the website of Kurtzman Carson Consultants LLC at www.kccllc.net/swiftenergy, no later than 10 days before the deadline to vote on the Plan.  The Debtors also will serve the Exhibits on the parties on the general service list being maintained in the Reorganization Cases no later than 10 days before the deadline to vote on the Plan.

The requirements for Confirmation, including the vote of creditors entitled to vote on the Plan and certain of the statutory findings that must be made by the Bankruptcy Court for a plan to be confirmed, are set forth in Section I.C.  Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions, which are summarized in Section I.D.  There is no assurance that these conditions will be satisfied or waived.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan of reorganization are that the plan:  (i) is accepted by the requisite holders of claims and interests in impaired classes of such debtor; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for such debtor; (iii) is feasible; and (iv) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only holders of Allowed Claims in Classes 4A, 4B, 4E and 4F (Senior Notes and Rejection Claims) are entitled to vote to accept or reject the Plan.  To avoid the costs of soliciting votes to accept or reject the Plan from holders of Claims in Class 8A (Stock Interests of Swift), Class 8A is deemed to reject the Plan.  Because all of the other Classes are unimpaired, they are deemed to vote to accept the Plan.  See Section I.C for a discussion of the Bankruptcy Code requirements for Plan Confirmation.

B.      **Summary of Classes and Treatment of Claims and Interests**

The classification of Claims and Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to holders of Claims or Interests in each Class are summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Section VIII.B.

**SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN**

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Classes 1A through 1I<br><br>Priority Claims | On the later of the Effective Date and the date on which the Claim in Classes 1A through 1I is allowed, unless otherwise agreed by the holder of an Allowed Claim in Classes 1A through 1I and the Debtors or Reorganized Debtors, each holder of an Allowed Claim in Classes 1A through 1I shall receive cash in an amount equal to such Allowed Priority Claim. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | [__] | 100% |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Classes 2A, 2F, 2G and 2H<br><br>RBL Secured Claims | In full satisfaction of an RBL Secured Claim, on the Effective Date, the RBL Agent, on behalf of the holders of Allowed RBL Secured Claims, shall receive, as determined by the applicable Debtor or Reorganized Debtor with the consent of the Required Consenting Noteholders:  (i) cash equal to the amount of such Allowed RBL Secured Claim; (ii) such other recovery necessary to render the RBL Secured Claims unimpaired pursuant to  section 1124 of the Bankruptcy Code; or (iii) satisfaction of such RBL Secured Claim pursuant to such other terms and conditions as may be agreed upon by the Debtors or Reorganized Debtors and the holder of such RBL Secured Claim, with such agreement subject to the consent of the Required Consenting Noteholders, plus, in each case, payment in cash of any unpaid adequate protection payments due to the RBL Agent and/or the RBL Lenders, as applicable, pursuant to the DIP Orders, and the RBL Agent and the RBL Lenders shall retain any payments received by such party pursuant to the DIP Orders. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | [__] | 100% |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Classes 3A through 3I<br><br>Other Secured Claims | In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is allowed, each holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the applicable Debtor or Reorganized Debtor:  (i) Reinstatement of such Allowed Other Secured Claim, (ii) cash equal to the amount of such Allowed Other Secured Claim; (iii) the collateral securing such Allowed Other Secured Claim, (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code; or (v) satisfaction of such Other Secured Claim pursuant to such other terms and conditions as may be agreed upon by the Debtors or Reorganized Debtors and the holder of such Other Secured Claim and with the consent of the Required Consenting Noteholders. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | [__] | 100% |
| Classes 4A, 4B, 4E and 4F<br><br>Senior Notes and Rejection Claims | In full satisfaction of the Allowed Senior Notes Claims and the Allowed Rejection Claims, on or as soon as practicable after the Effective Date, unless otherwise agreed by the holder of an Allowed Senior Note Claim or holder of an Allowed Rejection Claim, as applicable, and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Senior Note Claim or holder of an Allowed Rejection Claim shall receive its Pro Rata share of the Senior Notes and Rejection Distribution. | **Impaired**<br><br>Entitled to Vote | [__] | [__] |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Classes 5A through 5I<br><br>General Unsecured Claims | On the later of the Effective Date and the date on which the General Unsecured Claim is allowed, unless otherwise agreed by the holder of an Allowed Claim in Classes 5A through 5I and the applicable Debtor or Reorganized Debtor, including agreements entered into between the Debtors and the holder in connection with the Lien Order, each holder of an Allowed General Unsecured Claim shall receive the following treatment at the option of the Debtors or Reorganized Debtors (i) Reinstatement of such Allowed General Unsecured Claim in accordance with ordinary course terms, (ii) payment in cash in an amount equal to such Allowed General Unsecured Claim or (iii) such other treatment, as determined by the Debtors, with the consent of the Required Consenting Noteholders, that will render it unimpaired pursuant to section 1124 of the Bankruptcy Code. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | [__] | 100% |
| Classes 6A through 6I<br><br>Intercompany Claims | On the Effective Date, each Intercompany Claim in Classes 6A through 6I shall be Reinstated, subject to the effect of the Restructuring Transactions. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | [__] | 100% |
| Classes 7B through 7I<br><br>Intercompany Interests | On the Effective Date, each Intercompany Stock Interest in Classes 7B through 7I shall be Reinstated, subject to the effect of the Restructuring Transactions. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | [__] | 100% |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Class 8A<br><br>Stock Interests of Swift | On the Effective Date, Stock Interests of Swift shall be cancelled and discharged and shall be of no further force or effect, whether surrendered for cancellation or otherwise.  On or as soon as practicable after the Effective Date, holders of Stock Interests of Swift shall receive, in exchange for the surrender or cancellation of their Interests and for the releases by such holders of the Released Parties, their Pro Rata share of (a) the Shareholder Equity Distribution and (b) the Warrants; provided, however, that any holder of a Stock Interest of Swift that opts not to grant the voluntary releases contained in Section IV.I.3.b of the Plan shall not be entitled to receive its Pro Rata share of the Shareholder Equity Distribution and Warrants and shall not receive any consideration in exchange for the surrender or cancellation of its Interests or any Distribution whatsoever under the Plan; and provided, further, that, notwithstanding Section VI.E. of the Plan, the Debtors may provide any holder of a Stock Interest of Swift that would otherwise be entitled to receive a Distribution of less than one share of the New Swift Common Stock with a Distribution of one share of New Swift Common Stock; provided, however, in no event shall such Distribution alter the respective percentages of the outstanding New Swift Common Stock allocated to any Class or Claim holder. | **Impaired**<br><br>Deemed to Reject the Plan<br><br>Not Entitled to Vote | [__] | [__] |

The Estimated Amounts of Claims shown in the table above are based upon the Debtors' review of their books and records and may be revised following the Debtors' analysis of the Claims Filed and with the consent of the Required Consenting Noteholders.  Further, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim.

**C.**      **Voting on and Confirmation of the Plan**

      **1.**      **Voting Procedures and Requirements**

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of reorganization are entitled to vote to accept or reject a plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturities.  Classes of claims and equity interests that are not impaired

are not entitled to vote on a plan and are conclusively presumed to have accepted that plan. Further, to avoid the cost of soliciting votes on a plan, impaired classes of claims may be deemed to reject the plan. As all classes except Classes 4A, 4B, 4E and 4F (Senior Notes and Rejection Claims) have been either deemed to accept or reject the plan, only holders of Senior Notes and Rejection Claims may vote on the Plan. For a summary of the classifications of Claims and Interests pursuant to the Plan, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired under the terms of the Plan, see Section II.B.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes. By order of the Bankruptcy Court, voting procedures have been established, which include certain vote tabulation rules that temporarily allow or disallow certain Claims for voting purposes only. These voting procedures, including the tabulation rules, are described in the solicitation materials provided with your ballot and on Exhibit II to this Disclosure Statement.

**Voting on the Plan by each holder of an Senior Notes Claim in Classes 4A, 4B, 4E and 4F is important. Please carefully follow all of the instructions contained on the ballot or ballots provided to you. All ballots must be completed and returned in accordance with the instructions provided.**

**To be counted, your ballot or ballots must be received by 5:00 p.m., prevailing Eastern Time, on [__] at the address set forth on the preaddressed envelope provided to you. It is of the utmost importance to the Debtors that you vote promptly to accept the Plan.**

**If you are entitled to vote and you did not receive a ballot, received a damaged ballot or lost your ballot, please call the Debtors' voting agent, Kurtzman Carson Consultants LLC, at [__]. Also, this Disclosure Statement, the Plan and all of the related exhibits and schedules, including ballots, are available, without charge, to any party in interest at www.kccllc.net/swiftenergy.**

**Votes cannot be transmitted orally or by facsimile or electronic mail. Accordingly, you are urged to return your signed and completed ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is <u>received</u> by Kurtzman Carson Consultants LLC before the deadline to vote on the Plan.**

### 2.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for [__] at [__], prevailing Eastern Time before the Honorable [__], United States Bankruptcy Judge for the District of Delaware. Judge [__] will convene the Confirmation Hearing on [__] in the United States District Court for the District of Delaware, J. Caleb Boggs Federal Building, 844 N. King Street, [__] Floor, Wilmington, Delaware 19801 in Courtroom [__]. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court and/or the District Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objections must be Filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

### 3.    Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court and/or the District Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes of creditors and equity interest holders;

- the Plan is feasible and Confirmation will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or the Reorganized Debtors;

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date; and

- the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Reorganized Debtors have been made.

### 4.    Acceptance

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation. In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in an impaired class.

### 5.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires a finding that Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). For purposes of determining whether the Plan meets this requirement, the Debtors have prepared the projections set forth in Exhibit III hereto (the "Projections"). Based upon the Projections, the Debtors believe that their reorganization under the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 6.    Best Interests Test; Liquidation Analysis

#### a.    Generally

Notwithstanding acceptance of a plan by each impaired class, for a plan to be confirmed, the Bankruptcy Court must determine that the plan is in the best interest of each holder of a claim who is in an impaired class and has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim that has a value, as of the date such plan is consummated, at least equal to the value of the distribution that such class member would receive if the debtors proposing the plan were liquidated under chapter 7 of the Bankruptcy Code on such date. The Debtors have considered the effect that the conversion of the Reorganization Cases to cases under chapter 7 of the Bankruptcy Code would have and have concluded that the Plan provides value to holders of Senior Notes and Rejection Claims in Classes 4A, 4B, 4E and

4F and Stock Interests of Swift in Class 8A at least equal to the value such holders would receive under a chapter 7 liquidation.  The Debtors therefore believe that the Plan satisfies the best interests test for each class of impaired Claims.

### b.    Liquidation Analysis

The information contained in Exhibit IV hereto contains a liquidation analysis that assumes a hypothetical chapter 7 liquidation of the Debtors in which a trustee appointed by the Bankruptcy Court would liquidate the respective Debtors' properties and interests in property.  The liquidation analysis reflects the potential range of recoveries in a liquidation net of the costs associated with liquidation.  As the liquidation analysis demonstrates, a chapter 7 liquidation of the Debtors would result in recoveries to holders of Senior Notes and Rejection Claims and Stock Interests in Swift that are no greater than the potential range of recoveries under the Plan.  The Debtors accordingly believe that the Plan satisfies the best interests test.

### 7.    Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated other alternatives to the Plan, including alternative structures and terms of the Plan.  While the Debtors have concluded that the Plan is the best alternative given the current circumstances of their Reorganization Cases and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtors, individually or collectively, or any other party in interest in the Reorganization Cases, could attempt to formulate and propose a different plan or plans of reorganization.

### 8.    Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all provisions of the Bankruptcy Code.

### 9.    Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated alternatives to the Plan, including alternative structures and terms of the Plan.  While the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtors, individually or collectively, or (subject to the Debtors' exclusive periods under the Bankruptcy Code to File and solicit acceptances of a plan or plans) any other party in interest in the Reorganization Cases could attempt to formulate and propose a different plan.  Further, if no plan under chapter 11 of the Bankruptcy Code can be confirmed, the Reorganization Cases may be converted to chapter 7 cases.  In a liquidation case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the remaining assets of each Debtor and distribute proceeds to creditors.  The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code.  For further discussion of the potential impact on the Debtors of the conversion of the Reorganization Cases to chapter 7 liquidations, see Section II.C.6.  The Debtors believe that Confirmation and consummation of the Plan is preferable to the available alternatives.

### D.    Conditions Precedent to Confirmation and Consummation of the Plan

### 1.    Conditions to Confirmation

The following shall be conditions to Confirmation unless such conditions shall have been duly waived pursuant to Section VIII.C. of the Plan :

1.    The Court shall have approved the Disclosure Statement.

2.    The Confirmation Order shall have been entered by the Bankruptcy Court, and shall be acceptable in form and substance to the Debtors, the Required Consenting Noteholders and the Exit Agent.

3.      The Plan Exhibits shall be acceptable in form and substance to the Debtors and the Required Consenting Noteholders.

## 2.      Conditions to the Effective Date

The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section VIII.C. of the Plan:

1.      The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) in form and substance acceptable to the Debtors and the Required Consenting Noteholders approving and authorizing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to effectuate, implement and consummate the Plan, including the execution, delivery and performance of contracts, instruments, releases and other agreements or documents created in connection with the Plan.

2.      Each of the documents and agreements contemplated by the provisions and Exhibits of the Plan to be executed and delivered as of the Effective Date shall have been fully executed and delivered in form and substance acceptable to the Debtors and the Restructuring Support Parties and shall be fully enforceable in accordance with their terms.

3.      [The Exit Loan Documents in form and substance acceptable to the Required Consenting Noteholders shall have been executed and delivered by all Entities that are parties thereto, and all conditions precedent to the consummation of the Exit Credit Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Credit Facility shall have occurred, and the Debtors shall have received the proceeds of the Exit Credit Facility.]

4.      The Confirmation Order shall be a Final Order.

5.      All governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

6.      All conditions precedent to the issuance of the New Swift Common Stock, other than any conditions related to the occurrence of the Effective Date, shall have occurred.

7.      The Restructuring Support Agreement shall not have terminated and shall be in full force and effect, and shall not be (i) identified on Exhibit V.C of the Plan or (ii) the subject of a pending motion to reject Executory Contracts or Unexpired Leases, and the Debtors shall be in compliance therewith.

The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time on the date that the Debtors or Reorganized Debtors file a notice (with the consent of the Required Consenting Noteholders) with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions to the Effective Date has been satisfied or waived in accordance with the Plan.

## 3.      Waiver of Conditions to Confirmation or the Effective Date

The conditions to Confirmation set forth in Section VIII.A. of the Plan and the conditions to the Effective Date set forth in Section VIII.B. of the Plan may be waived in whole or part in writing by the Debtors, subject to the consent of Restructuring Support Parties.  Confirmation and the Effective Date will occur irrespective of whether any claims allowance process or related litigation has been completed.

4.        **Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C. of the Plan, then upon the joint motion by the Debtors and the Required Consenting Noteholders made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Section VIII.D. of the Plan, (1) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (2) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights, including any claims or defenses, of the Parties or any other party in interest.

## III.    HISTORY OF THE DEBTORS

### A.    Historical Overview

In 1979, Aubrey Earl Swift founded Swift Energy Company ("Swift" and together with the Debtors and their non-debtor affiliates, the "Company") in Houston, Texas.  That year, Swift commenced an initial ten-well drilling program in West Virginia.  This initial drilling program marked Swift's first experience with hydraulic fracturing, which remains a core method of production.  All ten wells were eventually completed as successful gas producers.  Two years later, in 1981, Swift concluded its initial public offering and became a public company.  That year, Swift also closed its first producing property acquisition and has since continued a strategy of growing reserves through a mix of drilling and acquisition activities that varies based on industry conditions.

Throughout the 1980s and 1990s, the Company expanded through the acquisition of successful producing properties, including property outside of the United States.  In 1994, the Company made a strategic shift toward increased exploration and development drilling, and for the first time in many years, additions to the Company's proved reserves through exploration and development activities exceeded additions through the acquisition of producing properties.  Through that time, the Company weathered fluctuations in the prices of both oil and natural gas and continued to perform well.  Indeed, in 2000, the Company had both record revenues and record earnings.

In the 2000s, the Company's growth continued despite significant commodity price declines in 2001 and 2009.  Early in the decade, the Company acquired numerous interests in Louisiana and Texas.  In 2008, the Company sold substantially all its assets in New Zealand.

In 2010, the oil and gas industry transitioned to a focus on previously unproductive shale resources made profitable, in part, by technological innovations in hydraulic fracturing and horizontal drilling.  Because the Company had employed hydraulic fracturing techniques since its founding in 1979, drilled horizontal wells since 1992 and drilled its first hydraulically fractured horizontal well in 2008, it was well positioned to take advantage of this industry-wide shift to development and production from shale formations.

Indeed, in 2010 and 2011, production and proved reserves increased dramatically.  Revenues also significantly increased in those years.  In 2012 and 2013, the Company set all-time record highs for volume of year-end reserves.

However, despite these achievements in the early part of this decade, declines in the prices of oil and natural gas have hurt performance in recent years.  In 2012, a nationwide decline in natural gas prices and relatively flat oil prices resulted in decreased revenues.  Additionally, increased costs and expenses driven primarily by increasing production in the highly competitive south Texas area and greater workover costs in southeast Louisiana contributed to decreased cash flows and net income.  Similarly, in 2013, a substantial drop in the prices of natural gas liquids ("NGLs") contributed to a non-cash write down in the value of the Company's oil and gas properties and, in 2014, a further write-down was required due to the beginning stages of the current collapse in crude oil prices.  Though the impact of the decline in crude oil prices was significant in 2014, the impact would have been even more

significant had the decline in prices impacted the entire year.  As explained below, the continuing decline has had a severe effect in 2015.

Throughout their history, the Debtors have implemented various strategies to respond to fluctuations in commodity prices.  Among other things, the Debtors have (a) continued to seek out ways to increase efficiency, including through employing advanced technologies and reducing operational costs, (b) focused on their core areas and (c) sought to maintain balance and diversification in their product mix (oil, natural gas and natural gas liquids), method of growth (acquisition v. drilling) and type of oil and gas properties (e.g. short lived versus long-lived reserves, developed versus undeveloped reserves, coastal versus inland properties, low risk versus high-risk prospects).  While this responsiveness and flexibility has allowed the Debtors to weather many industry cycles from the early 1980s through this year, as explained below, the continuing steep decline in crude oil and natural gas prices that began in 2014 has adversely affected the Debtors' liquidity and balance sheet to the point that a restructuring has become necessary.

### B.    Corporate Structure

Swift is the ultimate parent of the Company and is a holding company with no operations.  Swift owns 100% of the equity of Debtors Swift Energy International, Inc. ("Swift International"), Swift Energy Group, Inc. ("Swift Group") and Swift Energy USA, Inc. ("Swift USA").   Swift International and Swift USA are also holding companies that respectively hold the non-debtor foreign subsidiaries and the domestic subsidiaries.   In particular, Swift USA holds 100% of the equity in Debtors Swift Energy Operating, LLC ("Swift Operating") and Swift Energy Alaska, Inc.   Debtor Swift Operating is the primary operating entity of the Company and is a co borrower under the RBL Credit Agreement and guarantor of the Senior Notes (as defined below).  Swift Operating also owns 100% of the equity interests in Debtors GASRS, LLC and SWENCO-Western, LLC, which hold certain royalty assets in Louisiana and are guarantors under the RBL Credit Agreement.

As of December 24, 2015, approximately 44,752,355 shares of Swift common stock were issued and outstanding.  Until recently, the shares traded on the New York Stock Exchange (the "NYSE").  On December 18, 2015, the NYSE notified Swift that due to "abnormally low" trading price levels, it had immediately suspended trading intraday and would commence proceedings to delist Swift's common stock.  Though Swift had the right to appeal this determination, it determined not to do so.  Effective December 21, 2015, the common stock of Swift commenced trading on the OTC Pink marketplace under the symbol "SFYW."

### C.    Operations

The Debtors' core areas of production and exploration are in the Eagle Ford play in south Texas, where they have owned producing properties since 1989 and, to a lesser extent, the onshore and inland waters of Louisiana.  The cornerstone of the Debtors' operations is in south Texas, where their operating, technical and regional expertise has made them one of the region's premier operators.  In that regard, the Debtors are generally the operator of wells in which they have a significant economic interest.  In that role, the Debtors design and manage the development of the well and supervise operation and maintenance activities on a day-to-day basis.  The Debtors do not own drilling rigs or other oil field services equipment used for drilling or maintaining wells on properties they operate.  Instead, the Debtors typically engage independent contractors who provide equipment, services, supplies and certain personnel.  The Debtors currently have approximately 228 employees, including individuals employed at the Debtors' Houston, Texas headquarters.

For the nine month period ended September 30, 2015, the Debtors generated revenue of approximately $195.7 million from net oil and gas production of 8.8 million barrels of oil equivalents (MMBoe).  Crude oil represented 22% of production volume and 47% of revenues, and natural gas represented 66% of production volume and 44% of revenues for the nine months ended September 30, 2015.  NGLs accounted for the remaining production and revenues.

As explained below, while the Debtors' operations remain profitable at the field level, the extreme decline in crude oil and natural gas prices in 2015 has severely constrained the Debtors' liquidity and adversely impacted their ability to service their debt obligations.

D.     **Saka Energi Joint Venture**

In 2014, Swift closed a transaction with PT Saka Energi Indonesia ("Saka Energi") to fully develop 8,300 acres of natural gas properties in the Fasken area of South Texas. Saka Energi purchased a 36% full participating interest in the properties for $175 million in total cash consideration, with $125 million paid at closing and $50 million to be paid over time. As of the Petition Date, approximately $5.4 million remains of Saka Energi's $50 million obligation. This amount is expected to be paid in full by the end of 2016 but is partially dependent on the pace of drilling in the Fasken area.

E.     **Prepetition Indebtedness**[3]

RBL Credit Agreement. On September 21, 2010, Swift and Swift Operating, as borrowers, and certain of their affiliates as guarantors, entered into the Second Amended and Restated Credit Agreement (the "RBL Credit Agreement") with certain lender parties thereto (the "RBL Lenders") and JPMorgan Chase Bank, N.A., as administrative agent (the "RBL Agent"), which provided for a $500 million revolving credit facility (the "RBL Facility") subject to a borrowing base. The borrowing base is subject to redetermination on a semi-annual basis, at the sole discretion of the RBL Lenders and the RBL Agent, based on the value of the Debtors' oil and gas reserves.

The RBL Credit Agreement has been amended six times, most recently on November 2, 2015. Certain of these amendments either increased or reduced the borrowing base and commitment amount under the RBL Credit Agreement. The most recent amendment, among other things, reduced the borrowing base and commitment amount of the RBL Credit Agreement from $375 million to $330 million, changed certain financial covenant ratios and provided for a borrowing base redetermination on or about February 1, 2016 if certain conditions, including a reduction in unsecured or subordinated debt by at least 50%, are not met by that date. In addition, while the November 1, 2017 maturity date remains unchanged, that date is subject to being accelerated to March 2, 2017 if by that date the maturity dates of the existing Senior Notes (as defined below) are not extended to May 1, 2018 or later, or if the Senior Notes are not repurchased, redeemed or refinanced.

The RBL Credit Agreement is secured by substantially all the Debtors' assets, including real property mortgages on at least 96% of the Debtors' proved oil and gas properties. As of the Petition Date, there was approximately $330 million utilized under the RBL Credit Agreement, comprised of approximately $325 million in outstanding borrowings and $5 million of issued letters of credit.

Senior Notes. As described below, the Debtors have three series of senior, unsecured notes (the "Senior Notes") issued under two base indentures and three supplemental indentures. The Senior Notes have different interest rates and maturities, but rank equally in terms of their priority. The Senior Notes were issued by Swift and guaranteed by Swift Operating. Wells Fargo Bank, National Association served as indenture trustee of each series of the Senior Notes until December 31, 2015 when it was replaced by Wilmington Trust, National Association. Interest on the Senior Notes is payable semi-annually, as described below, in each case subject to a 30-day grace period. As of the Petition Date, there was approximately $905.1 million aggregate principal and interest outstanding under the Senior Notes.

*2017 Notes.* On June 1, 2007, Swift issued $250 million aggregate principal amount of 7.125% senior notes due June 1, 2017 (the "2017 Notes"). Interest on the 2017 Notes is due semi-annually on June 1 and December 1. The Debtors did not make the scheduled interest payment approximating $8.9 million on December 1, 2015, which triggered a 30-day grace period under the 2017 Notes. As of the Petition Date, there was approximately $260.4 million in aggregate principal and interest outstanding under the 2017 Notes.

*2020 Notes.* On November 25, 2009, Swift issued $225 million of 8.875% senior notes due January 15, 2020 (the "2020 Notes"). The 2020 Notes were issued at 98.389% of par (or an original issue discount of $3.6 million), resulting in an effective yield to maturity of 9.125%. Interest on the 2020 Notes is payable semi-annually on January 15 and July 15. Interest expense on the 2020 Notes, including amortization of debt issuance costs and

---

[3]     This summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

debt discount, totaled $15.6 million for the nine months ended September 30, 2015.  As of the Petition Date, there was approximately $234.2 million aggregate principal and interest outstanding under the 2020 Notes.

*2022 Notes.*  On November 30, 2011, Swift issued $250 million of 7.875% senior notes due March 1, 2022 (the "2022 Notes") at 99.156% of par (or an original issue discount of $2.1 million), resulting in an effective yield to maturity of 8%.  On October 3, 2012, Swift issued an additional $150 million in 2022 Notes at 105% of par (or a premium of $7.5 million), resulting in an effective yield to worst (i.e., minimum yield) of 6.993%.  Interest on the 2022 Notes is payable semi-annually on March 1 and September 1.  Interest expense on the 2022 Notes, including amortization of debt issuance costs and debt premium, totaled $23.7 million for the nine months ended September 30, 2015.  As of the Petition Date, there was approximately $410.5 million aggregate principal and interest outstanding under the 2022 Notes.

Trade Debt.  In the ordinary course of producing oil and gas from their properties, the Debtors have historically obtained goods and services from numerous vendors.  As of the Petition Date, the Debtors estimated that they owe approximately $50 million to such vendors comprised of accounts payable and accrued expenses for prepetition services.

## IV.    RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE COMMENCEMENT OF THE REORGANIZATION CASES

### A.    Industry Overview and the Company's Recent Performance

The recent collapse in oil prices is among the most severe on record.  West Texas Intermediate ("WTI") crude oil spot prices have fallen from a monthly high of approximately $105 per barrel in June of 2014 to a recent daily closing low of approximately $34.73 per barrel on December 18, 2015.  Prices this low have not been seen in many years.  Natural gas prices have also fallen significantly.  The average natural gas price paid to the Debtors dropped from $3.58 per Mcf during the fourth quarter of 2014 to $2.51 per Mcf during the third quarter of 2015 — a nearly 30% decline.  In recent weeks, natural gas prices have hovered around, and even fallen below, $2 per Mcf.

Low commodity prices have caused broad-ranging distress in the oil and gas industry.  Independent exploration and production companies like Swift have been particularly hard hit because they rely primarily on sales of oil and gas to generate revenues.

Like the industry as a whole, the Debtors' recent performance has been significantly impacted by the extreme and continuing decline in oil and natural gas prices.  Third quarter oil and gas revenues decreased 55%, or $73.9 million, compared to the same period in 2014, primarily due to lower commodity pricing and lower oil and NGL production.  Swift reported net cash provided by operating activities of $28.4 million in the first nine months of 2015, as compared to $252.2 million generated during the same period in 2014.  Finally, largely as a result of a non-cash write down of oil and gas properties, Swift reported a net loss of $354.6 million for the third quarter of 2015.

### B.    The Company's Cost-Reduction Initiatives

The Debtors took a number of significant actions to reduce costs in 2015.  First, the Debtors have meaningfully reduced capital spending, with capital expenditures of approximately $126.8 million for the first nine months in 2015 as compared to $317 million for the first nine months in 2014.  In addition, the Debtors have significantly reduced operating costs, including through negotiations with their primary suppliers and service companies.  Lease operating expenses, excluding workover costs, decreased from $66.3 million in the first nine months of 2014 to $52.7 million spent during the same period in 2015.  The Debtors have also implemented various efforts to reduce administrative costs, which included a significant headcount reduction (approximately 20% in the first quarter of 2015 involving approximately 55 employees) and a down-sizing of office space at their corporate headquarters.  These cost savings efforts resulted in a reduction in net general administrative costs from $33.6 million during the first nine months of 2014 to $31.5 million during the same period in 2015.[4]

---

[4]    The 2015 costs include approximately $2.8 million in non-recurring costs related to the initial implementation of these cost-savings efforts.

### C.    The Debtors' Refinancing, Drill-Co and Sale Efforts

Throughout 2015, the Debtors attempted to execute a series of strategic transactions to improve their capital structure and liquidity position.  Because of the substantial and continuing decline in oil and natural gas prices throughout 2015, however, traditional credit transactions, as well as non-traditional mezzanine and finance transactions, and divestiture transactions, were either unavailable or available on highly unfavorable terms.

Among other things, in the spring of 2015, the Debtors initiated an effort to obtain first lien financing to refinance the RBL Credit Agreement and provide incremental liquidity.  That effort ultimately failed due to an inability to secure acceptable terms and pricing.

The Debtors also attempted to generate additional liquidity through pursuit of a number of "Drill-Co" transactions with private equity firms.  In these transactions, the investor typically provides cash to the oil and gas company to drill specific oil and gas fields and, in return, receives a reversionary working interest in those oil and gas fields and an agreed upon rate of return.  Once that agreed rate of return is reached, the working interest usually reverts back to the oil and gas company.  Although the Debtors received some expressions of interest with respect to possible Drill-Co transactions, no agreement on acceptable terms could be reached.

Finally, the Debtors solicited interest from dozens of potential buyers regarding the Debtors' non-core Louisiana properties.  Although the Debtors reached an agreement to sell a significant portion of their Louisiana assets at a favorable price (as further described below),  that transaction does not address the Debtors' capital structure imbalance or provide the level of additional liquidity the Debtors need to succeed in the current commodity price environment.

### D.    The Company's Negotiations with Certain Noteholders

Notwithstanding the Debtors' cost-reduction initiatives and other efforts to improve their liquidity profile, the decline in oil and natural gas prices continued to adversely affect the Debtors' liquidity.  By late summer 2015, it became apparent that a balance sheet restructuring that significantly deleveraged the Debtors would be necessary to, among other things, substantially reduce or eliminate altogether the debt service obligations on the Senior Notes, which aggregated approximately $70 million per year, and provide additional liquidity.  Beginning in August and continuing into the Fall of 2015, the Debtors, with the assistance of Lazard Freres & Co. LLC ("Lazard") and Jones Day, and later A&M, began analyzing various restructuring alternatives, which included potential out-of-court and in-court solutions.

In September 2015, the Debtors, with the assistance of their advisors, commenced extensive, good-faith discussions with an ad hoc committee (the "Noteholder Committee") of holders representing more than 50% of the Senior Notes (the "Noteholders") regarding a potential restructuring of the Debtors' obligations with respect to the Senior Notes.  The Noteholder Committee retained Houlihan Lokey ("Houlihan") and Kirkland & Ellis LLP ("K&E") to advise it in connection with these discussions.  After a period of due diligence by Houlihan and K&E, the Debtors and the Noteholder Committee commenced good-faith, arm's length negotiations regarding a potential restructuring of the Senior Notes that would materially delever the Debtors' balance sheet and provide the Debtors with incremental liquidity.  In the course of these negotiations, the Noteholder Committee and the Debtors exchanged and considered, with the assistance of their respective advisors, numerous restructuring proposals, which contemplated both in-court and out-of-court transactions.

As discussions with the Noteholder Committee and its advisors developed, an interest payment in the amount of $8.9 million came due on the 2017 Notes.  In view of their tight liquidity and unresolved negotiations, the Debtors determined not to make the December 1 interest payment.  The 30-day grace period under the 2017 Notes then went into effect and that period expired on the Petition Date.

E.        **The Restructuring Support Agreement**[5]

After extensive good-faith negotiations with the Noteholder Committee, on December 31, 2015, the Noteholder Committee and the Debtors finalized an agreement on the terms of a restructuring as set forth in the restructuring support agreement (the "RSA"). In accordance with the RSA, the Debtors and the Noteholder Committee have agreed on the Plan that, among other things, exchanges the approximately $905.1 million outstanding on account of Senior Notes obligations for 96% of the common equity in the Reorganized Debtors (as defined in the Plan), cancels existing equity and gives current shareholders 4% of the common equity in the Reorganized Debtors and certain warrants, and pays in full, reinstates, or provides for other treatment (subject to pending negotiations) for all other secured or unsecured debt of the Debtors. Under the RSA, the Debtors and the Noteholders party thereto agreed, among other things, to support the Plan, vote their claims on account of the Senior Notes in support of the Plan, and abide by certain milestones regarding the Plan and administration of these chapter 11 cases. The milestones in the RSA are as follows:

- the Debtors must commence these chapter 11 cases on or before the Petition Date;

- the Debtors must appoint a chief restructuring officer on or before the Petition Date;

- the Debtors must file the Plan, DIP Motion, and Disclosure Statement on the Petition Date;

- the Bankruptcy Court must enter (i) the Interim DIP Order within 3 business days of the Petition Date and (ii) the Final DIP Order within 30 days of the Petition Date;

- the Consenting Noteholders and the Debtors must reach an agreement with respect to an amendment and restatement, refinancing, or other treatment of the Prepetition RBL Facility within 45 days of the Petition Date (which agreement shall be subject in all respects to the consent of the Consenting Noteholders);

- the Consenting Noteholders and the Debtors must reach an agreement on the treatment of the DIP Facility within 45 days of the Petition Date (which agreement shall be subject in all respects to the consent of the Consenting Noteholders);

- the Bankruptcy Court must enter an order approving the Disclosure Statement within 45 days of the Petition Date;

- the Bankruptcy Court must enter the Confirmation Order approving the Plan within 90 days of the Petition Date; and

- the Plan Effective Date must occur within 110 days of the Petition Date.

The Debtors have commenced good-faith negotiations with the Noteholder Committee, as well as the RBL Agent and the RBL Lenders to reach the required agreements with respect to the treatment of the RBL Facility and the treatment of the DIP Facility (as defined below).

The Debtors and the Noteholder Committee have also negotiated and reached agreement on a management incentive plan, which will become effective upon emergence, the process for selecting members of the Board of Directors of the Reorganized Debtors (as defined in the Plan), and certain other governance terms for the Reorganized Debtors.

---

[5]    This summary is qualified in its entirety by reference to the Restructuring Support Agreement, which is attached hereto as Exhibit V.

F.      **Debtor in Possession Financing**[6]

In concert with the pre-petition negotiations on the Restructuring Support Agreement, certain Senior Noteholders (the "DIP Lenders") also agreed to provide a debtor-in-possession credit facility in an aggregate principal amount of $75 million (the "DIP Facility"), to be available in  amounts up to:

- $15 million from the date of entry of an interim order approving the DIP Facility;

- $15 million from the date of entry of a final order approving the DIP Facility; and

- $45 million upon the occurrence of certain conditions, including, without limitation, agreements between the Debtors and the Ad Hoc Group of Senior Noteholders with respect to the treatment of the DIP Facility and the RBL Facility under the Plan, subject to the consent of the Ad Hoc Group of Senior Noteholders in all respects.

The Debtors agreed to provide security for the DIP Facility in the form of (i) a second-priority perfected lien, granted by the Debtors and to be approved by the Bankruptcy Court pursuant to section 364(c)(3) of the Bankruptcy Code, in any and all "Collateral" as defined in the loan documentation relating to the Secured Credit Facility, subject to certain customary exceptions to be mutually agreed; and (ii) a first-priority perfected lien, granted by the Debtors and to be approved by the Bankruptcy Court pursuant to section 364(c)(2) of the Bankruptcy Code, in any and all presently owned and hereafter acquired personal property, real property and all other assets of the Debtors and their estates.

In close consultation with their respective advisors, the Debtors and the DIP Lenders are engaged in ongoing arm's-length discussions with respect to an alternative treatment and resolution of DIP Facility Claims under the Plan, including, among other options, a potential reinstatement of such claims as a second lien exit facility of the Reorganized Debtors or a full or partial conversion of the DIP Facility Claims into equity of the Reorganized Debtors.  These negotiations are being held in tandem with extensive good-faith discussions between the Ad Hoc Group of Senior Noteholders, the Debtors, the RBL Agent, and RBL Lenders with respect to the treatment of the RBL Facility and the Debtors' exit financing.  Such discussions are critical elements of the Reorganization Cases, and the Debtors and the Ad Hoc Group of Senior Noteholders hope to reach acceptable resolutions of these issues in due course.

V.      **EVENTS DURING THE REORGANIZATION CASES**

A.      **Commencement of the Reorganization Cases**

On December 31, 2015, the Debtors each commenced a reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Reorganization Cases are being jointly administered as Swift Energy Corporation, Case No. [__].  The Reorganization Cases of the Debtors were assigned to U.S. Bankruptcy Judge [__] of the United States Bankruptcy Court for the District of Delaware.

B.      **First Day Relief**

On the Petition Date, the Debtors filed a number of motions seeking typical "first-day" relief in chapter 11 cases (collectively, the "First Day Motions") as well as a declaration in support thereof.  The purpose of these motions was to stabilize the Debtors' business in the initial days of these Reorganization Cases, and to ease the strain on the Debtors' relationships with employees, vendors and customers following the commencement of the Reorganization Cases.

In particular, the First Day Motions sought authority to:  (1) administer the Reorganization Cases jointly for procedural purposes; (2) appoint a claims noticing agent; (3) file a consolidated list of creditors and implement certain notice procedures; (4) pay certain pre-petition employee wages, benefits and related items; (5) pay certain

---

[6]      This summary is qualified in its entirety by reference to the operative documents, agreements, and exhibits.

pre-petitions taxes; (6) pay certain prepetition amounts due with respect to certain oil and gas interests; (7) pay certain amounts due to potential lien claimants, potential claimants with setoff rights and under certain marketing obligations; (8) continue the Debtors' insurance programs and pay related obligations; (9) establish adequate assurance procedures with respect to the Debtors' utility providers; (10) establish notice and sell-down procedures for trading in claims against the Debtors' estates; and (11) continue use of the Debtors' cash management system. [The Bankruptcy Court for the most part granted the relief sought in the First Day Motions.]

C.      DIP Financing

On the Petition Date, the Debtors filed a motion to approve the DIP Facility (the "DIP Financing Motion"). On [__], the Bankruptcy Court entered an interim order authorizing certain relief requested in the DIP Financing Motion. On [__], the Bankruptcy Court entered a final order (i) authorizing the Debtors to (a) obtain financing on a super-priority, secured basis and (b) utilize cash collateral; (ii) granting (a) liens and super-priority claims and (b) adequate protection to certain prepetition lenders, (iii) modifying the automatic stay and (iv) granting related relief (the "Final DIP Order"). The Final DIP Order, among other things, approved a DIP Facility in the principal amount of $75 million, which may be accessed and drawn upon the Debtors in accordance with the terms and conditions set forth in the Final DIP Order and accompanying credit agreement.

Further, the majority of the financing available under the DIP Facility is fully contingent upon meeting the conditions described in the related DIP credit agreement and DIP orders, including, among other things, that the Restructuring Support Agreement remains in full force and effect and that the Debtors and Ad Hoc Group of Senior Noteholders have reached agreements (subject to the consent of the Required Consenting Noteholders in all respects) regarding the treatment of the DIP Facility and the RBL Facility under the Plan.

D.      Sale to Texegy LLC

On [___], 2016, the Debtors filed a motion seeking approval of a sale of certain oil and gas properties located in Louisiana (the "Louisiana Assets") between Swift, GASRS LLC and SWENCO-Western, LLC, as sellers, and Texegy LLC, as buyer, for $[65] million. On [__], the Bankruptcy Court entered an order approving the sale of the Louisiana Assets, and the sale closed on [__].

E.      Expected Timeline of the Reorganization Cases

Pursuant to the Restructuring Support Agreement, the Debtors are required to proceed quickly in their Reorganization Cases. Under the terms of the Restructuring Support Agreement, the Debtors are required to seek confirmation of the Plan within 90 days of the Petition Date, and the Effective Date of the Plan must be within 110 days of the Petition Date. No assurances can be made, however, that the Bankruptcy Court will enter orders on the timetable anticipated by the Debtors.

In addition, pursuant to the Restructuring Support Agreement, the Debtors are required to reach agreements with the Ad Hoc Group of Senior Noteholders on (1) the treatment of the DIP Facility; and (2) the amendment and restatement, refinancing, or other treatment of the RBL Facility within the 30 days of the Petition Date. Although the Debtors cannot guarantee that they will resolve these issues on that timetable, the Debtors and the Ad Hoc Group of Senior Noteholders, as well as their respective advisors, are actively engaged in arms-length discussions and expect that they will timely reach the required agreements.

VI.     RISK FACTORS

Prior to voting on the Plan, holders of Senior Notes and Rejection Claims in Classes 4A, 4B, 4E and 4F, as well as entities in non-voting Classes, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. However, these risk factors are not exhaustive, and they should not be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Section X for a discussion of certain tax law considerations and Section XI for a discussion of certain federal and state securities law considerations.

### A.    Bankruptcy Specific Considerations

#### 1.    The Plan is Based Upon Assumptions That May Prove Incorrect.

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of its business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances.  Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to the Debtors' (i) ability to obtain adequate liquidity and financing sources; (ii) ability to maintain customers' confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iii) ability to retain key employees, as well as the overall strength and stability of general economic conditions of the oil and gas industry.  The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon Projections, including with respect to revenues, EBITDA, debt service, and cash flow.  Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate.  Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their businesses or operations.  The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

#### 2.    Plan Confirmation may not occur.

There is no guarantee that that the Plan will be confirmed.  If the Plan, or a substantially similar plan, is not confirmed, the Debtors will remain in chapter 11 and the terms and timing of any plan of reorganization ultimately confirmed in the Reorganization Cases and the treatment of Claims and Interest will be unknown.

#### 3.    Parties in interest may object to the Debtors' classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a debtor may place a claim or an equity interest in a particular class under a plan of reorganization only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests in the Plan complies with the Bankruptcy Code requirements.  Nevertheless, there can be no assurance that the Court will reach the same conclusion.

#### 4.    Allowance of Claims may differ from the Debtors' current estimates.

This Disclosure Statement has been prepared based on preliminary information concerning filed Claims and the Debtors' books and records.  The actual amount of Allowed Claims may differ from the Debtors' current estimates.

#### 5.    The Effective Date may not occur.

The Plan provides that there are several conditions precedent to the occurrence of the Effective Date. There is no guarantee as to the timing of the Effective Date.  Additionally, if the conditions precedent to the Effective Date are not satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order.  In that event, the Plan would be deemed null and void and the Debtors or any other party may propose or solicit votes on an alternative plan of reorganization that may not be as favorable to parties in interest as the Plan.

6.      **If the Effective Date is delayed or projected proceeds are not timely received, the Debtors may need to seek additional postpetition financing.**

The Debtors may not have sufficient cash available in order to operate their business if the Effective Date is delayed or projected proceeds are not timely received by the Debtors.  In that case, the Debtors may need additional postpetition financing, which may substantially increase the costs of consummating the Plan. There is no assurance of the terms on which such financing may be available or if such financing will be available.  Any increased costs as a result of the incurrence of additional indebtedness may reduce amounts available to distribute to Holders of Allowed Claims.

7.      **The Restructuring Support Agreement could be terminated.**

The Restructuring Support Agreement contains certain provisions that give both the Debtors and the Restructuring Support Parties the ability to terminate the Restructuring Support Agreement if various conditions are not satisfied.  Termination of the Restructuring Support Agreement could result in protracted Reorganization Cases, which could significantly and detrimentally impact relationships with creditors, vendors, suppliers, employees, and major customers.  Further, in the event that the Restructuring Support Agreement is terminated pursuant to its terms, the Debtors will be unable to access the final $45 million in financing potentially available under the DIP Facility. This lack of incremental liquidity could have significant and material adverse effects on the administration of these Reorganization Cases as well as recoveries to creditors and Interest holders.

8.      **The Reorganization Cases may impact the Debtors' relationships with counterparties.**

Despite the fact that holders of General Unsecured Claims are unimpaired by the proposed Plan, the Reorganization Cases may affect the Debtors' relationships with, and its ability to negotiate favorable terms with, creditors, customers, suppliers, vendors, employees, and other personnel and counterparties.  While the Debtors expect to continue normal operations, public perception of its continued viability may affect, among other things, the desire of new and existing customers to enter into, or continue, agreements or arrangements with the Debtors.  The failure to maintain any of these important relationships could adversely affect the Debtors' business, financial condition, and results of operations.  Because of the public disclosure of the Reorganization Cases and concerns vendors may have about liquidity, the Debtors' ability to maintain normal credit terms with vendors may be impaired.  Also, the Debtors' transactions that are outside of the ordinary course of business are generally subject to the approval of the Court, which may limit the Debtors' ability to respond on a timely basis to certain events or take advantage of certain opportunities.  As a  result, the effect that the Reorganization Cases will have on the Debtors' business, financial conditions, and results of operations cannot be accurately predicted or quantified at this time.

9.      **The Restructuring of the Debtors may adversely affect the Debtors' tax attributes.**

Under federal income tax law, a corporation is generally permitted to deduct from taxable income net operating losses ("NOLs") carried forward from prior years.  The Debtors have NOL carryforwards of approximately $718 million as of the Petition Date.  The Debtors' ability to utilize their NOL carryforwards and other tax attributes to offset future taxable income and to reduce federal income tax liability is subject to certain requirements and restrictions.  If the Debtors experience an "ownership change," as defined in section 382 of the Internal Revenue Code, then their ability to use the NOL carryforwards may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations.  Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period.  Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur.  Under section 382 of the Internal Revenue Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future taxable income generally is subject to an annual limitation.  Even if the NOL carryforwards are subject to limitation under section 382, such NOLs can be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Internal Revenue Code or to offset any taxable gains recognized by the Debtors attributable to the restructuring transactions.  The Debtors currently expect that their net operating loss carryforwards and other tax attributes may be significantly reduced in connection with the restructuring transactions.

10.     **The Debtors may not be successful in discharging or satisfying prepetition claims.**

The Debtors may be subject to Claims in various legal proceedings and may become subject to other legal proceedings in the future. Although any such Claims will be generally stayed while the Reorganization Cases are pending, the Debtors may not be successful in ultimately discharging or satisfying such Claims. The ultimate outcome of each of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated presently for every case. The liability the Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may be in excess of amounts currently accrued with respect to such matters and, as a result, these matters may potentially be material to the Debtors' business, financial condition, or operations.

11.     **Historical financial information of the Debtors may not be comparable to the financial information of the Reorganized Debtors.**

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

12.     **The Projections set forth in this Disclosure Statement may not be achieved.**

The Projections cover the operations of the Reorganized Debtors through [__]. The Projections are based on numerous assumptions that are an integral part thereof, including, but not limited to:

- Confirmation and consummation of the Plan in accordance with its term;

- the anticipated future performance of the Reorganized Debtors;

- industry performance;

- general business and economic conditions;

- competition;

- adequate financing;

- absence of material claims;

- the ability to make necessary capital expenditures;

- the ability to establish strength in new markets and to maintain, improve, and strengthen existing markets;

- customer purchasing trends and preferences;

- the ability to increase gross margins and control future operating expenses; and

- other matters, many of which are beyond the control of the Reorganized Debtors, including those described below under "Risk Factors Related to the Debtors' and the Reorganized Debtors' Businesses."

In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the operations of the Reorganized Debtors. These variations may be material and adverse. Because the actual results achieved throughout the periods covered by the Projections will

vary from the projected results, and such variances may be material.  The Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

**B.      Risk Factors Related to Stock Interests in Swift and Reorganized Swift**

**1.      Swift's common stock has been delisted from trading on the NYSE.**

In August 2015, Swift received a notice from NYSE informing Swift that it was not in compliance with the listing standards set forth in Sections 802.01B and 802.01C of the NYSE's Listed Company Manual.  On December 18, 2015, Swift was notified by the NYSE that due to "abnormally low" trading price levels, pursuant to Section 802.01D of the NYSE's Listed Company Manual, the NYSE determined to commence proceedings to delist Swift's common stock.  Trading in Swift's common stock was suspended immediately intra-day on December 18, 2015.  Effective December 21, 2015, the common stock of Swift commenced trading on the OTC Pink marketplace under the symbol "SFYW."  Swift's stock was delisted on [__].

The delisting could adversely impact Swift by, among other things:

- reducing the liquidity and market price of its common stock;

- reducing the number of investors willing to hold or acquire Swift's common stock;

- limiting Swift's ability to issue additional securities in the future; and

- limiting Swift's ability to fund its operations.

**2.      Holders of Stock Interests of Swift may not receive any distribution if the Plan is not confirmed.**

Based on the Projections, there is no value in the Debtors for holders of Stock Interests of Swift.  Accordingly, they are not entitled to a distribution on account of their Stock Interests.  Notwithstanding the foregoing, the Plan provides that holders of Stock Interests of Swift shall receive, in exchange for the surrender or cancellation of their Interests and for the releases by such holders of the Released Parties, their Pro Rata share of (a) the Shareholder Equity Distribution and (b) the Warrants.  If (a) the Plan is not confirmed, (b) the Effective Date does not occur, or (c) the Restructuring Support Agreement is terminated, the Debtors could at some point file one or more chapter 11 plans other than the Plan without the benefits of the Restructuring Support Agreement.  If that occurs, it is not likely that holders of Stock Interests in Swift will receive any distribution on account of their Interests.

**3.      Certain holders of New Swift Common Stock could have a significant degree of influence on Reorganized Swift and matters presented to holders of New Swift Common Stock.**

As set forth above, after the Effective Date, the holders of Senior Notes and Rejection Claims will receive 96% of New Swift's Common Stock.  If such holders of New Swift Common Stock were to act as a group, such holders would be in a position to exercise a controlling influence over the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the Warrants and New Swift Common Stock.

Further, Section IV.D.2. of the Plan provides certain Senior Noteholders shall have the authority to appoint certain members of the New Swift Board.  Thus, certain holders of New Swift Common Stock may have significant influence or control over the operations of Reorganized Swift and matters presented to equityholders of Reorganized Swift.

4.       **The transfer of New Swift Common Stock will be restricted.**

The recipients of securities issued under the Plan who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities.  In addition, securities issued under the Plan to affiliates of the Reorganized Debtors will be subject to restrictions on resale.  These persons will be permitted to transfer or sell such securities only pursuant to the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act.  These restrictions may adversely impact the value of the shares of New Swift Common Stock and make it more difficult for such shareholders to dispose of their shares, or to realize value on the shares, at a time when they may wish to do so.

5.       **There will be a lack of an established market for New Swift Common Stock and the Warrants.**

A liquid trading market for the New Swift Common Stock and the Warrants issued under the Plan does not exist.  The future liquidity of the trading markets for New Swift Common Stock and the Warrants will depend, among other things, upon the number of holders of such securities and whether such securities become listed for trading on an exchange or trading system at some future time.

Swift's stock was delisted from the NYSE on [__].  Reorganized Swift will use reasonable efforts to seek to list New Swift Common Stock on the NYSE on or as soon as reasonably practicable after the Effective Date.  Reorganized Swift is under no obligation to list the Warrants on any securities exchange and can provide no assurance that such listing will occur.  While a liquid trading market may develop in the future for the New Swift Common Stock, no assurance can be provided that such a market will develop, and it is unlikely that a liquid trading market will develop with respect to the Warrants.

6.       **Future issuances of New Swift Common Stock may cause holders to incur substantial dilution.**

In the future, Reorganized Swift may grant equity securities to its officers, directors and employees under the Management Incentive Program that Reorganized Swift intends to adopt to be effective following the Effective Date.  Furthermore, Reorganized Swift may issue equity securities in connection with future investments, acquisitions or capital raising transactions.  Such grants or issuances could constitute a substantial portion of the then-outstanding common stock, which may result in substantial dilution in ownership to holders of equity interests in Reorganized Swift.

7.       **Resolution of Claims outstanding under the DIP Facility may cause the Senior Noteholders to incur further dilution.**

The Debtors and the DIP Lenders, with the aid of their respective advisors, are currently engaged in discussions with respect to the treatment and resolution of the claims that will arise from the DIP Facility.  Among other potential alternatives, the Debtors and the DIP Lenders are considering whether the DIP Facility will remain outstanding with the Reorganized Debtors after the Effective Date or whether it will be converted (in full or in part), into New Swift Common Stock or other Interests in the Reorganized Debtors.  Such treatment is also dependent upon the continued negotiations between the Debtors, the Ad Hoc Group of Senior Noteholders, the RBL Agent, and RBL Lenders regarding the treatment of the RBL Facility and the Debtors' exit financing.  To the extent it is determined that the DIP Facility will be converted into New Swift Common Stock, there will be potentially significant dilution to the 96% of New Swift Common Stock otherwise available to the Senior Noteholders.  This dilution, however, will not impact other recoveries under the Plan, including on account of existing Stock Interests of Swift.

8.       **Reorganized Swift does not expect to pay dividends in the near future.**

Reorganized Swift does not anticipate that cash dividends or other distributions will be paid with respect to the New Swift Common Stock in the foreseeable future and there can be no assurance that such dividends or other

distributions will be paid at any time in the future or at all.  [In addition, restrictive covenants in certain debt instruments to which Reorganized Swift will, or may, be a party, may limit the ability of Reorganized Swift to pay dividends or for Reorganized Swift to receive dividends from its subsidiaries.]

**C.**    **Risk Factors Related to the Reorganized Debtors' Exit Financing**

**1.**    **[To come]**

**2.**    **Resolution of the Reorganized Debtors' exit financing and the RBL Facility could materially impact the Debtors' DIP Financing and support for the Reorganization Cases.**

The Debtors' ability to draw upon the final $45 million in potential financing committed by the DIP Lenders under the DIP Facility is entirely contingent on the Debtors and the Ad Hoc Group of Senior Noteholders reaching an agreement (subject in all respects to the consent of the Required Consenting Noteholders) with regards to the potential amendment and restatement, refinancing, or other treatment of the RBL Facility.  If the Debtors are unable to reach such an agreement, the Restructuring Support Agreement may also be terminated, and the Ad Hoc Group of Senior Noteholders will have no further obligation to support the Plan or restructuring.  These events could have a significant adverse impact on the Debtors' ability to successfully reorganize and provide maximum recoveries to their creditors as contemplated by the Plan.

**D.**    **Risk Factors Related to the Debtors' and the Reorganized Debtors' Businesses[7]**

**1.**    **Oil and natural gas prices are volatile.**

Commodity prices have dropped substantially and rapidly over the past year.  Continued low prices or their further downward movement would adversely affect the Debtors' liquidity, operating results, financial condition, cash flows and growth prospects.  The Debtors' future revenues, net income, cash flow, and the value of their oil and natural gas properties depend primarily upon the prices they receive for their oil and natural gas production.  Oil and natural gas prices historically have been volatile and have dropped precipitously over the past year.

Continued low price levels or further decreases in price levels for either oil or natural gas would negatively affect the Debtors in several ways, including:

- the Debtors' cash flow would be reduced, decreasing funds available for capital expenditures;

- certain reserves would no longer be economic to produce, leading to both lower cash flow and lower proved reserves;

- the Debtors' lenders could reduce the borrowing base under their bank credit facility because of lower oil and natural gas reserves values, reducing their liquidity and possibly requiring mandatory loan repayments; and

- such a reduction may result in a downward adjustment to the Debtors' estimated proved reserves, and require write-downs of their oil and gas properties.

**2.**    **Federal legislation and state legislative and regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.**

Hydraulic fracturing using fluids other than diesel is currently exempt from regulation under the federal Safe Drinking Water Act, but opponents of hydraulic fracturing have called for further study of the technique's environmental effects and, in some cases, a moratorium on the use of the technique.  Various committees of

---

[7]    All the risk factors in this section apply equally to the Debtors and the Reorganized Debtors.

Congress have been investigating hydraulic fracturing practices and several proposals have been submitted to Congress that, if implemented, would subject all hydraulic fracturing to regulation under the Safe Drinking Water Act. Further, the EPA's Office of Research and Development (the "ORD") is conducting a scientific study to investigate the possible relationships between hydraulic fracturing and drinking water. Several states have adopted or are otherwise considering legislation to regulate hydraulic fracturing practices, including restrictions on its use in environmentally sensitive areas. Some municipalities have significantly limited or prohibited drilling activities, or are considering doing so.

Although it is not possible at this time to predict the final outcome of the ORD's study or the requirements of any additional federal or state legislation or regulation regarding hydraulic fracturing, any new federal or state, or local restrictions on hydraulic fracturing that may be imposed in areas in which the Debtors conduct business could significantly increase their operating, capital and compliance costs as well as delay or halt their ability to develop oil and gas reserves.

The Debtors' ability to produce crude oil and natural gas economically and in commercial quantities could be impaired if they are unable to acquire adequate supplies of water for their drilling operations or are unable to dispose of or recycle the water they use economically and in an environmentally safe manner.

Drilling activities require the use of fresh water. For example, the hydraulic fracturing process which the Debtors employ to produce commercial quantities of crude oil and natural gas from many reservoirs, including the Eagle Ford Shale, require the use and disposal of significant quantities of water. In certain areas, there may be insufficient aquifer capacity to provide a local source of water for drilling activities. Water must be obtained from other sources and transported to the drilling site.

The Debtors' inability to secure sufficient amounts of water, or to dispose of or recycle the water used in their operations, could adversely impact their operations in certain areas. Moreover, the imposition of new environmental initiatives and regulations could include restrictions on their ability to conduct certain operations such as hydraulic fracturing or disposal of waste, including, but not limited to, produced water, drilling fluids and other wastes associated with the exploration, development or production of natural gas.

Compliance with environmental regulations and permit requirements governing the withdrawal, storage and use of surface water or groundwater necessary for hydraulic fracturing of wells may increase the Debtors' operating costs and cause delays, interruptions or termination of their operations, the extent of which cannot be predicted, all of which could have an adverse effect on their operations and financial condition.

> ### 3.    If the Debtors cannot replace their reserves, their revenues and financial condition will suffer.

Unless the Debtors successfully replace their reserves, their long-term production will decline, which could result in lower revenues and cash flow. When their capital expenditures are limited to funding from their cash flow in lower commodity price environments, or when oil and natural gas prices decrease, the Debtors' cash flow decreases, resulting in less available cash to drill and replace their reserves and an increased need to draw on their credit facility or generate funds through property sales or joint ventures, neither of which can be assured. Even if the Debtors have the capital to drill new wells, unsuccessful wells can hurt their efforts to replace reserves. Additionally, lower oil and natural gas prices can have the effect of lowering the Debtors' reserves estimates and the number of economically viable prospects that they have to drill.

> ### 4.    The Debtors' business depends on oil and natural gas transportation facilities, some of which are owned by others.

The marketability of the Debtors' oil and natural gas production depends in part on the availability, proximity, and capacity of pipeline systems owned by third parties an area in which the Debtors have been affected by constraints for periods of time. The unavailability of or lack of available capacity on these systems and facilities could result in the shut-in of producing wells or the delay or discontinuance of development plans for properties. Although the Debtors have some contractual control over the transportation of their product, material changes in

these business relationships could materially affect their operations.  Federal and state regulation of oil and natural gas production and transportation, tax and energy policies, changes in supply and demand, pipeline pressures, damage to or destruction of pipelines and general economic conditions could adversely affect the Debtors' ability to produce, gather and transport oil and natural gas.

     5.     **Estimates of proved reserves are uncertain, and revenues from production may vary significantly from expectations.**

The quantities and values of the Debtors' proved reserves in the Projections are only estimates and subject to numerous uncertainties.  The accuracy of any reserves estimate is a function of the quality of available data and of engineering and geological interpretation.  These estimates depend on assumptions regarding quantities and production rates of recoverable oil and natural gas reserves, future prices for oil and natural gas, timing and amounts of development expenditures and operating expenses, all of which will vary from those assumed in the Debtors' estimates.  If the variances in these assumptions are significant, many of which are based upon extrinsic events the Debtors cannot control, they could significantly affect these estimates.

Any significant variance from the assumptions used could result in the actual amounts of oil and natural gas ultimately recovered and future net cash flows being materially different from the estimates in the Debtors' reserves reports.  In addition, results of drilling, testing, production, and changes in prices after the date of the estimates of the Debtors' reserves may result in substantial downward revisions.  These estimates may not accurately predict the present value of future net cash flows from the Debtors' oil and natural gas reserves.

On December 31, 2014, approximately 66% of the Debtors' estimated proved reserves were undeveloped.  Recovery of undeveloped reserves generally requires significant capital expenditures and successful drilling operations.

The Debtors' Southeast Louisiana core area could occasionally be affected by hurricane activity in the Gulf of Mexico, resulting in pipeline outages or damage to production facilities, causing production delays and/or significant repair costs.  Approximately 6% of the Debtors' 2014 reserves, 12% of their 2014 production and 23% of their 2014 revenues were located in the Debtors' Southeast Louisiana core area.  Increased hurricane activity over the past seven years has resulted in production curtailments and physical damage to the Debtors' Gulf Coast operations.  For example, a significant percentage of the Debtors' production was shut down by Hurricanes Gustav and Ike in 2008, and by Hurricane Isaac in 2012.  Since the Debtors do not carry business interruption insurance (loss of production), if hurricanes damage the Gulf Coast region where they have a significant percentage of the Debtors' operations, their cash flow would suffer.  This decrease in cash flow, depending on the extent of the decrease, could reduce the funds available for capital expenditures and reduce their ability to borrow money or raise additional capital.

     6.     **A worldwide financial downturn or negative credit market conditions may have lasting effects on the Debtors' liquidity, business and financial condition that they cannot control or predict.**

Global economic conditions may adversely affect the financial viability of and increase the credit risk associated with the Debtors' purchasers, suppliers, insurers, and commodity derivative counterparties to perform under the terms of contracts or financial arrangements they have with them.  Although the Debtors have heightened their level of scrutiny of their contractual counterparties, their assessment of the risk of non-performance by various parties is subject to sudden swings in the financial and credit markets.  This same crisis may adversely impact insurers and their ability to pay current and future insurance claims that the Debtors may have.  Further, the Debtors' future access to capital could be limited due to tightening credit markets that could affect their ability to fund their future capital projects.  In addition, long-term restriction upon or freezing of the capital markets and legislation related to financial and banking reform may affect short-term or long-term liquidity.

7.     **The Debtors' oil and natural gas exploration and production business involves high risks and they may suffer uninsured losses.**

These risks include blowouts, explosions, adverse weather effects and pollution and other environmental damage, any of which could result in substantial losses to the Debtors due to injury or loss of life, damage to or destruction of wells, production facilities or other property, clean-up responsibilities, regulatory investigations and penalties and suspension of operations. Although the Debtors currently maintain insurance coverage that they consider reasonable and that is similar to that maintained by comparable companies in the oil and gas industry, they are not fully insured against certain of these risks, such as business interruption, either because such insurance is not available or because of the high premium costs and deductibles associated with obtaining and carrying such insurance.

8.     **Drilling wells is speculative and capital intensive.**

Developing and exploring properties for oil and natural gas requires significant capital expenditures and involves a high degree of financial risk, including the risk that no commercially productive oil or natural gas reservoirs will be encountered. The budgeted costs of drilling, completing, and operating wells are often exceeded and can increase significantly when drilling costs rise. Drilling may be unsuccessful for many reasons, including title problems, weather, cost overruns, equipment shortages, and mechanical difficulties. Moreover, the successful drilling or completion of an oil or natural gas well does not ensure a profit on investment. Exploratory wells bear a much greater risk of loss than development wells.

9.     **The Debtors may incur substantial losses and be subject to substantial liability claims as a result of their oil and natural gas operations.**

The Debtors are not insured against all risks. Losses and liabilities arising from uninsured and underinsured events could materially and adversely affect the Debtors' business, financial condition, or results of operations. The Debtors' oil and natural gas exploration and production activities are subject to all of the operating risks associated with drilling for and producing oil and natural gas, including the possibility of:

- hurricanes, tropical storms or other natural disasters;

- environmental hazards, such as uncontrollable flows of oil, natural gas, brine, well fluids, toxic gas, or other pollution into the environment, including groundwater and shoreline contaminates;

- abnormally pressured formations;

- mechanical difficulties, such as stuck oil field drilling and service tools and casing collapse;

- fires and explosions; and

- personal injuries and death.

Any of these risks could adversely affect the Debtors' ability to conduct operations or result in substantial losses. The Debtors may elect not to obtain insurance if they believe that the cost of available insurance is excessive relative to the risks presented. In addition, pollution and environmental risks generally are not fully insurable. If a significant accident or other event occurs and is not fully covered by insurance, it could adversely affect the Debtors' financial condition.

10.    **Prospects that the Debtors decide to drill may not yield oil or natural gas in commercially viable quantities.**

There is no way to predict in advance of drilling and testing whether any particular prospect will yield oil or natural gas in sufficient quantities, if at all, to recover drilling or completion costs or to be economically viable. The use of seismic data and other technologies and the study of producing fields in the same area will not enable the

Debtors to know conclusively prior to drilling whether oil or natural gas will be present.  The Debtors provide assurances that the analogies they draw from available data from other wells, more fully explored prospects, or producing fields will be applicable to the Debtors' drilling prospects.   In addition, a variety of factors, including geological and market-related, can cause a well to become uneconomical or only marginally economical.  For example, if oil and natural gas prices are much lower after the Debtors complete a well than when they identified it as a prospect, the completed well may not yield commercially viable quantities.

> **11.      The Debtors may have difficulty competing for oil and gas properties, equipment, supplies, oilfield services, and trained and experienced personnel.**

The Debtors operate in a highly competitive environment, competing with major integrated and independent energy companies for desirable oil and natural gas properties, as well as for the equipment, labor, and materials required to develop and operate such properties.  Many of these competitors have financial and technological resources substantially greater than the Debtors.  The market for oil and natural gas properties is highly competitive and the Debtors may lack technological information or expertise available to other bidders.  They may incur higher costs or be unable to acquire and develop desirable properties at costs the Debtors consider reasonable because of this competition.  As demand increases for equipment, services, and personnel, the Debtors may experience increased costs and various shortages and may not be able to obtain the necessary oilfield services and trained personnel.

> **12.      Governmental laws and regulations relating to environmental protection are costly and stringent.**

The Debtors' exploration, production, and marketing operations are subject to complex and stringent federal, state, and local laws and regulations governing, among other things, the discharge of substances into the environment or otherwise relating to environmental protection.  These laws, regulations and related public policy considerations affect the costs, manner, and feasibility of the Debtors' operations and require them to make significant expenditures in order to comply.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil, and criminal penalties, the imposition of investigatory and remedial obligations, and the issuance of injunctions that could limit or prohibit the Debtors' operations.  In addition, some of these laws and regulations may impose joint and several, strict liability for contamination resulting from spills, discharges, and releases of substances, including petroleum hydrocarbons and other wastes, without regard to fault or the legality of the original conduct.  Under such laws and regulations, the Debtors could be required to remove or remediate previously disposed substances and property contamination, including wastes disposed or released by prior owners or operators.  Changes in, or additions to, environmental laws and regulations occur frequently, and any changes or additions that result in more stringent and costly waste handling, storage, transport, disposal, cleanup or other environmental protection requirements could have a material adverse effect on the Debtors' operations and financial position.

> **13.      Enactment of legislative or regulatory proposals under consideration could negatively affect the Debtors' business.**

Numerous legislative and regulatory proposals affecting the oil and gas industry have been introduced, are anticipated to be introduced, or are otherwise under consideration, by Congress, state legislatures and various federal and state agencies.  Among these proposals are: (1) climate change/carbon tax legislation introduced in Congress, and EPA regulations to reduce greenhouse gas emissions; (2) proposals contained in the President's budget, along with legislation introduced in Congress (none of which have passed), to impose new taxes on, or repeal various tax deductions available to, oil and gas producers, such as the current tax deductions for intangible drilling and development costs, which deductions, if eliminated, could raise the cost of energy production, reduce energy investment and affect the economics of oil and gas exploration and production activities; and (3) legislation previously considered by Congress (but not adopted) that would subject the process of hydraulic fracturing to federal regulation under the Safe Drinking Water Act, and new or anticipated Department of Interior and EPA regulations to impose new and more stringent regulatory requirements on hydraulic fracturing activities, particularly those performed on federal lands, and to require disclosure of the chemicals used in the fracturing process.  Any of the foregoing described proposals could affect the Debtors' operations, and the costs thereof.  The trend toward stricter standards, increased oversight and regulation and more extensive permit requirements, along with any future

laws and regulations, could result in increased costs or additional operating restrictions which could have an effect on demand for oil and natural gas or prices at which it can be sold.  However, until such legislation or regulations are enacted or adopted into law and thereafter implemented, it is not possible to gauge their impact on the Debtors' future operations or their results of operations and financial condition.

14.     **Certain federal income tax deductions currently available with respect to natural gas and oil exploration and development may be eliminated, and additional state taxes on natural gas extraction may be imposed, as a result of future legislation.**

In recent years, legislation has been proposed that would, if enacted into law, make significant changes to U.S. federal income tax laws, including the elimination of certain U.S. federal income tax benefits and deductions currently available to oil and gas companies.  Such changes include, but are not limited to, (i) the repeal of the percentage depletion allowance for oil and gas properties, (ii) the increase of the amortization period of geological and geophysical expenses, (iii) the elimination of current deductions for intangible drilling and development costs; and (iv) the elimination of the deduction for certain U.S. production activities.  It is currently unclear whether any such proposals will be enacted or what form they might possibly take.  The passage of such legislation or any other similar change in U.S. federal income tax law could eliminate, reduce or postpone certain tax deductions that are currently available to the Debtors, and any such change could negatively affect the Debtors' financial condition and results of operations.

15.     **The recent adoption of derivatives legislation by the U.S. Congress could have an adverse effect on the Debtors' ability to hedge risks associated with their business.**

The Dodd-Frank Act requires the Commodities Futures Trading Commission (the "CFTC") and the SEC to promulgate rules and regulations establishing federal oversight and regulation of the over-the-counter derivatives market and entities that participate in that market including swap clearing and trade execution requirements.  New or modified rules, regulations or requirements may increase the cost and availability to the Debtors' counterparties of their hedging and swap positions which they can make available to the Debtors, and may further require the counterparties to the Debtors' derivative instruments to spin off some of their derivative activities to separate entities which may not be as creditworthy as the current counterparties.  Any changes in the regulations of swaps may result in certain market participants deciding to curtail or cease their derivative activities.

While many rules and regulations have been promulgated and are already in effect, other rules and regulations remain to be finalized or effectuated, and therefore, the impact of those rules and regulations on the Debtors is uncertain at this time.  The Dodd-Frank Act, and the rules promulgated thereunder, could (i) significantly increase the cost, or decrease the liquidity, of energy-related derivatives the Debtors use to hedge against commodity price fluctuations (including through requirements to post collateral), (ii) materially alter the terms of derivative contracts, (iii) reduce the availability of derivatives to protect against risks the Debtors encounter, and (iv) increase the Debtors' exposure to less creditworthy counterparties.

16.     **Legal proceedings could result in liability affecting the Debtors' results of operations.**

Most oil and gas companies, such as the Debtors, are involved in various legal proceedings, such as title, royalty, or contractual disputes, in the ordinary course of business.  The Debtors will defend themselves vigorously in all such matters.

Because the Debtors maintain a portfolio of assets in the various areas in which they operate, the complexity and types of legal procedures with which they may become involved may vary, and they could incur significant legal and support expenses in different jurisdictions.  If the Debtors are not able to successfully defend themselves, there could be a delay or even halt in their exploration, development or production activities or other business plans, resulting in a reduction in reserves, loss of production and reduced cash flows.  Legal proceedings could result in a substantial liability.  In addition, legal proceedings distract management and other personnel from their primary responsibilities.

17.    **A cyber incident could result in information theft, data corruption, operational disruption, and/or financial loss.**

The Debtors' business has become increasingly dependent on digital technologies to conduct day-to-day operations, including certain of their exploration, development and production activities. The Debtors depend on digital technology to estimate quantities of oil and gas reserves, process and record financial and operating data, analyze seismic and drilling information and in many other activities related to their business. Their technologies, systems and networks may become the target of cyber attacks or information security breaches that could result in the disruption of their business operations. For example, unauthorized access to the Debtors' seismic data, reserves information or other proprietary information could lead to data corruption, communication interruption, or other operational disruptions in the Debtors' drilling or production operations.

To date the Debtors have not experienced any material losses relating to cyber attacks, however there can be no assurance that the Debtors will not suffer such losses in the future. As cyber threats continue to evolve, the Debtors may be required to expend significant additional resources to continue to modify or enhance their protective measures or to investigate and remediate any cyber vulnerabilities.

## VII.    REORGANIZED DEBTORS

### A.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein, each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate or other legal Entity, with all the powers of a corporation or other legal Entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. Except as otherwise provided herein, as of the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in the applicable Reorganized Debtor, free and clear of all Claims, Encumbrances and Interests. On and after the Effective Date, each Reorganized Debtor may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees and expenses relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

### B.    Issuance of New Swift Common Stock and Warrants

#### 1.    Issuance of Securities

Shares of New Swift Common Stock shall be authorized under the Certificate of Incorporation, and shares of New Swift Common Stock shall be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan. The number of shares of New Swift Common Stock to be distributed as set forth in the Plan, and the number of shares of New Swift Common Stock issuable upon exercise of the Warrants and the Management Incentive Program Equity and corresponding strike prices, are subject to adjustment by the Debtors, with the consent of the Required Consenting Noteholders, in a manner that does not alter the respective percentages of the outstanding New Swift Common Stock allocated to any Class or Claim holder, except for immaterial changes resulting from the treatment of fractional shares; provided that the New Swift Common Stock, as of the Effective Date, shall be subject to dilution from the Management Incentive Program Equity. All of the New Swift Common Stock, issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the New Swift Common Stock, the Warrants, Management Incentive Program Equity by Reorganized Swift, and the issuance of shares pursuant to the exercise of the Warrants and the Management Incentive Program Equity, is authorized without the need for any further corporate action and without any further action by any holder of a Claim or Interest.

Except as provided below, the New Swift Common Stock distributed under the Plan will be issued in book-entry form through the direct registry system of the transfer agent and DTC. The ownership interest of each holder of such New Swift Common Stock, and transfers of ownership interests therein, will be recorded on the records of the transfer agent and the direct and indirect participants in DTC. To receive Distributions of New Swift Common Stock through DTC, holders of Senior Notes Claims and holders of Rejection Claims will be required to designate a direct or indirect participant in DTC with whom such holder has an account into which such New Swift Common Stock may be deposited. The New Swift Common Stock issuable to holders of Stock Interests of Swift will, with respect to Stock Interests of Swift held through DTC, be delivered by the Reorganized Swift to the holders of Stock Interests of Swift through DTC (via Mandatory Exchange if applicable), and holders that do not hold their Stock Interests of Swift in DTC may designate a direct or indirect participant in DTC with whom such holder has an account into which such New Swift Common Stock may be deposited or have their shares issued in book-entry form on the register of the transfer agent.

### 2.       Exemption from Registration

The offering of the New Swift Common Stock under Article III of the Plan shall be exempt from the registration requirements of section 5 of the Securities Act and other applicable law under section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act. The issuance and Distribution of the New Swift Common Stock and the Warrants under Article III of the Plan, and the New Swift Common Stock issuable upon exercise of the Warrants shall be exempt from the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration of an offer or sale of securities under section 1145(a) of the Bankruptcy Code. The New Swift Common Stock underlying the Management Incentive Program will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

The issuance of the New Swift Common Stock to the holders of Senior Notes and Rejection Claims and the issuance of the Warrants to the holders of Stock Interests of Swift shall be exempt from the requirements of section 16(b) of the Securities and Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director by deputization for purposes thereof) as of the Effective Date.

### 3.       SEC Reporting Requirements and Listing of New Swift Common Stock

As of the Effective Date, Reorganized Swift will be a reporting company under the Securities Exchange Act of 1934, as amended. Reorganized Swift will use reasonable efforts to cause the listing on NYSE or such other exchange of the New Swift Common Stock on or as soon as reasonably practicable after the Effective Date.

### 4.       Warrants

#### a.       Issuance

Each Warrant will, subject to the antidilution adjustments described below and in the Warrant Agreement, be exercisable for one share of New Swift Common Stock.

#### b.       Anti-Dilution Protection

The Warrant Agreement shall contain provisions for the adjustment of the exercise price and shares of New Swift Common Stock issuable upon exercise following certain organic dilutive events such as splits, combinations, stock dividends, tender offer or other similar organic dilutive events involving the New Swift Common Stock. The Warrants, as of the Effective Date, shall be subject to dilution only from the Management Incentive Program Equity.

#### c.       Form

Except as provided below, all Warrants distributed under the Plan will be issued in book-entry form through the direct registry system of the warrant agent and DTC. The warrant agent will be the transfer agent for the New Swift Common Stock. The ownership interest of each holder of such Warrants, and transfers of ownership

interests therein, will be recorded on the records of the warrant agent and the direct and indirect participants in DTC. Holders of Stock Interests of Swift that hold such Interests in DTC will receive their Warrants by deposit to the account of a direct or indirect participant in DTC in which such Stock Interests of Swift are held. Holders that do not hold their Stock Interests of Swift in DTC may designate a direct or indirect participant in DTC with whom such holder has an account into which such Warrants may be deposited or have their Warrants issued in book-entry form on the register of the warrant agent for the Warrants. Beneficial owners of the Warrants will be required to follow the procedures that DTC or its direct or indirect participants, or the warrant agent for the Warrants, as applicable, may establish for exercising their rights in respect of the Warrants, including exercise and transfer thereof. New Swift Common Stock issuable upon exercise of such Warrants will be issued in book-entry form and held through DTC or the warrant agent for the Warrants, as applicable.

C.      **Cancellation of Certain Indebtedness, Agreements, and Existing Securities**

On the Effective Date, except as otherwise specifically provided for in the Plan, the obligations of the Debtors under the RBL Credit Agreement, the Guarantees, the Senior Notes Indentures and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in any of the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of any Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to any such Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and the obligations of any of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Restructuring Support Agreement, the RBL Credit Agreement, the Guarantees, the Senior Notes Indentures and any other shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of any of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of any Debtors that are specifically reinstated pursuant to the Plan or assumed by any such Debtors) shall be released and discharged; provided, however, that, notwithstanding the occurrence of the Confirmation Date or the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of such Claims to receive Distributions under the Plan as provided herein, (b) allowing the Senior Notes Indenture Trustees to make Distributions under the Plan as provided herein, and deduct therefrom such reasonable compensation, fees, and expenses due thereunder or incurred in making such Distributions, to the extent not paid by the Debtors and authorized under such agreement, and (c) allowing the Senior Notes Indenture Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan. For the avoidance of doubt, nothing in this section shall affect the discharge of or result in any obligation, liability, or expense of the Debtors or the Reorganized Debtors, or affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any additional obligation, expense, or liability of the Debtors or the Reorganized Debtors. On and after the Effective Date, all duties and responsibilities of the Senior Notes Indenture Trustees shall be discharged except to the extent required to effectuate the Plan.

D.      **Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action**

1.      **Certificates of Incorporation and By-Laws of the Reorganized Debtors**

As of the Effective Date, the Certificate of Incorporation and the By-Laws of each Reorganized Debtor will be in such form as the Debtors and the Required Consenting Noteholders may determine. The initial Certificate of Incorporation and By-Laws of each Reorganized Debtor, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After the Effective Date, each such Entity shall be permitted to amend and restate its Certificate of Incorporation or By-Laws pursuant to applicable state law and the terms and conditions of such constituent documents.

2.      **Directors and Officers of the Reorganized Debtors**

As of the Effective Date, the term of the current members of the board of directors of Swift shall expire without further actions by any Person. The New Swift Board shall consist of seven members. The initial directors

of the New Board shall be appointed in accordance with the Certificates of Incorporation and By-Laws of each Reorganized Debtor and shall consist of (a) the Chief Executive Officer of Reorganized Swift; (b) two directors selected by Strategic Value Partners LLC or an affiliate thereof; (b) two directors selected by the Required Consenting Noteholders; and (c) two independent directors (one of which will be the non-executive chairman) initially nominated by the Required Consenting Noteholders and nominated by the nominating and governance committee of the New Swift Board once formed. Members of the Debtors' existing Board of Directors, desiring to serve, will be interviewed and considered in the selection process.  The identities of the New Swift Board members of Reorganized Swift are identified on Exhibit IV.D.2. of the Plan.

The Chief Executive Officer of Reorganized Swift will be consulted and participate in the independent director selection process with respect to the board member selections and selection of the non-executive chairman.

The terms of the New Swift Board shall be staggered with two New Swift Board members serving a one year term, two serving a two year term, and three serving a three year term.   Any New Swift Board members (other than the Chief Executive Officer of Reorganized Swift) elected from the existing board of directors shall serve a one year term.

The New Swift Board shall have four committees: Audit, Compensation, Governance/Nominating and Strategy.

### 3.        Employee Arrangements of the Reorganized Debtors

As of the Effective Date, the Reorganized Debtors shall be authorized to:  (a) maintain, amend or revise existing employment, indemnification and other arrangements with their active and retired directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, indemnification and other arrangements with active and retired directors, officers and employees; all as determined by the board of directors of the applicable Reorganized Debtor.

### 4.        Corporate Action

Pursuant to section 1142 of the Bankruptcy Code and section 6.201 of the Texas Business Organizations Code, the following (which shall occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) shall be authorized and approved in all respects and for all purposes without any requirement of further action by stockholders or directors of any of the Debtors or the Reorganized Debtors or by any other Entity:  (a) the initial Certificates of Incorporation and By-Laws of the Reorganized Debtors; (b) appointment of the initial directors and officers of the Reorganized Debtors; and (c) other corporate actions that are necessary or appropriate to effectuate, implement and consummate the provisions of the Plan, including the Restructuring Transactions; and (d) the adoption, execution, delivery and performance of all contracts, instruments, releases and other agreements and documents related to any of the foregoing.

### 5.        Management Incentive Program

On or after the Effective Date, the Reorganized Debtors shall adopt the Management Incentive Program and shall provide for the Distribution, and the reservation for further issuance, as applicable, of the Management Incentive Program Equity to participating officers, directors and employees of the Reorganized Debtors.  A total of 5.5% of New Swift Common Stock (on a fully diluted basis) will be reserved for the Management Incentive Program.  The Management Incentive Program Equity will be allocated as follows:

2.25% of the Management Incentive Program Equity will be granted to management on the Effective Date:

1.25% of the Management Incentive Program Equity will be structured as Restricted Stock Units ("RSU") that vest solely based on a time-based vesting schedule, which shall be ratably vested and settled over 3 years (i.e. one-third vests  and pays each year over three years);

1.00% of the Management Incentive Program Equity will be structured as stock options with strike prices set at emergence equity value based on Reorganized Swift's enterprise value at emergence. The stock options shall vest solely based on a time-based vesting schedule, which shall be ratably over 3 years (i.e. one-third vest each year over three years) and shall expire after 5 years.

Allocation of the foregoing 2.25% of the Management Incentive Program Equity will be based on a schedule agreed to by the Required Consenting Noteholder and the Debtors. Vesting of the RSUs and stock options will not be conditioned on any financial, operating or other performance metrics. Except for termination due to death or disability, termination without cause, termination for good reason or change of control, individuals must be employed on each vesting date to receive those vested shares/options.

The remaining 3.25% of Management Incentive Program Equity shall be granted to management and the New Swift Board, subject to vesting with time and performance thresholds to be determined by the New Swift Board and its compensation committee.

**6.      Indemnification of Directors, Officers and Employees**

Notwithstanding any other provisions of the Plan, from and after the Effective Date, indemnification obligations owed by the Debtors or the Reorganized Debtors to directors, officers or employees of the Debtors who served or were employed by the Debtors on the Petition Date, to the extent provided in the articles or certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of the Debtors, will be deemed to be, and treated as though they are, executory contracts that are assumed pursuant to the Plan and section 365 of the Bankruptcy Code. All such indemnification obligations shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on, or after the Petition Date. Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date.

**E.      Effect on Royalty Interests and Oil and Gas Leases**

**1.      Royalty Interests**

Nothing in the Plan shall affect, modify, or impair the rights of any holder of a royalty interest in the production of the Assets which is otherwise valid, perfected, unavoidable and enforceable in accordance with applicable law to receive royalty or other payments which become due on and after the Effective Date.

**2.      Oil and Gas Leases**

On the Effective Date, each Debtor's right, title and interest in and to all of such Debtor's oil & gas leases, including those oil & gas leases set forth on Exhibit IV.E.2. of the Plan, shall revest in such Debtor as reorganized hereby on the terms and conditions set forth in the Plan. To the extent such oil & gas leases may be deemed to be, and treated as though they are, executory contracts, such leases shall be deemed assumed pursuant to the Plan and section 365 of the Bankruptcy Code.

**F.      Intercompany Stock Interests**

The Intercompany Stock Interests shall be retained and the legal, equitable and contractual rights to which the holder of such Intercompany Stock Interest is entitled shall remain unaltered, subject to the effect of the Restructuring Transactions.

G.      **Cash for Plan Distributions**

All cash payments to be made pursuant to the Plan shall be funded by the applicable Reorganized Debtor. All cash necessary for a Reorganized Debtor to fund such cash payments pursuant to the Plan shall be obtained through a combination of one or more of the following:  (1) such Reorganized Debtor's cash balances and cash generated by the operations of such Reorganized Debtor; (2) any Tax refunds actually received by such Reorganized Debtor; or (3) such other means of financing or funding as determined by the board of directors (or its equivalent) of such Reorganized Debtor.

H.      **Waiver of Recovery Actions**

To the extent not already otherwise waived pursuant to another order of the Bankruptcy Court, effective as of the Effective Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any Recovery Actions that belong to the Debtors on account of paying or having paid all General Unsecured Claims in full pursuant to the Plan.

I.      **Preservation of Rights of Action; Settlement of Claims and Releases**

1.      **Preservation of Rights of Action by the Debtors and the Reorganized Debtors**

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtors shall retain and may enforce, and shall have the sole right to enforce, any claims, demands, rights and causes of action that any Debtor or Estate may hold against any Entity.  For the avoidance of doubt, the preservation of such rights of action described in the preceding sentence includes, without limitation, the Reorganized Debtors' right to object to Administrative Claims and any other Claims.  The Reorganized Debtors or their successors may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors holding such claims, demands, rights or causes of action.  Further, the Reorganized Debtors retain their right to File and pursue, and shall have the sole right to File and pursue, any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to any Debtor.

2.      **Comprehensive Settlement of Claims and Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, Section IV.I.2. of the Plan incorporates an integrated compromise and settlement designed to achieve a beneficial and efficient resolution of these cases for all parties in interest.  Accordingly, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section IV.I.3. of the Plan, shall constitute a good-faith compromise and settlement of all Claims, disputes, or controversies relating to the rights that a holder of a Claim may have with respect to any Claim (other than Claims Reinstated hereunder) or any Distribution to be made pursuant to the Plan on account of any such Claim (other than Claims Reinstated hereunder).

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, disputes, or controversies provided for herein, and the Bankruptcy Court's determination that such compromises and settlements are in the best interests of the Debtors, their estates, the Reorganized Debtors, creditors and all other parties in interest, and are fair, equitable and within the range of reasonableness.  If the Effective Date does not occur, the settlements set forth herein shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

3.      **Releases**

a.      **Release by the Debtors and Reorganized Debtors**

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, to the fullest extent permitted by law, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all Entities who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party with respect to any of the Debtors or the Estates, the Reorganization Cases or the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Restructuring Support Agreement, the Plan, the Exhibits, the Disclosure Statement, the DIP Credit Agreement, the Warrant Agreements, the Restructuring Transactions or any other transactions proposed in connection with the Debtors, the Reorganization Cases or any Distributions made under or in connection with the Plan or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under the Plan or the obligations assumed hereunder; *provided*, *however*, that the foregoing provisions of Section IV.I.3.a of the Plan shall not affect (a) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud), (b) except as otherwise set forth in the Plan any rights to enforce the Plan or the other contracts, instruments, releases, agreements or documents to be, or previously, entered into or delivered in connection with the Plan, (c) except as otherwise expressly set forth in the Plan, any objections by the Debtors or the Reorganized Debtors to Claims or Interests filed by any Entity against any Debtor and/or the Estates, including rights of setoff, refund or other adjustments, (d) the rights of the Debtors to assert any applicable defenses in litigation or other proceedings with their employees (including the rights to seek sanctions, fees and other costs) and (e) any claim of the Debtors or Reorganized Debtors, including (but not limited to) cross-claims or counterclaims or other causes of action against employees or other parties, arising out of or relating to actions for personal injury, wrongful death, property damage, products liability or similar legal theories of recovery to which the Debtors or Reorganized Debtors are a party.

    **b.**    **Release by Holders of Claims or Interests**

    Any holder of Stock Interests of Swift that opts not to grant the releases contained in Section IV.I.3.b of the Plan shall not receive the New Swift Common Stock and Warrants that it would otherwise be entitled to receive under Section III.B.8 of the Plan and will not receive any Distribution whatsoever under the Plan.

    Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, unless otherwise provided in the Confirmation Order, each Releasing Party shall be deemed to forever release, waive and discharge all Liabilities in any way that such Releasing Party has, had or may have against any Released Party (which release shall be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code), in each case, relating to any of the Debtors or the Estates, the Reorganization Cases or the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Restructuring Support Agreement, the Plan, the Exhibits, the Disclosure Statement, the DIP Credit Agreement, the Warrant Agreements, the Restructuring Transactions or any other transactions proposed in connection with the Debtors, the Reorganization Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under the Plan or the obligations assumed hereunder; *provided*, *however*, that the foregoing provisions of Section IV.I.3.b of the Plan shall have no effect on the liability of (a) any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan and (b) any Released Party that would otherwise result from any act or omission of such Released Party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud).

    **c.**    **Injunction Related to Releases**

As further provided in Section IX.B.1.b of the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan.

### J.      Reinstatement and Continuation of Insurance Policies

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Section V.A of the Plan.  Nothing in the Plan shall affect, impair or prejudice the Reorganized Debtors' rights under the insurance policies in any manner, and the Reorganized Debtors shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

### K.      Release of Encumbrances

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, all Encumbrances against the property of any Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such Encumbrances, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.

### L.      Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors thereof shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements and documents and take such actions as may be necessary or appropriate to effect and implement the provisions of the Plan, including the Restructuring Transactions (subject to the consent of the Required Consenting Noteholders).  The secretary or any assistant secretary of each Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp Tax or similar Tax:  (1) the creation of any Encumbrances; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

## VIII.    DISTRIBUTIONS UNDER THE PLAN

### A.      Unclassified Claims

#### 1.      Payment of Administrative Claims

##### a.      Administrative Claims in General

Except as specified in Section III.A.1. of the Plan, and subject to the bar date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such Administrative Claim either (i) as soon as practicable after the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim.

### b.    Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined at the Confirmation Hearing by the Bankruptcy Court shall be paid in cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.

### c.    Ordinary Course Liabilities

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including Administrative Trade Claims, any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E. of the Plan) shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims or further approval of the Bankruptcy Court.

### d.    DIP Facility Claims

Unless otherwise agreed by the DIP Agent and the DIP Lenders, on or before the Effective Date, Allowed DIP Facility Claims shall (i) be paid in full in cash by the applicable Debtor or (ii) at the option of the DIP Lenders, be converted (in full or in part) into New Swift Common Stock; provided, however, that in the event that an Allowed DIP Facility Claim is converted (in full or in part) into New Swift Common Stock, the DIP Lenders will receive New Swift Common Stock from the Senior Notes and Rejection Distribution, and under no circumstances will the conversion of the DIP Facility Claim to New Swift Common Stock dilute the Shareholder Equity Distribution.  The DIP Lenders shall have no further obligation to pay or otherwise fund any Professional fees or disbursements or Carve-Out Expenses (as such term is defined in the DIP Orders).  The Debtors shall be authorized to take any action necessary or appropriate to cancel, extend, refinance or replace the DIP Credit Agreement in accordance with the agreed upon treatment of the DIP Facility Claims.

### e.    Bar Dates for Administrative Claims

#### (i)    General Bar Date Provisions

Except as otherwise provided in Section III.A.1.e.ii. of the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 60 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the requesting party by 120 days after the Effective Date.

#### (ii)    Bar Dates for Certain Administrative Claims

##### (a)    Professional Compensation

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than 60 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order.  A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order

in its Final Fee Application.  Objections to any Final Fee Application must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) 50 days after the Effective Date or (2) 30 days after the Filing of the applicable Final Fee Application.  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims.  Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application.

### (b)      Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Trade Claims, any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E. of the Plan, shall not be required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims shall be satisfied pursuant to Section III.A.1.c. of the Plan.

### (c)      DIP Facility Claims

Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such Claims.  Such Administrative Claims are allowed in the amount agreed upon between the Debtors and the DIP Lenders, as specified in the DIP Credit Agreement and the DIP Orders, and shall be satisfied pursuant to Section III.A.1.d. of the Plan.

### 2.      Payment of Priority Tax Claims

#### a.      Priority Tax Claims in General

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full of the allowed amount of the Priority Tax Claim plus Postpetition Interest, if any, on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

#### b.      Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section III.A.2.a. of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the holder (other than as the holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

### B.      Classified Claims

#### 1.      Priority Claims (Classes 1A through 1I) are unimpaired.

On the later of the Effective Date and the date on which the Claim in Classes 1A through 1I is allowed, unless otherwise agreed by the holder of an Allowed Claim in Classes 1A through 1I and the Debtors or Reorganized Debtors, each holder of an Allowed Claim in Classes 1A through 1I shall receive cash in an amount equal to such Allowed Priority Claim.

#### 2.      RBL Secured Claims (Classes 2A, 2F, 2G and 2H) are unimpaired.

In full satisfaction of an RBL Secured Claim, on the Effective Date, the RBL Agent, on behalf of the holders of Allowed RBL Secured Claims, shall receive, as determined by the applicable Debtor or Reorganized

Debtor with the consent of the Required Consenting Noteholders: (i) cash equal to the amount of such Allowed RBL Secured Claim; (ii) such other recovery necessary to render the RBL Secured Claims unimpaired pursuant to section 1124 of the Bankruptcy Code; or (iii) satisfaction of such RBL Secured Claim pursuant to such other terms and conditions as may be agreed upon by the Debtors or Reorganized Debtors and the holder of such RBL Secured Claim, with such agreement subject to the consent of the Required Consenting Noteholders, plus, in each case, payment in cash of any unpaid adequate protection payments due to the RBL Agent and/or the RBL Lenders, as applicable, pursuant to the DIP Orders, and the RBL Agent and the RBL Lenders shall retain any payments received by such party pursuant to the DIP Orders.

**3.      Other Secured Claims (Classes 3A through 3I are unimpaired.**

In full satisfaction of an Allowed Other Secured Claim, on the later of the Effective Date and the date on which the Other Secured Claim is allowed, each holder of an Allowed Other Secured Claim shall receive, at the sole and exclusive option of the applicable Debtor or Reorganized Debtor:  (i) Reinstatement of such Allowed Other Secured Claim, (ii) cash equal to the amount of such Allowed Other Secured Claim; (iii) the collateral securing such Allowed Other Secured Claim, (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code; or (v) satisfaction of such Other Secured Claim pursuant to such other terms and conditions as may be agreed upon by the Debtors or Reorganized Debtors and the holder of such Other Secured Claim and with the consent of the Required Consenting Noteholders.

**4.      Senior Notes and Rejection Claims (Classes 4A, B, E and F) are impaired.**

In full satisfaction of the Allowed Senior Notes Claims and the Allowed Rejection Claims, on or as soon as practicable after the Effective Date, unless otherwise agreed by the holder of an Allowed Senior Note Claim or holder of an Allowed Rejection Claim, as applicable, and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Senior Note Claim or holder of  an Allowed Rejection Claim shall receive its Pro Rata share of the Senior Notes and Rejection Distribution.

**5.      General Unsecured Claims (Classes 5A through 5I) are unimpaired.**

On the later of the Effective Date and the date on which the General Unsecured Claim is allowed, unless otherwise agreed by the holder of an Allowed Claim in Classes 5A through 5I and the applicable Debtor or Reorganized Debtor, including agreements entered into between the Debtors and the holder in connection with the Lien Order, each holder of an Allowed General Unsecured Claim shall receive the following treatment at the option of the Debtors or Reorganized Debtors (i) Reinstatement of such Allowed General Unsecured Claim in accordance with ordinary course terms, (ii) payment in cash in an amount equal to such Allowed General Unsecured Claim or (iii) such other treatment, as determined by the Debtors, with the consent of the Required Consenting Noteholders, that will render it unimpaired pursuant to section 1124 of the Bankruptcy Code.

**6.      Intercompany Claims (Classes 6A through 6I) are unimpaired.**

On the Effective Date, each Intercompany Claim in Classes 6A through 6I shall be Reinstated, subject to the effect of the Restructuring Transactions.

**7.      Intercompany Stock Interests (classes 7B through 7I) are unimpaired.**

On the Effective Date, each Intercompany Stock Interest in Classes 7B through 7I shall be Reinstated, subject to the effect of the Restructuring Transactions.

**8.      Stock Interests of Swift (Class 8A) are Impaired.**

On the Effective Date, Stock Interests of Swift shall be cancelled and discharged and shall be of no further force or effect, whether surrendered for cancellation or otherwise.  On or as soon as practicable after the Effective Date, holders of Stock Interests of Swift shall receive, in exchange for the surrender or cancellation of their Interests and for the releases by such holders of the Released Parties, their Pro Rata share of (a) the Shareholder Equity

Distribution and (b) the Warrants; provided, however, that any holder of a Stock Interest of Swift that opts not to grant the voluntary releases contained in Section IV.I.3.b of the Plan shall not be entitled to receive its Pro Rata share of the Shareholder Equity Distribution and Warrants and shall not receive any consideration in exchange for the surrender or cancellation of its Interests or any Distribution whatsoever under the Plan; and provided, further, that, notwithstanding Section VI.E. of the Plan, the Debtors may provide any holder of a Stock Interest of Swift that would otherwise be entitled to receive a Distribution of less than one share of the New Swift Common Stock with a Distribution of one share of New Swift Common Stock; provided, however, in no event shall such Distribution alter the respective percentages of the outstanding New Swift Common Stock allocated to any Class or Claim holder.

### C.    Insurance

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an insurance policy, such Claim shall first be paid from proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

### D.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, Distributions to be made on the Effective Date to holders of Claims that are Allowed Claims as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than:  (1) 60 days after the Effective Date or (2) such later date when the applicable conditions of Section V.B. of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section VI.D.2. of the Plan (regarding undeliverable Distributions) or Section VI.G.3. of the Plan (regarding compliance with Tax requirements) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made pursuant to Section VI.G.2. of the Plan.  Any Claim that is disallowed by order of the Bankruptcy Court (or the District Court) prior to the Effective Date shall be deemed expunged (to the extent not already expunged) as of the Effective Date without the necessity for further Bankruptcy Court approval and the holder of any such Claim shall not be entitled to any Distribution under the Plan.

### E.    Method of Distributions to Holders of Claims in General

Except as otherwise provided in the Plan, the Reorganized Debtors or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion shall make all Distributions of cash and other instruments or documents required under the Plan.  Each Disbursing Agent shall serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan.

### F.    Distributions of New Swift Common Stock and Warrants

On the Effective Date, the Reorganized Debtors (or their agent or designee) shall distribute (i) the Senior Notes and Rejection Distribution to the holders of the Senior Notes Claims and the holders of Rejection Claims, (ii) the Shareholder Equity Distribution to the holders of Stock Interests of Swift who provide the release set forth in Section IV.I.3.b. of the Plan and (iii) the Warrants to the holders of Allowed Stock Interests of Swift who provide the release set forth in Section IV.I.3.b. of the Plan.

### G.    Unclaimed Distributions of New Swift Common Stock and Warrants

Any Distribution of New Swift Common Stock and Warrants under the Plan that is unclaimed after six months after it has been delivered (or attempted to be delivered) shall be retained by the Reorganized Debtors, notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such Allowed Claim or Allowed Stock Interest of Swift to such Distribution or any subsequent Distribution on account of such Allowed Claim or Allowed Stock Interest of Swift shall be extinguished and forever barred.

H.      **Fractional New Swift Common Stock and Warrants and De Minimis Distributions**

Notwithstanding any other provision in the Plan to the contrary, no fractional shares of New Swift Common Stock or fractional Warrants shall be issued or distributed pursuant to the Plan. Whenever any Distribution of a fraction of a share of New Swift Common Stock or a fractional Warrant would otherwise be required under the Plan, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole share or warrant (up or down), with half shares or warrants or less being rounded down and fractions in excess of a half of a share or warrant being rounded up; provided, however, in no event shall such Distribution on account of fractional shares of New Swift Common Stock or fractional Warrants alter the respective percentages of the outstanding New Swift Common Stock allocated to any Class or Claim holder.   No consideration will be provided in lieu of fractional shares that are rounded down. Fractional shares of New Swift Common Stock or Warrants, as applicable, that are not distributed in accordance with Section IV.E. of the Plan shall be cancelled.  The Reorganized Debtors shall not be required to, but may in their sole and absolute discretion, make any payment on account of any Claim or Stock Interest of Swift in the event that the costs of making such payment exceeds the amount of such payment.

I.      **Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan shall receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. These payments shall be made on terms agreed to with the Reorganized Debtors and shall not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent.

J.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.      **Delivery of Distributions**

Distributions to holders of Allowed Claims shall be made by a Disbursing Agent (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims; (b) at the addresses set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of Filing of any related proof of Claim; or (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

2.      **Undeliverable Distributions Held by Disbursing Agents**

a.      **Holding and Investment of Undeliverable Distributions**

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions shall be made to such holder unless and until the applicable Disbursing Agent is notified by written certification of such holder's then-current address.  Undeliverable Distributions shall remain in the possession of the applicable Disbursing Agent pursuant to Section VI.G.2.a. of the Plan until such time as a Distribution becomes deliverable.  Undeliverable cash shall be held in segregated bank accounts in the name of the applicable Disbursing Agent for the benefit of the potential claimants of such funds.  Any Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtors' investment and deposit guidelines.

b.      **After Distributions Become Available**

On each Quarterly Distribution Date, the applicable Disbursing Agents shall make all Distributions that become deliverable to holders of Allowed Claims during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.

c.      **Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within one year after the later of (i) the Effective Date and (ii) the last date on which a Distribution was attempted to be made to such holder shall have its claim for such undeliverable Distribution discharged and shall be forever barred from asserting any such claim against the Reorganized Debtors or their respective property.  Unclaimed Distributions shall become property of the respective Reorganized Debtor, free of any restrictions thereon, including the right of any state or other government to escheat such property, and any such Distributions held by a Third Party Disbursing Agent shall be returned to the applicable Reorganized Debtor.  Nothing contained in the Plan shall require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

### K.       Distribution Record Date

#### 1.       No Recognition of Transfers After the Distribution Record Date

A Disbursing Agent shall have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

#### 2.       Treatment of Certain Transfers

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### L.       Means of Cash Payments

Except as otherwise specified herein, cash payments made pursuant to the Plan to holders of Claims shall be in U.S. currency by checks drawn on a domestic bank selected by the Reorganized Debtors, or, at the option of the Reorganized Debtors, by wire transfer from a domestic bank; provided, however, that cash payments to foreign holders of Allowed Claims may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### M.       Timing and Calculation of Amounts to Be Distributed

#### 1.       Timing of Distributions Under the Plan

Any Distribution to be made by any Debtor or Reorganized Debtor pursuant to the Plan shall be deemed to have been timely made if made within 60 days after the time therefor specified in the Plan.  Except as otherwise provided in the Plan, no interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

#### 2.       Allowed Claims

On the Effective Date, each holder of an Allowed Claim shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class.  On each Quarterly Distribution Date, Distributions also shall be made pursuant to Section VII.C. of the Plan to holders of Disputed Claims in any such Class that were allowed during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such quarterly Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

#### 3.       Compliance with Tax Requirements

##### a.       Withholding and Reporting

In connection with the Plan, to the extent applicable, each Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision of the Plan to the contrary, each Disbursing Agent shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any cash Distribution to be made under the Plan to pay applicable Tax withholding, requiring Claim holders to submit appropriate certifications or establishing other mechanisms such Disbursing Agent believes are reasonable and appropriate. To the extent that any Claim holder fails to submit appropriate certifications required by a Disbursing Agent or to comply with any other mechanism established by a Disbursing Agent to comply with Tax withholding requirements, such Claim holder's Distribution may, in such Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to Section VI.G.2. of the Plan.

### b.    Backup Withholding

Without limiting the generality of the foregoing, in accordance with the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides at the applicable Disbursing Agent's request a completed IRS Form W-9 (or substitute therefor) on which the holder includes a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Among other things, to receive any post-petition interest, if requested by a Disbursing Agent, a holder of an Allowed Claim shall be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding. Non-U.S. Allowed Claim holders may be required by the applicable Disbursing Agent to provide a completed IRS Form W-8BEN or W-8BEN-E, as applicable (or other applicable Form W-8 or successor form), to establish an exemption from or a treaty-reduced rate of withholding on interest distributed pursuant to the Plan. Unless a Disbursing Agent, in its discretion, determines otherwise, no Distributions on account of post-petition interest shall be made to a holder of an Allowed Claim until such time as the holder of such Claim establishes exemption from withholding or provides the applicable IRS Form.

### c.    Obligations of Distribution Recipients

Notwithstanding any other provision of the Plan, each Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other Tax obligations.

### 4.    Compliance with Domestic Relations Orders

In connection with the Plan, each Disbursing Agent may allocate and make Distributions in compliance with applicable wage garnishment, alimony, child support and similar domestic relations orders.

### N.    Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued. Any claim in respect of such a voided check shall be made within 30 days after the date upon which such check was deemed void. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Distribution shall revert without restriction to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

### O.    Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan,

the Reorganized Debtors or, as instructed by the applicable Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before any Distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claim, right or cause of action that the Debtor or Reorganized Debtor may possess against such a Claim holder; provided, however, that in no event may such setoffs be made against any Senior Notes Claim.

### P.      Allocation of Payments

Amounts paid to holders of Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess being allocated to accrued but unpaid interest on such Claims.

### Q.      Prosecution of Objections to Claims

#### 1.      Objections to Claims

Objections to Claims must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Cases.  If an objection has not been Filed to a proof of Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or Schedules relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.

#### 2.      Authority to Prosecute Objections

After the Effective Date, the Reorganized Debtors shall have the authority to File (if applicable), settle, compromise, withdraw or litigate to judgment objections to all Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors may settle, compromise or otherwise resolve any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

#### 3.      Authority to Amend Schedules

The Debtors or the Reorganized Debtors shall have the authority to amend the Schedules with respect to any Claim and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or Reorganized Debtor shall provide the holder of such Claim with notice of such amendment and such holder shall have 20 days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the Debtor or Reorganized Debtor may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

### R.      Treatment of Disputed Claims

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.

### S.      Distributions on Account of Disputed Claims Once Allowed

On each Quarterly Distribution Date, the applicable Disbursing Agent shall make all Distributions on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.

T.        **Discharge of Claims and Interests**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests.  Except as provided in the Plan or in the Confirmation Order, Confirmation shall, as of the Effective Date, discharge the Debtors from all Claims, Interests or other liabilities that arose on or before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim based on such debt has accepted the Plan.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of a discharge of all Claims, Interests and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against a Debtor at any time, to the extent that such judgment relates to a discharged Claim, debt or liability.

U.        **Injunctions**

1.        **General Injunctions**

a.        **No Actions on Account of Discharged Claims**

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claim, debt or liability:  (i) commencing or continuing in any manner any action or other proceeding against any Debtor or Reorganized Debtor, or any of its property, other than to enforce any right to a Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any Debtor or Reorganized Debtor, or any of its property, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance against any Debtor or Reorganized Debtor, or any of its property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor or Reorganized Debtor; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

b.        **No Actions on Account of Released Claims**

As of the Effective Date, all Entities that have held, currently hold or may hold any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities that are released pursuant to the Plan shall be permanently enjoined from taking any of the following actions against any released Entity, or any of its property, on account of such released claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities:  (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Entity; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

c.        **Recipients of Distribution Deemed to Consent**

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section IX.B. of the Plan.

V.      **Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

W.      **Subordination Rights**

The classification and manner of satisfying Claims and Interests under the Plan does not take into consideration subordination rights, and nothing in the Plan or Confirmation Order shall affect any subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

IX.     **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      **Executory Contracts and Unexpired Leases to Be Assumed**

1.      **Assumption Generally**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, including the Restructuring Transactions, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor shall assume, with the consent of the Required Consenting Noteholders, each of its respective Executory Contracts and Unexpired Leases other than those listed on Exhibit V.C. of the Plan; provided, however, that the Debtors, with the consent of the Required Consenting Noteholders, reserve the right, at any time prior to the Effective Date, to amend Exhibit V.C. of the Plan to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to Exhibit V.C. of the Plan, thus providing for its rejection pursuant to Section V.A.1. of the Plan.  The Debtors shall provide notice of any amendments to Exhibit V.C. of the Plan to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Cases.  Nothing herein shall constitute an admission by a Debtor or Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

2.      **Assumptions of Executory Contracts and Unexpired Leases**

Each Executory Contract or Unexpired Lease assumed under Section V.A.1. of the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease.

3.      **Approval of Assumption and Assignment Procedures**

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section V.A.1. of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. The procedures for assumption of an Executory Contract or Unexpired Lease are as follows:

a.      After the entry of the Confirmation Order, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim (which will be determined in consultation with the Required Consenting Noteholders) if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

b.      Any Entity wishing to object to (i) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must File and serve

on counsel to the Debtors a written objection setting forth the basis for the objection within 20 days of service of the notice described in Section V.A.3.a. of the Plan.

    c. If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease:  (i) the proposed assumption of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtors in the notice shall be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

    d. If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable and with the consent of the Required Consenting Noteholders, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

    e. If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection:  (i) the Debtors or Reorganized Debtors may File a reply to such objection no later than 30 days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) the Debtors or Reorganized Debtors, as applicable and with the consent of the Required Consenting Noteholders, may designate the Executory Contract or Unexpired Lease underlying such objection for rejection pursuant to Section V.C. of the Plan and amend Exhibit V.C. of the Plan accordingly.

**B.**    **Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

    To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or Reorganized Debtor (and with the consent of the Required Consenting Noteholders) assuming such contract or lease or the assignee of such Debtor or Reorganized Debtor, if any:  (1) by payment of the Cure Amount Claim in cash on the Effective Date or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest.  If there is a dispute regarding:  (1) the amount of any Cure Amount Claim; (2) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  For assumptions of Executory Contracts or Unexpired Leases between Debtors, the Reorganized Debtor assuming such contract may cure any monetary default (1) by treating such amount as either a direct or indirect contribution to capital or Distribution (as appropriate) or (2) through an intercompany account balance in lieu of payment in cash.

**C.**    **Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures**

    On the Effective Date, each Executory Contract and Unexpired Lease listed on Exhibit V.C. of the Plan shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract and lease listed on Exhibit V.C. of the Plan shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit V.C. of the Plan shall not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The appropriate procedures for rejection of an Executory Contract or Unexpired Lease are as follows:

a.        Unless previously rejected by an order of the Bankruptcy Court, after the entry of the Confirmation Order, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such proposed rejection.

b.        Any Entity wishing to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within 20 days of service of the notice described in Section V.C.1. of the Plan.

c.        If no objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court.

d.        If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable and with the consent of the Required Consenting Noteholders, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

e.        If an objection to the proposed rejection is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection, the Debtors or Reorganized Debtors, as applicable, may File a reply to such objection no later than 30 days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time.

D.        **Obligations to Indemnify Directors, Officers and Employees**

The obligations of each Debtor or Reorganized Debtor to indemnify any individual serving as one of its directors, officers or employees on the Petition Date by reason of such individual's prior or future service in such a capacity or as a director, officer or employee of any Debtor or other Entity, to the extent provided in the applicable Certificate of Incorporation or By-Laws, by statutory law or by written agreement, policies or procedures of or with such Debtor, shall be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date. Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date.

E.        **Contracts and Leases Entered Into After the Petition Date**

Notwithstanding any other provision of the Plan, contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business. Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

X.        **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN**

A.        **General**

**A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN**

**EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN. NO RULING HAS BEEN REQUESTED FROM THE IRS; NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.**

**THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, PARTNERS OR PARTNERSHIPS AND TAX EXEMPT ORGANIZATIONS, NOR DOES IT ADDRESS HOLDERS OF CLAIMS OR INTERESTS THAT ARE NOT ENTITLED TO VOTE ON THE PLAN. IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.**

**FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

      **B.**      **U.S. Federal Income Tax Consequences to the Debtors**

      **1.**      **Cancellation of Debt Income**

Generally, the discharge of a debt obligation of a U.S. debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income, that must be included in the debtor's income. The amount of the Debtors' COD income is dependent upon the value of the Plan consideration distributed on account of the Allowed Claims against the Debtors relative to the amount of such Allowed Claims (or adjusted issue price if different from the amount of the Allowed Claims), as well as the extent to which those Allowed Claims constitute debt for federal income tax purposes and to the extent the payment of such Allowed Claims would be deductible for tax purposes. However, COD income is excluded from taxable income by a taxpayer that is a debtor in a reorganization case if the discharge is granted by the bankruptcy court or pursuant to a plan of reorganization approved by a bankruptcy court. The Plan, if approved, would enable the Debtors to qualify for this bankruptcy exclusion rule with respect to any COD income triggered by the Plan.

If debt of a Debtor is discharged in a reorganization case qualifying for the bankruptcy exclusion, however, certain income tax attributes otherwise available and of value to the debtor are reduced, in most cases by the amount of the COD income. Tax attributes subject to reduction include, in the following order: (a) NOLs and NOL carryforwards; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate amount of the debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards. A U.S. debtor may elect to avoid the prescribed order of attribute reduction and instead reduce the basis of depreciable property first.

In the case of affiliated corporations filing a consolidated return, such as Swift and its consolidated U.S. subsidiaries that are taxed as corporations (the "Swift Loss Group"), the attribute reduction rules apply first to the separate attributes of or attributable to the particular corporation whose debt is being discharged, and then, if necessary, to certain attributes of other members of the group. Accordingly, COD income of a debtor would result

first in the reduction of any NOLs and other attributes, including asset basis, of or attributable to such debtor, and then, potentially, of consolidated NOLs and/or basis of or attributable to other members of the consolidated group. Attribute reduction does not occur until immediately after the close of the taxable year in which the debt discharge occurs, i.e., after use of any such NOLs and other attributes to determine the consolidated group's taxable income for the tax year in which the debt is discharged.

The Swift Loss Group is expected to recognize a significant amount of COD income in connection with the implementation of the Plan. The Reorganized Debtors have not yet determined whether to elect to first reduce tax basis in their depreciable property or to reduce NOLs first. Regardless of whether the Reorganized Debtors make this election, it is expected that the Reorganized Swift Loss Group will have significant NOLs remaining after reduction for COD income, although no assurance can be given at this time.

## 2.    Limitation on NOL Carryforwards

### a.    General

The Debtors estimate that their U.S. federal income tax NOL carryforwards are approximately $718 million as of the Petition Date, which amounts will likely be even higher on the Effective Date. These NOLs are primarily located in Swift Operating. The Debtors do not believe that the NOLs are currently subject to any limitations on use.

Section 382 of the IRC provides rules limiting the utilization of a corporation's NOLs and other losses, deductions and credits following a more than 50% change in ownership of a corporation's equity (an "Ownership Change"). An Ownership Change will occur with respect to the Swift Loss Group in connection with the Plan. Section 382(l)(6) of the IRC sets forth the limitation provisions applicable to corporations that undergo an ownership change in bankruptcy that does not qualify for, or for which the corporations elects out of, the Bankruptcy Exception (as defined below). Therefore, post-Effective Date usage of any NOLs and other tax attributes of the Swift Loss Group (after reduction for COD income) by the Reorganized Swift Loss Group will be limited by section 382(l)(6) of the IRC, unless the Bankruptcy Exception applies to the transactions contemplated by the Plan. Under section 382(l)(6), the amount of post-ownership change annual taxable income of the Reorganized Swift Loss Group that can be offset by the pre-ownership change NOLs of the Swift Loss Group generally cannot exceed an amount equal to the product of (a) the applicable federal long-term tax-exempt rate in effect on the date of the ownership change (e.g., 2.65% for an ownership change occurring in January 2016) and (b) the value of Reorganized Swift Equity Interests immediately after implementation of the Plan (the "Annual Limitation"). The value of Reorganized Swift Equity Interests for purposes of this computation would reflect the increase, if any, in value resulting from any surrender or cancellation of any Claims in the Reorganization Cases.

The Annual Limitation may be increased if Swift has a net unrealized built-in gain at the time of its Ownership Change. If, however, Swift has a net unrealized built-in loss at the time of its Ownership Change, the Annual Limitation may apply to amounts of the net unrealized built-in loss that are recognized within five years after the Ownership Change.

Any unused Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable year. However, if Reorganized Swift and its subsidiaries do not continue the Debtors' historic business or use a significant portion of their assets in a new business for two years after the ownership change (the "Business Continuity Requirement"), the Annual Limitation resulting from the ownership change is zero.

### b.    Bankruptcy Exception

Section 382(l)(5) of the IRC (the "Bankruptcy Exception") provides that the Annual Limitation will not apply to limit the utilization of a debtor's NOLs or built-in losses if the debtor stock owned by those persons who were stockholders of the debtor immediately before the ownership change, together with the stock received by certain holders of claims pursuant to the debtor's plan, comprise 50% or more of the value of all of the debtor's stock outstanding immediately after the ownership change. Stock received by holders will be included in the 50% calculation if, and to the extent that, such holders constitute "qualified creditors." A "qualified creditor" is a holder

of debt that (i) was held by such holder since the date that is 18 months before the date on which the debtor first filed its petition with the bankruptcy court or (ii) arose in the ordinary course of business and is held by the person who at all times held the beneficial interest in such debt.  In determining whether the Bankruptcy Exception applies, certain holders of debt that would own a *de minimis* amount of the debtor's stock pursuant to the debtor's plan are presumed to have held their debt since the origination of such debt.  In general, this *de minimis* rule applies to holders of debt who would own directly or indirectly less than 5% of the total fair market value of the debtor's stock pursuant to the plan.  The applicability of this Bankruptcy Exception to the Swift Loss Group is uncertain.

If the Bankruptcy Exception applies, a subsequent ownership change with respect to the Reorganized Swift Loss Group occurring within two years after the Effective Date will result in the reduction of the Annual Limitation that would otherwise apply to the subsequent ownership change to zero.  Thus, an ownership change within two years after the Effective Date would eliminate the ability of the Swift Loss Group to use pre-ownership change NOLs thereafter.  If the Bankruptcy Exception applies, the Business Continuity Requirement does not apply, although a lesser business continuation requirement may apply under Treasury regulations.  If a change of ownership occurs after the two years following the Effective Date, then the Swift Loss Group will become subject to limitation in the use of their NOLs based upon the value of the Swift Loss Group at the time of that subsequent change.

Although the Annual Limitation will not apply to restrict the deductibility of NOLs if the Bankruptcy Exception applies, NOLs of the Swift Loss Group will be reduced by the amount of any deduction for any interest paid or accrued, with respect to all Allowed Claims converted into Reorganized Swift Equity Interests, by the Debtors during the three taxable years preceding the taxable year in which the ownership change occurs and during the portion of the taxable year of the ownership change preceding the ownership change.

The Reorganized Swift Loss Group has not yet determined whether it is eligible for the Bankruptcy Exception. Even if the Bankruptcy Exception otherwise applies, the Reorganized Debtors may elect to not have the Bankruptcy Exception apply, in which event the Annual Limitation would apply.  The Reorganized Swift Loss Group will have until the due date of the tax return for the taxable year of the Effective Date to make such a determination. Transfers of Stock Interests in Reorganized Swift may be subject to customary restrictions consistent with the preservation of the NOLs and other tax attributes of the Debtors, including as necessary to avoid a second ownership change that would eliminate the benefits of the Bankruptcy Exception.

### 3.        Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular federal income tax purposes by available NOL carryforwards, a corporation is generally entitled to offset no more than 90% of its AMTI with NOL carryforwards (as recomputed for AMT purposes).  Accordingly, usage of the Debtors' NOLs by the Reorganized Debtors may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

If a corporation (or a consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

C.      **U.S. Federal Income Tax Consequences to U.S. Holders of Claims in Classes 4A, 4B, 4E and 4F**

For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

The U.S. federal income tax consequences of the Plan to a U.S. Holder of an Allowed Claims in Classes 4A, 4B, 4E and 4F will depend, in part, on whether the Senior Notes constitute "tax securities" for U.S. federal income tax purposes, whether the U.S. Holder reports income on the accrual or cash basis, whether the U.S. Holder has taken a bad debt deduction or worthless security deduction with respect to an Allowed Claim in Classes 4A, 4B, 4E and 4F and whether the U.S. Holder receives distributions under the Plan in more than one taxable year.

1.      **Definition of Securities**

There is no precise definition of the term "security" under the U.S. federal income tax law.  Rather, all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether it is a security.  Nevertheless, courts generally have held that a debt instrument having a term of less than five years will not be considered a tax security, while corporate debt evidenced by a written instrument and having an original maturity of ten years or more will be considered a tax security.  Because all of the Senior Notes had original maturities of approximately 10 years, it is probable that they are tax "securities", and the following discussion assumes that they are tax "securities."

2.      **Tax Treatment of Exchange of Securities for Equity**

Under the Plan, holders of Claims in Classes 4A, 4B, 4E and 4F (Senior Notes and Rejection Claims) will receive Stock Interests of Reorganized Swift in exchange for their Senior Notes.

As "securities" for U.S. federal income tax purposes, the exchange of Senior Notes for Stock Interests of Reorganized Swift pursuant to the Plan would be treated as part of a "reorganization" for U.S. federal income tax purposes.  Accordingly, a U.S. Holder who receives Stock Interests of Reorganized Swift in exchange for Senior Notes pursuant to the Plan generally would not recognize gain or loss on the exchange.  To the extent any portion of a U.S. Holder's recovery is allocable to interest on the Senior Notes, such portion would be treated as interest income to such holder.

The exchange of Senior Notes for Stock Interests of Reorganized Swift in the reorganization pursuant to the Plan would cause the U.S. Holder's aggregate tax basis in the Stock Interests of Reorganized Swift (apart from any portion thereof allocable to interest) to equal the holder's basis in its Senior Notes.  The holding period for the Stock Interests of Reorganized Swift (apart from any portion allocable to interest) would include the holder's holding period in the Senior Notes surrendered.

The U.S. Holder's tax basis in any Stock Interests of Reorganized Swift that are allocable to accrued interest on an Senior Note would equal the fair market value of such Stock Interests of Reorganized Swift on the date of the distribution to the holder, and the holding period of such Stock Interests of Reorganized Swift would begin on the day after the day of receipt.

D.      **Certain Other Tax Considerations for U.S. Holders of Allowed Claims**

1.      **Medicare Surtax**

Subject to certain limitations and exceptions, U.S. Holders who are individuals, estates or trusts may be required to pay a 3.8% Medicare surtax on all or part of that U.S. Holder's "net investment income," which includes, among other items, dividends on stock and interest (including original issue discount) on, and capital gains from the sale or other taxable disposition of, debt. U.S. Holders should consult their own tax advisors regarding the effect, if any, of this surtax on their receipt and ownership of Stock Interests of Reorganized Swift issued pursuant to the Plan.

2.      **Accrued but Unpaid Interest**

In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on the U.S. Holder's Allowed Claim may be required to include such amount as taxable interest income upon receipt of a distribution under the Plan. A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on the U.S. Holder's Allowed Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Allowed Claim until such principal amount is paid in full and then to any accrued but unpaid interest on such Allowed Claim. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder and attributable to principal under the Plan is properly allocable to interest. Each U.S. Holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

3.      **Bad Debt and/or Worthless Securities Deduction**

A U.S. Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165 of the IRC. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

4.      **Market Discount**

A U.S. Holder that purchased its Allowed Claim from a prior U.S. Holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the U.S. Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Allowed Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

To the extent that a U.S. Holder's Senior Note is exchanged in a transaction in which gain or loss is not recognized for U.S. federal income tax purposes, any accrued market discount not treated as ordinary income upon such exchange should carry over, on an allocable basis, to any Stock Interests of Reorganized Swift received, such that any gain recognized by the holder upon a subsequent disposition of such Stock Interests of Reorganized Swift would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

The market discount rules are complicated, and in particular, their application to an Allowed Claim acquired at a significant discount to face is uncertain. U.S. Holders of Allowed Claims that acquired them at a discount are urged to consult their tax advisors.

5.        **Information Reporting and Backup Withholding**

All distributions under the Plan will be subject to applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest.  Under the IRC's backup withholding rules, a U.S. Holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the U.S. Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax.  A U.S. Holder of an Allowed Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**E.        Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims in Classes 4A, 4B, 4E and 4F**

For purposes of this discussion, a "<u>Non-U.S. Holder</u>" is any Holder that is neither a U.S. Holder nor a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes.

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Claims in Classes 4A, 4B, 4E and 4F.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders of Claims in Classes 4A, 4B, 4E and 4F are complex.  Each Non-U.S. Holder of Claims in Classes 4A, 4B, 4E and 4F should consult its own tax advisor regarding the U.S. federal, state and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the Stock Interests of Reorganized Swift.

1.        **Tax Treatment of Exchange of Securities for Equity**

A Non-U.S. Holder of Claims in Classes 4A, 4B, 4E and 4F generally would not recognize gain or loss on the exchange of its Claims for Stock Interests of Swift in the tax "reorganization," as set forth above in connection with U.S. Holders of Claims in Classes 4A, 4B, 4E and 4F.

2.        **Accrued but Untaxed Interest**

Subject to the application of FATCA and/or backup withholding, payments to a Non-U.S. Holder of Claims in Classes 4A, 4B, 4E and 4F that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person and therefore the portfolio interest exception is met, unless:

- the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes entitled to vote;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder tenders a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (a) generally will not be subject to withholding tax, but (b) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty

provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder that does not qualify for an exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax established through adequate documentation to be available to such holder under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E (or such successor form as the IRS designates), special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3.        Sale, Redemption or Repurchase of Stock Interests of Reorganized Swift

Subject to the application of FATCA and/or backup withholding, a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of the Stock Interests of Reorganized Swift unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the Reorganized Debtors (and/or the Debtors) are or have been a U.S. real property holding corporation (a "USRPHC") for U.S. federal income tax purposes at any time within the shorter of the five-year period preceding the disposition or the Non-U.S. Holder's holding period for the Stock Interests of Reorganized Swift.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax established through adequate documentation to be available to such holder under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed certain capital losses allocable to U.S. sources during the taxable year of disposition.  If the second or the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder and, if the third exception applies, would also be subject to withholding tax with respect to gross proceeds, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).  Although the Debtors have not performed a formal analysis and it is therefore not free from doubt, it is likely that Swift is a USRPHC and that Reorganized Swift will also be a USRPHC.

### 4.        Distributions Paid to Non-U.S. Holders

Any distributions made with respect to Equity Interests of Reorganized Swift will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles.  If the amount of any distribution exceeds the Reorganized Debtors' current or accumulated profits, such excess will first be treated as a return of capital to the extent of a Non-U.S. Holder's basis in its Equity Interests of Reorganized Swift, and thereafter will be treated as capital gain.  Except as described below, dividends paid with respect to Stock Interests of Reorganized Swift held by

a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax established through adequate documentation to be available to such holder under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to Stock Interests of Reorganized Swift held by a Non-U.S. Holder that are established through adequate documentation to be effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### 5.    FATCA

Pursuant to the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities who do not comply with certain new information reporting rules with respect to their U.S. account holders and investors may be subject to a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements will generally be subject to a new 30% withholding tax with respect to any "withholdable payments."  For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodical income (including distributions, if any, on Stock Interests of Reorganized Swift) and also include the entire gross proceeds from the sale or other disposition of any property of a type which can produce U.S.-source interest or dividends (which would include Stock Interests of Reorganized Swift) even if the payment would otherwise not be subject to U.S. nonresident withholding tax (e.g., because it is capital gain).  Under the applicable final Treasury regulations, withholding under FATCA will generally apply to payments of U.S.-source dividends on the Stock Interests of Reorganized Swift, although withholding will be deferred until January 1, 2019 for gross proceeds from dispositions of the Stock Interests of Reorganized Swift. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

We will not pay any additional amounts to Non-U.S. Holders in respect of any amounts withheld pursuant to FATCA.  Under certain circumstances, a Non-U.S. Holder might be eligible for refunds or credits of such taxes. Non-U.S. Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstances.

The tax consequences of the Plan to the Non-U.S. Holders are uncertain.  Non-U.S. Holders should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

### F.    The Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

XI.    APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS

A.    **Stock Interests of Reorganized Swift**

The following is a discussion of the federal and state securities laws applicable to the issuance of securities pursuant to the Plan, including the Stock Interests of Reorganized Swift.

The Debtors anticipate that no registration statement will be filed under the Securities Act or any state securities laws with respect to the offer and distribution under the Plan of the Stock Interests of Reorganized Swift in respect of certain Claims.  The Debtors believe that the provisions of section 1145(a) of the Bankruptcy Code exempt the offer and distribution of such securities under the Plan from federal and state securities registration requirements as discussed below.

1.    **Initial Offer and Sale**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (b) the recipients of the securities must hold a claim against, interest in, or an administrative expense claim in the case concerning the debtor or such affiliate; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such affiliate, or principally in such exchange and partly for cash or property.  Section 1145(a)(2) of the Bankruptcy Code exempts the offer of a security through any warrant, option, right to purchase or conversion privilege that is sold in the manner specified in section 1145(a)(1) and the sale of a security upon the exercise of such a warrant, option, right or privilege.

The exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.  Section 1145(b) provides that, with specified exemptions and except with respect to "ordinary trading transactions" of an entity that is not an "issuer," an entity is an "underwriter" if the entity:

- purchases a claim against, an interest in, or a claim for administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

- offers to sell securities offered under a plan for the holders of such securities ("distributors");

- offers to buy securities under a plan from the holders of such securities, if the offer to buy is (a) with a view to distributing such securities and (b) made under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or

- who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly controlling, controlled by or under common control with the issuer.

The Debtors believe that the offer and sale of Stock Interests of Reorganized Swift under the Plan in satisfaction of Claims satisfy the requirements of section 1145(a) of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and state securities laws.

Persons who are not deemed "underwriters" may generally resell the securities they receive under section 1145(a)(1) without registration under the Securities Act or other applicable law.  Persons deemed "underwriters"

may sell such securities without registration only pursuant to exemptions from registration under the Securities Act and other applicable law.

2.      **Subsequent Transfers Under Federal Securities Law**

a.      **Non-Affiliates**

Securities issued pursuant to section 1145(a) are deemed to have been issued in a public offering pursuant to section 1145(c) of the Bankruptcy Code.  In general, therefore, resales of and subsequent transactions in such securities issued under the Plan will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to  such securities.  For these purposes, an "issuer" includes any "affiliate" of the issuer, defined as a person directly or indirectly controlling, controlled by or under common control with the issuer.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.   A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.  Whether or not any particular person would be deemed to be an "affiliate" of Reorganized Swift or an "underwriter" or a "dealer" with respect to any securities issued under the Plan will depend upon various facts and circumstances applicable to that person.

Notwithstanding the provisions of section 1145(b) of the Bankruptcy Code regarding accumulators and distributors, in connection with prior bankruptcy cases, the staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators or distributors of securities who are not "affiliates" of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions."  The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

- either (a) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (b) concerted action by distributors on behalf of one or more recipients in connection with such sales;

- the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto and documents filed with the SEC pursuant to the Exchange Act; or

- the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades.

The Debtors have not sought the views of the SEC on this matter and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above.  Any persons intending to rely on such exemption are urged to consult their own counsel as to the applicability thereof to any particular circumstances.

b.      **Affiliates**

Securities issued under the Plan to "affiliates" of Reorganized Swift will be subject to restrictions on resale. Affiliates of Reorganized Swift for these purposes will generally include its directors and officers and its controlling stockholders.  While there is no precise definition of a "controlling" stockholder, the legislative history of section

1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" of the debtor.  For any "affiliate" of an issuer deemed to be an underwriter, Rule 144 under the Securities Act provides a safe-harbor from registration under the Securities Act for certain limited public resales of unrestricted securities by "affiliates" of the issuer of such securities.  Rule 144 allows a Holder of unrestricted securities that is an affiliate of the issuer of such securities to sell, without registration, within any three-month period a number of shares of such unrestricted securities that does not exceed the greater of 1% of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer.

### 3.        Subsequent Transfers Under State Law

The securities issued under the Plan pursuant to section 1145(a) of the Bankruptcy Code generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states.  However, the availability of such state exemptions depends on the securities laws of each state, and holders of Claims may wish to consult with their own legal advisors regarding the availability of these exemptions in their particular circumstances.

In addition, state securities laws generally provide registration exemptions for subsequent transfers to institutional or accredited investors.  Such exemptions generally are expected to be available for subsequent transfers of the securities issued pursuant to the Plan.

**GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER AND OTHER ISSUES ARISING UNDER APPLICABLE SECURITIES LAWS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER STOCK INTERESTS IN REORGANIZED SWIFT ISSUED PURSUANT TO THE PLAN.  THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

## XII.    ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  The Debtors, with the consent of the Required Consenting Noteholders, will File all Exhibits to the Plan with the Bankruptcy Court that are currently not attached as Exhibits to the Plan and make them available for review on the website of Kurtzman Carson Consultants LLC at www.kccllc.net/swiftenergy no later than 10 days before the deadline to vote on the Plan.  The Debtors also will serve these supplemental Exhibits to the Plan on the parties on the general service list maintained in the Reorganization Cases no later than 10 days before the deadline to vote on the Plan.

## XIII.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all holders of Senior Notes and Rejection Claims in Classes 4A, 4B, 4E and 4F, the only Classes entitled to vote on the Plan, to vote to accept (i.e., vote in favor of) the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the deadline to vote on the Plan.

Dated:  December 31, 2015

Respectfully submitted,

SWIFT ENERGY COMPANY (for itself and on behalf of all other Debtors )

By:  /s/ _____
    Terry Swift
    President and Chief Executive Officer

Counsel:
Daniel J. DeFranceschi (DE 2732)
Zachary I. Shapiro (DE 5103)
Brendan J. Schlauch (DE 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

       - and -

Gregory M. Gordon (TX 08435300)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

Thomas A. Howley (TX 24010115)
Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

**EXHIBIT I**

**JOINT PLAN OF REORGANIZATION OF
THE DEBTORS AND DEBTORS IN POSSESSION**

**EXHIBIT II**

**VOTING PROCEDURES**

**EXHIBIT III**

**PROJECTIONS**

**EXHIBIT IV**

**LIQUIDATION ANALYSIS**

**EXHIBIT V**

**RESTRUCTURING SUPPORT AGREEMENT**