**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

**ORIGINAL**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| SWIFT ENERGY COMPANY, *et al.*,[1] | : | Case No. 15-12670 (MFW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | **Re: Docket No. 17** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING ON A SUPER-PRIORITY, SECURED
BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND
SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN
PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] [Docket No. 17], dated December 31, 2015, of Swift

Energy Company ("<u>Swift</u>") and certain of its affiliates, as debtors and debtors in possession in

the above-captioned cases (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") pursuant to

sections 105, 361, 362, 363(c), 363(e), 364(c), 364(e), and 507 of chapter 11 of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "<u>Local Rules</u>"), seeking entry of an interim order (this "<u>Interim Order</u>") providing

for, among other things:

---

[1] The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Swift Energy Company (0661); Swift Energy International, Inc. (6721); Swift Energy Group, Inc. (8150); Swift Energy USA, Inc. (8212); Swift Energy Alaska, Inc. (6493); Swift Energy Operating, LLC (2961); GASRS LLC (4381); SWENCO-Western, LLC (0449); and Swift Energy Exploration Services, Inc. (2199). The address of each of the Debtors is 17001 Northchase Drive, Suite 100, Houston, Texas 77060.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

(i)      authority for the Debtors to obtain secured postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Debtor-in-Possession Credit Agreement, by and among Swift, as borrower (the "DIP Borrower"), Swift Energy Operating, LLC ("Swift Energy Operating"), GASRS LLC ("GASRS"), and SWENCO Western, LLC ("SWENCO" and, together with Swift Energy Operating and GASRS, the "Guarantors" and, together with Swift, the "Loan Parties"), as guarantors, Cantor Fitzgerald Securities, as administrative agent for the DIP Lenders (as defined below) (the "DIP Agent"), and the lenders party thereto from time to time (collectively, the "DIP Lenders"), substantially in the form attached hereto as **Exhibit 1** (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Credit Agreement" and the financing made available pursuant to the DIP Credit Agreement and the other DIP Documents (as defined below), the "DIP Facility");

(ii)      authority for the Debtors to (a) execute, deliver, and perform under the DIP Credit Agreement and all other related or ancillary documents and agreements (including the Budget (as defined below)) (collectively with the DIP Credit Agreement, the "DIP Documents"), and (b) perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)      authority for the Debtors to (a) use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code and/or under the DIP Documents, as applicable (the "Cash Collateral") and the other RBL Collateral (as defined below), subject to (x) the restrictions set forth in the DIP Documents and this Interim Order, and (y) the grant of adequate protection to the Prepetition Secured Parties for any diminution

in value of their interests in the RBL Collateral (each as defined herein), and (b) access and use the liquidity provided under the DIP Facilities on an interim basis, as follows (1-3 below being collectively defined as the "Interim DIP Financing"):

(1) access and use of the postpetition term loans made available from time to time under the DIP Facility in the amount of up to $15.0 million during the period commencing on the closing date of the DIP Facility through the entry of the Final Order to provide for ongoing debtor-in-possession working capital, capital expenditures, and other general corporate purposes, in each case consistent with the Budget;

(2) pay interest, fees (including the Backstop Fee (as defined herein)), expenses, and other payments (including original issue discount in respect of the total amount of committed financing funded under the DIP Facility) contemplated in respect of the DIP Facility or as contemplated with respect to Adequate Protection (as defined herein) below; and

(3) administer the Debtors' chapter 11 cases and fund certain reorganization and restructuring fees, costs and expenses, including, without limitation, administrative and professional fees, costs and expenses, each on the terms set forth herein and in the DIP Documents;

(iv)      subject to the Carve-Out and the terms of paragraph 6(b), a grant of an automatically perfected, valid, enforceable, and unavoidable security interests and liens, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, on all DIP Collateral (as defined herein) and assets of the Loan Parties, including, following entry of the Final Order,  with respect to the proceeds of Avoidance Actions (as defined below), as more fully described herein;

(v)        a grant, with respect to the obligations of the Loan Parties hereunder and under the other DIP Documents (and subject only to the Carve-Out described in paragraph 31 hereof and, other than with respect to the Unencumbered Property (as hereinafter defined), the RBL 507(b) Claim described in paragraph 11(a) hereof), of an allowed super-priority administrative expense claim in each of the Debtors' bankruptcy cases (and against each of the Debtors' estates created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), or 726 thereof);

(vi)       authority for the Debtors to pay the principal, interest, fees (including the Backstop Fee), expenses, and other amounts payable under the DIP Documents as such become due, including, the reasonable and documented fees and disbursements of the DIP Agent's, the DIP Lenders' and the Ad Hoc Committee's (as defined below) attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the DIP Documents;

(vii)      a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as set forth herein;

(viii)     approval of the Chapter 11 Case Milestones (as set forth in the definition of "Milestones" in the DIP Credit Agreement and in Section 5.01 of that certain Restructuring Support Agreement entered into as of December 31, 2015, by and among

the Debtors and the ad hoc committee of Senior Noteholders (the "Ad Hoc Committee"),

the "Milestones") in respect of the Debtors' restructuring; and

        (ix)        scheduling of a final hearing (the "Final Hearing") to consider entry of an

order approving the relief requested in the Motion on a final basis (the "Final Order") and

approving the form of notice with respect to the Final Hearing;

and the Court having considered the Motion, the *Declaration of Dean E. Swick in Support of*

*Debtors' Chapter 11 Petitions and First Day Motions* filed concurrently with the Motion, the

DIP Documents, the evidence submitted or proffered at the interim hearing to consider the relief

requested in the Motion held on January 5, 2016 (the "Interim Hearing"); and notice of the

Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d),

and 9014; and the Interim Hearing having been held and concluded; and all objections to the

relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and

based on all pleadings filed with this Court, and all proceedings held before the Court; and it

appearing to the Court that granting the interim relief requested in the Motion is fair and

reasonable and in the best interests of the Debtors, their estates, and their creditors and equity

holders, and is essential for the continued operation of the Debtors' businesses; and it further

appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable

as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and adequate

protection being provided on account of the interests of certain holders of liens on the property of

the estates on which liens are to be granted; and after due deliberation and consideration, and for

good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE
DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:

      A.      *Petition Date*. On December 31, 2015 (the "Petition Date"), each of the Debtors
filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States
Bankruptcy Court for the District of Delaware (the "Court") commencing these chapter 11 cases.

      B.      *Debtors-in-Possession*. The Debtors continue to operate their businesses and
properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.
No trustee or examiner has been appointed in these chapter 11 cases.

      C.      *Jurisdiction and Venue*. This Court has jurisdiction over these proceedings and
the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334, and the
*Amended Standing Order of Reference from the United States District Court for the District of
Delaware*, dated as of February 29, 2012. Consideration of the Motion constitutes a core
proceeding under 28 U.S.C. § 157(b)(2). The Court may enter a final order consistent with
Article III of the United States Constitution. Venue for these chapter 11 cases and proceedings
on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

      D.      *Committee Formation*. As of the date hereof, the United States Trustee (the "U.S.
Trustee" has not yet appointed an official committee of unsecured creditors (the "Committee") in
these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.

      E.      *Debtors' Stipulations*. Subject only to the rights of parties in interest as set forth
in paragraph 35 hereof, after consultation with their attorneys and financial advisors, the Debtors
(on behalf of, and for themselves) admit, stipulate, acknowledge, and agree to the following:

(i)        *RBL Facility.*  Swift and Swift Energy Operating, as borrowers, the Guarantors, as guarantors, the lenders from time to time party thereto (the "RBL Lenders"), and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "RBL Agent" and, together with the RBL Lenders, the "RBL Secured Parties") and as issuing bank, are parties to that certain Second Amended and Restated Credit Agreement, dated as of September 21, 2010 (as may be amended, restated, modified, supplemented, or replaced from time to time, the "RBL Credit Agreement").

(ii)        The RBL Credit Agreement provides the Debtors with a reserve-based credit facility (the "RBL Facility"), subject to a borrowing base, all as set forth in the RBL Credit Agreement. As of the Petition Date, approximately $329.9 million of "Loans" (as defined in the RBL Credit Agreement) and not less than approximately $5.0 million in face amounts of letters of credit were outstanding under the RBL Facility. In addition, interest accrued and accruing at the rates set forth in the RBL Credit Agreement (together with any other Obligations (as defined in the RBL Credit Agreement) including obligations in respect of cash collateral for letters of credit, fees, expenses, and indemnity and all other obligations  secured by the Loan Documents (as defined by the RBL Credit Agreement), including without limitation, the Cash Management Obligations and the Hedging Obligations, collectively, the "RBL Obligations") was outstanding at the Petition Date. The RBL Obligations are secured by  first priority security interests and liens on substantially all of the Debtors' real and personal property,  including, without limitation, substantially all of the Borrowers' and Guarantors' Oil and Gas  Property (as defined in the RBL Credit Agreement), hydrocarbons and all cash, money and cash equivalents and all proceeds, products, rents or profits of all of the foregoing

(collectively, the "RBL Collateral" and the "RBL Liens," as applicable) pursuant to, and in accordance with, the "Security Instruments" (as such term is defined and as set forth in the RBL Credit Agreement; the "RBL Collateral Documents," and, together with the RBL Credit Agreement and the Loan Documents (as defined in the RBL Credit Agreement), the "RBL Documents") and the setoff rights described in the RBL Documents or arising by operation of law.

(iii)        *Senior Notes.*  Pursuant to (a) that certain Indenture, dated as of May 16, 2007 (as amended, modified, and/or supplemented from time to time, including as supplemented on June 1, 2007, by that certain First Supplemental Indenture (the "2017 Notes Indenture")), by and among  Swift, as issuer, Swift Energy Operating, as subsidiary guarantor, and Wells Fargo Bank, National Association, as trustee (solely in its capacity as such, together with its permitted successors and assigns, the "Indenture Trustee"), 7 1/8% senior notes due 2017 (the "2017 Notes") were issued in the principal amount of $250.0 million and (b) that certain Indenture, dated as of May 19, 2009 (as amended, modified, and/or supplemented from time to time, including (x) as supplemented on November 25, 2009, by that certain First Supplemental Indenture (as modified by such First Supplemental Indenture, the "2020 Notes Indenture") and (y) as supplemented on November 30, 2011, by that certain Second Supplemental Indenture (as modified by such Second Supplemental Indenture, the "2022 Notes Indenture" and, together with the 2017 Notes Indenture and the 2020 Notes Indenture, the "Senior Notes Indentures" and, together with the RBL Documents, the "Prepetition Financing Documents")), in each case, by and among Swift, as issuer, Swift Energy Operating, as subsidiary guarantor, and the Indenture Trustee, (x) 8 7/8% senior notes due 2020 (the

"2020 Notes") were issued in the principal amount of $225.0 million pursuant to the 2020 Notes Indenture and (y) 7 7/8% senior notes due 2022 (the "2022 Notes" and, together with the 2017 Notes and the 2020 Notes, the "Senior Notes") were issued in the principal amount of $400.0 million pursuant to the 2022 Notes Indenture. As used herein, the "Senior Noteholders" means the holders under the Senior Notes Indenture (together with the Indenture Trustee, the "Senior Notes Parties"). As of the Petition Date, approximately $875.0 million, plus interest accrued at the rates set forth in the Senior Notes Indentures, was outstanding in respect of the Senior Notes (together with any other amounts outstanding under the Senior Notes Indentures, including obligations in respect of fees, expenses, and indemnity, and any obligations created pursuant to this Interim Order, the "Senior Notes Obligations").

(iv)        *Validity and Priority of Prepetition Indebtedness and Liens.* After consultation with their attorneys and financial advisors, the Debtors, the RBL Agent, and the holders of a majority in principal amount of the Senior Notes (the "Required Senior Noteholders") acknowledge and agree that (a) the liens on the RBL Collateral granted pursuant to the RBL Documents are valid, binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except as expressly set forth in the RBL Documents); (b) the RBL Documents are valid and enforceable by the RBL Agent and RBL Lenders against each of the Debtors party to such agreements; (c) the Senior Notes Indentures are valid and enforceable by the Indenture Trustee and the Senior Noteholders against each of the

Debtors party to such agreements; (d) the RBL Obligations and the Senior Notes Obligations constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the RBL Documents and the Senior Notes Indentures; (e) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the RBL Obligations  or to any of the Senior Notes Obligations   exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law, except as expressly set forth in the RBL Documents and the Senior Notes Indentures; (f) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the RBL Agent, the RBL Lenders, the Indenture Trustee,  the Senior Noteholders, and/or any of such parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the RBL Documents or the Senior Notes Indentures (or the transactions contemplated thereunder), the RBL Obligations and the Senior Notes Obligations, or the security interests in and liens on the RBL Collateral; (g) as of the Petition Date, the RBL Obligations and Senior Notes Obligations constitute allowed and, as applicable, secured claims within the meaning of sections 506(a) and 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees, including, attorneys' and financial advisory fees

and related expenses, costs, expenses, and other charges of whatever nature owing in respect thereof; (h) the Debtors have waived, discharged, and released any right to challenge any of the RBL Obligations and the Senior Notes Obligations, including the priority thereof, and, in the case of the RBL Obligations, the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the RBL Agent, RBL Lenders, Indenture Trustee, and Senior Noteholders, and/or any of their respective officers, directors, or employees; (i) any payments made on account of the RBL Obligations and the Senior Notes Obligations (including, as applicable, the RBL Obligations and the Senior Notes Obligations) to or for the benefit of the RBL Agent, RBL Lenders, Indenture Trustee, or Senior Noteholders prior to the Petition Date were payments out of prepetition collateral and such payments did not diminish any property otherwise available for distribution to unsecured creditors; and (j) the aggregate value of the RBL Collateral exceeds the aggregate amount of the RBL Obligations.

(v)    *Cash Collateral.*    The Debtors acknowledge and stipulate that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other RBL Collateral, including without limitation, from the conversion of hydrocarbons, or subject to setoff rights, constitutes "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) of the RBL Secured Parties (the "Cash Collateral").

(vi)    *Default by the Debtors.*    The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the RBL Documents and the Senior Notes Indentures.  Furthermore, the Debtors acknowledge and stipulate that by

filing petitions for relief under chapter 11 of the Bankruptcy Code and commencing these chapter 11 cases, the principal amount of all of their debts and obligations under the RBL Documents and the Senior Notes Indentures (including, without limitation, any premiums payable thereunder and in accordance with the terms thereof) is immediately due and payable.

F.      *Consent to Adequate Protection*.    The RBL Agent has provided consent to the adequate protection provided in paragraph 11 of this Interim Order.

G.      *Findings Regarding the Postpetition Financing*.

        (i)      *Request for Postpetition Financing*.    The Debtors seek authority on an interim basis to:  (a) use Cash Collateral and the other RBL Collateral on the terms described herein, and (b) access and use the liquidity provided under the DIP Term Facility to:  (i) finance ongoing debtor-in-possession working capital purposes and other general corporate purposes; (ii) finance transaction fees, costs and expenses related to the DIP Credit Agreements; (iii) pay certain costs, fees, and expenses related to the above-captioned cases and make payment pursuant to any interim or final order of this Court authorizing the payment of prepetition amounts; (iv) make payments pursuant to this Order or any other order of the Court for the payment of prepetition amounts then due and owing by the Debtors; (v) make the payments in respect of the RBL Adequate Protection Obligations (defined below) set forth herein; and (vi) make intercompany loans to, and other investments in, certain Debtor and non-Debtor affiliates, in each case (i) through (iv), solely to the extent permitted under the DIP Documents and as expressly provided for in the Budget.

(ii)       *Need for Postpetition Financing and Use of Cash Collateral.*   The Debtors' need to use Cash Collateral and the other RBL Collateral and to obtain credit pursuant to the DIP Facility as provided for herein is necessary to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise to finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral and the other RBL Collateral.  Without the ability to access the DIP Facility or Cash Collateral and the other RBL Collateral, the Debtors, their estates, their creditors, and the possibility for a successful reorganization would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iii)       *No Credit Available on More Favorable Terms.*   Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors have been unable to obtain unsecured credit allowable under sections 503(b)(1) or 364(b) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders, (a) perfected security interests in and liens on (each as provided herein) all of

the Debtors' existing and after-acquired assets with the priorities set forth herein, (b) superpriority claims with the priority set forth herein, and (c) the other protections set forth in this Interim Order.

(iv)    *Adequacy of the Budget*.  As set forth in the DIP Documents, the Debtors have prepared and delivered to the DIP Agent and the DIP Lenders a budget, a copy of which is annexed as **Exhibit IX** to the DIP Credit Agreement (as may be modified, amended, restated or supplemented with the consent of the holders of a majority in principal amount of the Loans (as defined in the DIP Credit Agreement) (the "Required DIP Lenders") on the terms set forth in the DIP Documents and paragraph 14 hereof, the "Budget").  The Budget has been thoroughly reviewed by the Debtors, their management, and their advisors.  The Debtors, their management, and their advisors believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtors believe there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the Budget.

H.    *Section 506(c)*.  In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and, except with respect to the Unencumbered Property, to the RBL Liens, the RBL Replacement Liens (as defined below) and the RBL 507(b) Claim (as defined below), and (ii) the RBL Secured Parties' agreement to subordinate their liens and claims to the Carve-Out, each of the DIP Agent, the DIP Lenders, and the RBL Secured Parties shall, only upon entry of the Final Order, each receive a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.       _Section 552_.  In exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and, except with respect to the Unencumbered Property, to the RBL Liens, the RBL Replacement Liens and the RBL 507(b) Claim, and (ii) the RBL Secured Parties' agreement to subordinate their liens and claims to the Carve-Out, each of the DIP Agent, the DIP Lenders, and the RBL Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply; _provided_, that subpart (ii) of the foregoing shall be subject to entry of the Final Order with respect to parties in interest other than the Debtors.

J.       _Good Faith of the DIP Agent and the DIP Lenders_.

(i)       _Willingness to Provide Financing_.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to:  (a) the entry by this Court of this Interim Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, or any other order.

(ii)       _Business Judgment and Good Faith Pursuant to Section 364(e)_.  The terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents, and the fees paid (including the Backstop Fee) and to be paid hereunder and thereunder, are

fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility and the use of Cash Collateral and other RBL Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Agent, the DIP Lenders, the RBL Agent and the Ad Hoc Committee, including certain members of the Ad Hoc Committee that have agreed to serve as backstop DIP Lenders (collectively, the "Backstoppers") with respect to the loans available under the DIP Facility.[3] The use of Cash Collateral and the other RBL Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the RBL Secured Parties, the DIP Agent, and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

(iii)    *Good Cause*.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the Debtors' business and on-going operations, (b) preserve and maximize the value of the Estates for the benefit of all the Debtors' creditors, and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

---

[3]    For the avoidance of doubt, unless expressly specified otherwise, the term "DIP Lenders" shall include the Backstoppers.

(iv)    *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  No party appearing in these Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

K.    <u>Notice</u>.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties-in-interest, including:  (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Ad Hoc Committee; (iii) counsel to the RBL Agent; (iv) counsel to the DIP Agent; (v) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these chapter 11 cases; (vi) all parties holding security interests in any of the Debtors' assets; and (vii) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m) (collectively, the "<u>Notice Parties</u>").  The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    <u>Interim DIP Financing Approved</u>.  The Interim DIP Financing is authorized and approved, and the use of Cash Collateral and the other RBL Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order and the DIP Documents (including the Budget).

2.        Objections Overruled.   All objections to the DIP Facility and/or entry of this Interim Order to the extent not withdrawn or resolved are hereby overruled.

**DIP Facility Authorization**

3.        Authorization of the Interim DIP Financing and Entry into the DIP Documents; Application of DIP Proceeds.   The DIP Facility is hereby approved for the Interim DIP Financing.   The Debtors are expressly and immediately authorized and empowered to enter into the DIP Documents, including the DIP Credit Agreement, to incur and to perform the DIP Obligations (as defined herein) in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents that may be necessary or required for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Interim Order and the DIP Documents.   The DIP Documents evidence valid and binding obligations of the Debtors, which shall be enforceable against the Debtors, their estates, and their creditors in accordance with the terms and conditions of the DIP Documents and this Interim Order.   The Debtors are hereby authorized to pay, in accordance with this Interim Order, the principal, interest, fees (including original issue discount and the Backstop Fee), expenses, and other amounts described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Documents.   Subject to paragraph 18(b) hereof, all collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order, the RBL Documents (except with respect to Unencumbered Property) and the DIP Documents.   All of the obligations described in the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with the terms of the DIP

Documents and this Interim Order. The proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Credit Agreement) shall be used to (i) finance ongoing debtor-in-possession working capital purposes and other general corporate purposes; (ii) finance transaction fees, costs and expenses related to the DIP Credit Agreement; (iii) pay certain costs, fees, and expenses related to the above-captioned cases and make payments pursuant to any interim or final order of this Court authorizing the payment of any prepetition amounts; (iv) make the payments in respect of the RBL Adequate Protection Obligations set forth herein and certain general unsecured claims in accordance with the RSA and (v) make intercompany loans to, and other investments in, certain Debtor and non-Debtor affiliates, in each case (i) through (iii), solely to the extent permitted under the DIP Documents and as expressly provided for in the Budget.

4.     Authorization to Access the Interim DIP Financing. During the period that this Interim Order is effective, and subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to access the Interim DIP Financing pursuant to the terms herein and the terms of the DIP Documents.

5.     DIP Obligations. Upon entry of this Interim Order, the DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' obligations under the DIP Facility, the other DIP Documents, and this Interim Order (the "DIP Obligations"), which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including, any trustee appointed in these cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").

Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or to any of the DIP Lenders, under the DIP Documents, or this Interim Order, including all principal, accrued interest, costs, fees (including the Backstop Fee), expenses, and other amounts under the DIP Documents. Subject to the terms of this Interim Order, the DIP Obligations shall be due and payable as provided for herein and in the DIP Documents.

      6.    <u>DIP Liens and Collateral.</u>

      (a)    As more fully set forth in the DIP Documents, as security for the DIP Obligations, effective immediately upon the entry of this Interim Order, the DIP Agent is hereby granted, for its own benefit and the benefit of the DIP Lenders, without the necessity of the execution or filing by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other similar documents and instruments, the following liens and security interests pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (collectively, the "<u>DIP Liens</u>") (all property and interests in property identified in clauses (i) and (ii) of this subparagraph (a) being collectively referred to as the "<u>DIP Collateral</u>"), which security interests and liens shall be junior in payment and lien priority to the RBL Liens and the RBL Replacement Liens (as defined below) except in respect of the Unencumbered Property (as defined below) and subject to the Carve-Out.

      (i)    <u>Liens on Unencumbered Property.</u>  Pursuant to section 364(c)(2) of the Bankruptcy Code, and subject to paragraph 6(b) of this Interim Order, the DIP Agent is hereby granted (for its own benefit and the benefit of the DIP Lenders) a perfected, first-priority security interest in and lien upon all pre- and post-petition property of the

Debtors, whether existing on the Petition Date or thereafter created, acquired or arising, whether real or personal, tangible or intangible, wherever located, that, on or as of the Petition Date, was not subject to valid, perfected and non-avoidable liens or was not subject to valid, non-avoidable liens perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code, including, without limitation, (a) all cash of the Debtors, (b) all personal property of the Debtors, whether tangible or intangible, including, without limitation, all accounts receivable, books and records, contract rights, hydrocarbons and other inventory generated or produced after the Petition Date, vehicles, deposit accounts, equipment, fixtures, patents, copyrights, trademarks, trade names and other intellectual property, good, general intangibles, payment intangibles, chattel paper, instruments, promissory notes, drafts and documents, investments, investment property, the Debtors' equity interest in any other entities (including, without limitation, subsidiaries and/or affiliates), securities, commercial tort claims, instruments, letters of credit and rights under letters of credit, and life insurance policies, together with the income, products and proceeds thereof, and (c) all of the Debtors' interest in any real property, including, without limitation, owned real estate, leasehold interests, leases (and the proceeds from the disposition thereof), buildings, improvements, fixtures and structures thereon, and the income, products and proceeds of the foregoing; provided, that, upon entry of the Final Order, the DIP Liens shall attach to and encumber the proceeds from the claims and causes of action under chapter 5 of the Bankruptcy Code and similar laws (collectively, the "Avoidance Actions"), including property received by judgment, settlement or

otherwise (all of the foregoing property, collectively, the "Unencumbered Property"). For the avoidance of doubt, in no event shall Unencumbered Property include the Cash Collateral or any other proceeds, products, rents or profits of the RBL Collateral.

(ii)  <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject to paragraph 6(b) of this Interim Order, the DIP Agent is hereby granted (for its own benefit and the benefit of the DIP Lenders) a perfected security interest in and lien upon all pre- and post-petition property of the Debtors (other than the unencumbered property described in clause (i) of this paragraph 6(a), as to which property the liens and security interests granted to the DIP Agent are as described in such clause (i)), together with the income, products and proceeds thereof, whether existing on the Petition Date or thereafter acquired or arising, that, on or as of the Petition Date, is subject to valid, perfected and non-avoidable liens in existence immediately prior to the Petition Date or to valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code, including, without limitation, (a) all cash and Cash Collateral of the Debtors, (b) all personal property of the Debtors, whether tangible or intangible, including, without limitation, all accounts receivable, books and records, contract rights, hydrocarbons and other inventory generated or produced after the Petition Date, vehicles, deposit accounts, equipment, fixtures, patents, copyrights, trademarks, trade names and other intellectual property, good, general intangibles, payment intangibles, chattel paper, instruments, promissory notes, drafts and documents, investments, investment property,

the Debtors' equity interest in any other entities (including, without limitation, subsidiaries and/or affiliates), securities, commercial tort claims, instruments, letters of credit and rights under letters of credit, and life insurance policies, together with the income, products and proceeds thereof, and (c) all of the Debtors' interest in any real property, including, without limitation, owned real estate, leasehold interests, leases (and the proceeds from the disposition thereof), buildings, improvements, fixtures and structures thereon, and the income, products and proceeds of the foregoing, which security interests and liens granted to the DIP Agent pursuant to this subparagraph (ii) shall be junior in priority to such valid, perfected and non-avoidable liens.

(b)    <u>DIP Lien Priority</u>.  Notwithstanding anything to the contrary set forth in this Interim Order or the DIP Documents, the DIP Liens shall be junior, subject and subordinate in all respects only to the following: (i) other than with respect to the Unencumbered Property, the RBL Liens, (ii) other than with respect to the Unencumbered Property, the RBL Replacement Liens (as defined below), (iii) the Permitted Liens (as defined in the RBL Credit Agreement) as of the Petition Date, (iv) the Permitted Liens (as defined in the DIP Credit Agreement) as of the Petition Date, and (v) the Carve-Out (as defined herein).  Subject to the foregoing priorities, the DIP Liens shall secure all DIP Obligations.  Except as expressly set forth herein, the DIP Liens shall not be subordinated or made subject to or *pari passu* with any lien or security interest by any order of this Court heretofore or hereafter entered in these chapter 11 cases, whether pursuant to sections 105, 364(d) or 510 of the Bankruptcy Code, or otherwise  (except (i) with the prior written consent of the Required DIP Lenders and the RBL Agent or (ii) to the extent such lien or security interest is granted in respect of financing that shall provide for the payment in full in cash of the DIP Obligations and, the case of a financing

described in paragraph 18(a) hereof, the RBL Obligations), and shall be valid, perfected and enforceable against the Debtors, their estates, the DIP Collateral, any trustee appointed in the Cases, and any trustee appointed in any Successor Cases, and/or upon the dismissal of any of these chapter 11 cases.   The Debtors agree, on behalf of themselves and their respective bankruptcy estates, that, for so long as any DIP Obligations shall be outstanding, other than as expressly set forth in this Interim Order, or the Final Order, as applicable, or the DIP Credit Agreement, they shall not, and they irrevocably waive any right (whether pursuant to sections 105, 364(c) or 364(d) of the Bankruptcy Code or otherwise) to, (i) grant or confer, or request the Court to grant or confer, any lien on all or any portion of the DIP Collateral that is pari passu with or senior in priority to the DIP Liens securing the DIP Obligations or (ii) grant or confer, or request the Court to grant or confer, any claim that is *pari passu* with or senior in priority to the DIP Superpriority Claims (as defined herein). The Debtors agree that, except as expressly set forth in this Interim Order, or the Final Order, as applicable, they shall take no action in the Cases to cause the DIP Liens or the DIP Superpriority Claims to be subordinated or made subject to or *pari passu* with any lien, security interest or claim by any order of the Court heretofore or hereafter entered in these chapter 11 cases, whether pursuant to sections 105, 364(c), 364(d) or 510 of the Bankruptcy Code, or otherwise.

(c)    Section 551 Protection.  The DIP Liens shall not be subject or junior to any lien or security interest that is avoided under section 522, 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, or any lien void under section 506(d) of the Bankruptcy Code, that is preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

(d)    Enforceable Obligations.  The DIP Obligations shall be valid and binding obligations of the Debtors party to the DIP Facility, jointly and severally, enforceable against the

Debtors party to the DIP Facility in accordance with the terms of this Interim Order and the DIP Documents.

7.    DIP Superpriority Claims.  In addition to the liens and security interests granted to the DIP Agent on its behalf and on behalf of the DIP Lenders pursuant to this Interim Order, subject and subordinate to the Carve-Out and, other than with respect to the Unencumbered Property, the RBL 507(b) Claim (as defined below) and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code; provided, that upon the entry of the Final Order, the DIP Superpriority Claims shall attach to the proceeds of the Avoidance Actions.

8.    Extension of Credit.  The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent acting at the direction of the Required DIP Lenders.

9.    Use of DIP Facility Proceeds.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only pursuant to the terms herein and the terms of the DIP Documents, including as contemplated and limited by the Budget (including any variance therefrom as may be expressly permitted under the DIP Documents).

**Authorization to Use Cash Collateral and Adequate Protection**

10.    Authorization to Use Cash Collateral and the Other RBL Collateral. Subject to the terms and conditions set forth in, and in accordance with, this Interim Order, the

DIP Facility, and the DIP Documents, the Debtors are authorized to use Cash Collateral and the other RBL Collateral. Except as expressly permitted in this Interim Order, the DIP Facility, and the DIP Documents, nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral, any other RBL Collateral or other proceeds resulting therefrom. The Debtors' consensual use of Cash Collateral shall terminate on the terms set forth in paragraph 24.

11.    <u>Adequate Protection</u>.    Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection for the interests of the RBL Secured Parties in the RBL Collateral (including Cash Collateral) and in an amount equal to the aggregate post-petition diminution in value of the RBL Secured Parties' interests in the RBL Collateral on account of subordination to the Carve-Out, the Debtors' use, sale, depreciation, or disposition of the Cash Collateral and other RBL Collateral and the imposition of the automatic stay (the "<u>RBL Adequate Protection Obligations</u>"), the RBL Secured Parties shall receive the following adequate protection:

(a)    <u>RBL 507(b) Claim</u>.  The RBL Adequate Protection Obligations shall constitute allowed superpriority administrative expense claims (the "RBL 507(b) Claim") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code; <u>provided</u>, that upon the entry of the Final Order, the RBL 507(b) Claim shall attach to the proceeds of the Avoidance Actions. The RBL 507(b) Claim shall be subject and junior only to the

Carve Out and, with respect to the Unencumbered Property, the DIP Superpriority Claims.

(b)    <u>RBL Replacement Liens</u>. As security for the RBL Adequate Protection Obligations, the RBL Secured Parties shall have, subject to the terms and conditions set forth below, additional and replacement security interests and liens in the DIP Collateral (the "<u>RBL Replacement Liens</u>"), which shall be subject and junior only to the Carve-Out, and, with respect to the Unencumbered Property, the DIP Liens and the DIP Superpriority Claims.

(c)    <u>RBL Adequate Protection Payments</u>. The RBL Agent shall be entitled to receive, for itself and for the benefit of the RBL Lenders, from the Debtors: (i) within five (5) days after entry of the Interim Order, payment in cash of (x) all accrued and unpaid letter of credit and other fees and disbursements owed to the RBL Agent and the RBL Lenders, including all reasonable and documented fees and out-of-pocket expenses of counsel and other professionals and advisors of the RBL Agent and the RBL Lenders incurred prior to the Petition Date pursuant to, and in accordance with, the RBL Credit Agreement (with all fees and expenses invoiced as of the Petition Date being deemed reasonable and reimbursable under the RBL Credit Agreement) and (y) all interest accrued to and unpaid as of the Petition Date, which interest shall be paid at the non-default rate(s) accrued under the RBL Credit Agreement; (ii) monthly when due, current payment in cash of all reasonable and documented fees and out-of-pocket expenses payable to the RBL Agent and RBL Lenders under the RBL Credit Agreement including all reasonable and documented fees and out-of-pocket expenses of counsel and other professionals and advisors of the RBL Agent and the RBL Lenders; (iii) monthly, current

payment in cash of all accrued but unpaid interest under the RBL Credit Agreement, at the applicable non-default rate set forth in the RBL Credit Agreement (with all payments of interest to be without prejudice to the rights of the RBL Agent and the RBL Lenders to assert a claim for payment of additional interest at any other rates in accordance with the RBL Credit Agreement), letter of credit fees and Cash Management Obligations.  None of the costs, fees and expenses payable under this paragraph 11 shall be subject to separate court approval, and the recipients shall not be required to file any interim or final fee applications therefor; provided, that this Court shall resolve any disputes as to the reasonableness of such fees and expenses; provided, however, that the RBL Agent shall submit copies of the RBL Agent's and RBL Lenders' legal counsels' and financial advisor's invoices to the U.S. Trustee and the Committee, and the Debtors, the U.S. Trustee and the Committee shall have fourteen (14) days following the receipt of such invoices to object to the reasonableness of the fees and expenses included in any such invoice.  If any such objection is not resolved within ten (10) days after such objection is interposed, a hearing with respect thereto shall be conducted at a regularly-scheduled omnibus hearing, provided that the Debtors shall pay any undisputed portion of such fees, costs and expenses on the first business day following fifteen (15) days after the initial presentment to the Debtors of such invoice.

(d) Budget.  The Budget annexed as **Exhibit IX** to the DIP Agreement is hereby approved by the RBL Agent as satisfactory in form and substance with respect to the use of Cash Collateral.  The Debtors shall provide the RBL Agent two (2) Business Days' notice (the "Budget Review Period") of any subsequent modification, amendment or update to the Budget (a "Budget Amendment").  To the extent the RBL Agent objects to

the proposed Budget Amendment within the Budget Review Period, the RBL Agent shall have three (3) additional business days (the "Hearing Period" ) in which to obtain an expedited hearing (which may be conducted by telephone) before the Court of the objection to such proposed Budget Amendment.  Unless otherwise consented to by the RBL Agent, the Debtors shall not make any payment in accordance with the Budget Amendment during the Budget Review Period or the Hearing Period, provided that, for the avoidance of doubt that the Debtors may make payments under the existing Budget before such Budget Amendment during the Budget Review Period and the Hearing Period; provided further that, following the expiration of the Budget Review Period and the Hearing Period, absent an order of the Court barring such Budget Amendment, the Budget Amendment shall take effect and shall become the Budget for purposes hereof, and the Debtors shall be authorized to make any payments pursuant to such Budget Amendment.

(e) Payment of Prepetition Claims. The Debtors will provide two  (2) business days' notice (the "Payment Notice Period") to counsel to the RBL Agent of any proposed payments or distributions in an individual amount equal to or greater than $250,000 on account of prepetition Working Interest Obligations, Non-Operating Working Interest Obligations/Joint Interest Billings, Marketing Obligations, Shipping and Warehousing Claims, or other claims potentially subject to a lien as described in Debtors' Motion for an Order (I) Authorizing the Payment of (A) Prepetition Claims of Potential Lien Claimants, (B) Joint-Interest Billings, (C) Marketing Obligations, and (D) Shipping and Warehousing Claims and (II) Granting Certain Related Relief [D.I. __] (a "Proposed Payment").  To the extent the RBL Agent objects to such Proposed Payment within the

Payment Notice Period, the RBL Agent shall have three (3) additional business days (the "Hearing Period") in which to obtain an expedited hearing (which may be conducted by telephone) before the Court of the objection to such Proposed Payment. Unless otherwise consented to by the RBL Agent, the Debtors shall not make the Proposed Payment during the Payment Notice Period or the Hearing Period, provided that, following the expiration of the Payment Notice Period and the Hearing Period, absent an order of the Court barring such payment, the Debtors shall be authorized to make such Proposed Payment.

(f) <u>Other Covenants.</u> The Debtors shall maintain their cash management arrangements in a manner consistent with that described in the applicable "first-day" order. Subject to any necessary order or authorization of this Court and to the extent permitted under the Budget, the Debtors shall comply with the covenants contained in sections 5.18 and 5.19 of the RBL Credit Agreement regarding the maintenance and insurance of the Prepetition Collateral and the Adequate Protection Collateral. The Debtors shall contemporaneously provide the RBL Agent with any required reporting and notices that are provided to the DIP Agent or DIP Lenders pursuant to the DIP Credit Agreement.

12.    <u>Section 507(b) Reservation.</u> Subject only to the Carve-Out described in paragraph 31 hereof, nothing contained herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided in this Interim Order is insufficient to compensate for any diminution in value of the respective interests of the RBL Secured Parties in the RBL Collateral during these chapter 11 cases or any Successor Cases, and nothing contained herein shall preclude the RBL Secured Parties from requesting

further or different adequate protection; <u>provided that</u> such further or different adequate protection cannot conflict with, impair or otherwise adversely affect the Carve-Out or the rights of the DIP Lenders with respect to Unencumbered Property or otherwise limit the rights of parties in interest to contest such relief.

**<u>Provisions Common to DIP Financing and Use of Cash Collateral Authorizations</u>**

13.      <u>Amendment of the DIP Documents; Other Amendments</u>.    The DIP Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, amendment and restatement, modification, or supplement is (a) in accordance with the DIP Documents and this Interim Order and (b) not prejudicial in any material respect to the rights of third parties; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, except for actions expressly permitted to be taken by the DIP Agent or the DIP Lenders as provided in the DIP Documents, no amendment, modification, supplement, termination, or waiver of any provision of the DIP Documents, or any consent to any departure by any of the DIP Borrower or the Loan Parties therefrom, shall in any event be effective unless the consents required under the terms of the DIP Documents have first been obtained (it being understood that any necessary signatures may be on a document consenting to such amendment, modification, termination, or waiver).  No provision of this Interim Order addressing the RBL Adequate Protection Obligations, the use of Cash Collateral of the RBL Secured Parties, the Adequate Protection provided to the RBL Secured Parties or the priority or scope of the RBL Replacement Liens or the RBL 507(b) Claim shall be amended without the consent of the RBL Agent.

14.      <u>Budget Compliance</u>.  The DIP Borrower and the Loan Parties shall not, and shall not permit any subsidiary, directly or indirectly, use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with the DIP Documents and

this Interim Order.  The Budget annexed as **Exhibit IX** to the DIP Agreement is hereby approved, and any modification to, or amendment or update of, the Budget shall be in accordance with the terms of the DIP Credit Agreement.

15.    Modification of Automatic Stay.  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such additional acts as the DIP Agent may request (acting pursuant to the DIP Credit Agreement) in its sole discretion to assure the perfection and priority of the DIP Liens, (b) the Debtors to  grant the RBL Replacement Liens and the RBL 507(b) Claim, and to perform such acts as the RBL Agent may request in its sole discretion to ensure the perfection and priority of the RBL Replacement Liens, (c) the Debtors to incur all liabilities and obligations to the DIP Agent as contemplated under the DIP Documents, (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order, the DIP Documents and the RBL Documents, and (e) the implementation of the terms of this Interim Order.

16.    Perfection of DIP Liens and RBL Replacement Liens.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the RBL Replacement Liens, without the necessity of executing or filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or real property mortgage) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the RBL Replacement Liens, or to entitle the DIP Agent, the DIP Lenders, and the RBL Secured Parties to the priorities granted herein.

32

Notwithstanding the foregoing, the DIP Agent and the RBL Agent are each authorized to file, as it in its reasonable discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the RBL Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the RBL Replacement Liens. The Debtors are authorized to execute and promptly deliver to the DIP Agent and the RBL Agent all such financing statements, mortgages, notices, and other documents as the DIP Agent or the RBL Agent may reasonably request. The DIP Agent and the RBL Agent, in their respective sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

17.    After-Acquired Property.    Except as otherwise provided in this Interim Order with respect to the RBL Collateral, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including all DIP Collateral pledged or otherwise granted to the DIP Agent, on behalf of the DIP Lenders, pursuant to the DIP Documents and this Interim Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds, products, rents or profits of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date that is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

18.    <u>Proceeds of Subsequent Financing</u>.  (a)  If the Debtors, any trustee, any examiner with enlarged powers, or any  responsible officer subsequently appointed in these chapter 11 cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to first, the indefeasible payment in full of all RBL Adequate Protection Obligations and RBL Obligations, including the cancellation, backing or cash collateralization of the letters of credit provided for under the RBL Credit Agreement and second, the indefeasible payment in full of all DIP Obligations, and the termination of the DIP Agent's and DIP Lenders' obligations to extend credit under the DIP Facilities, then all of the cash proceeds derived from such credit or debt shall be distributed as agreed by the RBL Agent and the DIP Agent or, absent such agreement, in accordance with an allocation with respect to lien priority as determined by the Court.

(b)  If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in these chapter 11 cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b) or (c) of the Bankruptcy Code consistent with the priority of the RBL Obligations, the RBL Adequate Protection Obligations, the RBL Liens, the RBL Replacement Liens and the RBL 507(b) Claim set forth herein or any final order related hereto, then all cash proceeds derived from such debtor-in-possession financing shall (x) immediately be turned over first to the DIP Agent to satisfy the DIP Obligations in full and indefeasibly in accordance with the DIP Documents and (y) second to the RBL Agent to satisfy the RBL Adequate Protection Obligations and the RBL Obligations in full and indefeasibly in accordance with the RBL Documents.

19.    <u>Maintenance of DIP Collateral</u>.  Unless the Required DIP Lenders and RBL Agent may otherwise consent in writing, until the indefeasible payment in full or otherwise

acceptable satisfaction of all RBL Adequate Protection Obligations, all RBL Obligations and all DIP Obligations, and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facilities, the Debtors shall (a) insure the DIP Collateral and the RBL Collateral as required under the DIP Facilities and the RBL Documents, as applicable, and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court in accordance with the DIP Documents.

20.      <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Agent and the DIP Lenders are, and are deemed to be, without any further action or notice (including endorsements), named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

21.      <u>Disposition of Collateral</u>.  Except as expressly provided for in the DIP Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or RBL Collateral (collectively, "<u>Collateral</u>") without the prior written consent of each of the DIP Agent and the RBL Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or the RBL Agent or an order of this Court, except for sales, transfers, leases or uses of Debtors' hydrocarbons and other inventory in the ordinary course of their businesses).  Until such time as the RBL Adequate Protection Obligations, the RBL Obligations and the DIP Obligations have been paid in full or otherwise acceptably satisfied in accordance with the terms of the applicable RBL Documents, this Interim Order and DIP Documents, the Debtors shall remit, or cause to be remitted, first to the RBL Agent and following indefeasible payment in full of the RBL Adequate Protection Obligations and the RBL Obligations, to the DIP Agent all proceeds of Collateral for application against the RBL Adequate Protection Obligations,  the RBL Obligations and/or the DIP

Obligations in accordance with the terms of the applicable RBL Documents, DIP Documents, and this Interim Order.

22.     Events of Default.   The term "Event of Default" shall have the same meaning under this Interim Order as such term has under Section 7.1 of the DIP Credit Agreement and shall include, for the avoidance of doubt, failure to meet any of the Milestones.

23.     Rights and Remedies upon Event of Default or Termination Date.   The automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Agent, the DIP Lenders and the RBL Secured Parties to exercise, upon the occurrence and during (i) in the case of the DIP Agent and the DIP Lenders, a continuation of any Event of Default, or (ii) in the case of the DIP Agent, the DIP Lenders and the RBL Secured Parties, the occurrence of a Termination Date, in each case, following the provision by the DIP Agent or the RBL Agent, as applicable, to the Debtors of five (5) business days' prior written notice of such Event of Default or Termination Date (such period, the "Default Notice Period"), which written notice shall be served by the DIP Agent or RBL Agent, as applicable, via electronic mail or facsimile on the Debtors, counsel to the Debtors, counsel to the Ad Hoc Committee, counsel to the RBL Agent, counsel to the DIP Agent, counsel to the Committee appointed in this Case and the Office of the United States Trustee and filed with the Court by counsel to the DIP Agent or RBL Agent, all rights and remedies provided for in this Interim Order and/or the DIP Documents and/or RBL Documents, as applicable, and to take any or all of the actions without further order of or application to this Court following the conclusion of the Default Notice Period and in the absence of a determination by the Court that an Event of Default or Termination Date has not occurred and/or is not continuing, as applicable: (a) immediately terminate the Debtors' use of Cash Collateral

and cease making any Loans under the DIP Credit Agreement to the Debtors; (b) immediately declare all DIP Obligations to be immediately due and payable; (c) subject to the rights of the RBL Secured Parties in this Interim Order, immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Lenders for application towards the DIP Obligations; (d) immediately set off any and all amounts in accounts maintained by the Debtors with the RBL Agent or any of the RBL Lenders against the RBL Obligations, or otherwise enforce rights against the RBL Collateral and DIP Collateral in the possession of any of the RBL Lenders for application towards the RBL Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Credit Documents, the RBL Documents or applicable law to effect the repayment of the DIP Obligations and RBL Obligations, as applicable.  The automatic stay under section 362(a) of the Bankruptcy Code shall be automatically lifted and modified as provided above unless and until the Court has determined that an Event of Default or Termination Date has not occurred and/or is not continuing.  For the avoidance of doubt, neither the DIP Agent, any of the DIP Lenders nor any of the RBL Secured Parties shall exercise any such rights and remedies on account of an Event of Default or Termination Date until after expiration of the Default Notice Period.  During the Default Notice Period, the Debtors may request an expedited hearing regarding any alleged Event of Default or Termination Date. During the Default Notice Period, the Debtors may use proceeds of the loans under the DIP Credit Agreement and/or Cash Collateral only to (i) fund operations in accordance with the Budget and (ii) fund the Carve-Out.  In the event the automatic stay is lifted in accordance with this paragraph, the Debtors may seek, and the RBL Secured Parties and/or DIP Lenders, as

applicable, may oppose, any further order of this Court authorizing (a) the use of Cash Collateral, including accounts receivable, hydrocarbons and other inventory, and the proceeds thereof, of the Debtors in which the DIP Agent or any of the DIP Lenders has an interest or the RBL Secured Parties has an interest, or (b) under section 364 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest held by the DIP Agent or which is entitled to priority administrative status which is equal or superior to that granted to the DIP Agent for the benefit of the DIP Lenders or the RBL Secured Parties, as the case may be. Subject to any applicable grace periods, upon the occurrence of any Event of Default, the DIP Agent may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans under the DIP Facility. Upon the occurrence of an Event of Default, all loans under the DIP Facility shall become due and payable in accordance with the DIP Documents. Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in the DIP Credit Agreement or the RBL Credit Agreement.

24.    Termination of DIP Facility and Use of Cash Collateral.    Subject to paragraph 23, the Debtors' right to use and access the DIP Facility and Cash Collateral shall terminate immediately, and the DIP Facility shall mature and be due and payable in cash in accordance with the DIP Documents, subject to the rights of the RBL Secured Parties set forth in paragraph 47, upon the occurrence of any of the following, (the "Termination Date"):  (i) the failure of the Final DIP Order, in a form reasonably acceptable to the DIP Agent, the Required DIP Lenders and the RBL Agent, to be entered in these chapter 11 cases on or before the applicable Milestone, (ii) the failure of the Debtors to make any payment to the RBL Agent or the RBL Lenders within five (5) business days after such payment becomes due (other than

payments of interest required pursuant to paragraph 11(c)(iii), which payments shall be made as required therein), (iii) failure of the Debtors to comply with any material provision of this Interim Order, (iv) the effective date of a plan of reorganization or liquidation in the above-captioned cases, (v) consummation of a sale of all or substantially all of the assets of the Debtor pursuant to section 363 of the Bankruptcy Code, (vi) the entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying this Interim Order without the consent of each of the RBL Agent and the DIP Agent (which consent has not been unreasonably withheld or delayed), (vii) the entry of an order dismissing any of the cases, (viii) conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (ix) the Scheduled Maturity Date (as defined in the DIP Credit Agreement), (x) the commencement of any enforcement action against the DIP Collateral in connection with an Event of Default or (xi) the date of termination of the DIP Lenders' commitments and the acceleration of all of the DIP Obligations under the DIP Documents in accordance with section 7.2 of the DIP Credit Agreement.

      25.      <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order</u>.  Each of the DIP Agent, the DIP Lenders, and the RBL Secured Parties has acted in good faith in connection with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Agent, the DIP Lenders, and the RBL Secured Parties are entitled to fullest extent to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the

validity and enforceability of any payments or advances previously made or made hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the DIP Agent, the DIP Lenders, and/or the RBL Secured Parties arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

26.    DIP Fees and Other Expenses. (a) The Debtors are authorized and directed to pay all reasonable and documented fees and expenses of the DIP Agent and the DIP Lenders in connection with the DIP Facility, as provided in the DIP Documents, whether or not the transactions contemplated hereby are consummated, whether or not incurred prepetition or postpetition, including, without limitation, the Backstop Fee, agency fees, the professional fees and expenses of Kirkland & Ellis LLP (as counsel to the DIP Lenders), Klehr Harrison Harvey Branzburg, LLP (as local counsel to the DIP Lenders), Houlihan Lokey (as financial advisor to the DIP Lenders), Netherland, Sewell & Associates, Inc. (as consultants to the DIP Lenders), Shipman & Goodwin LLP (as counsel to the DIP Agent) and Potter Anderson & Corroon LLP (as local counsel to the DIP Agent), in each case promptly upon receipt of invoices which may be redacted for privileged, confidential, or proprietary information. For the avoidance of doubt, the fees and expenses described in the foregoing sentence shall include all out-of-pocket costs, fees, and expenses incurred in connection with the preparation, negotiation, execution, interpretation or administration of, any modification of any term of or termination of, any of the DIP Documents, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein. None of the costs, fees and expenses payable under this paragraph 26 shall be subject to

separate court approval, and the recipients shall not be required to file any interim or final fee applications therefor; provided, that this Court shall resolve any disputes as to the reasonableness of such fees and expenses; provided, however, that the DIP Agent shall submit copies of the DIP Agent's legal counsels' and financial advisor's and consultant's invoices to the U.S. Trustee and the Committee, and the Debtors, the U.S. Trustee and the Committee shall have fourteen (14) days following the receipt of such invoices to object to the reasonableness of the fees and expenses included in any such invoice.   If any such objection is not resolved within ten (10) days after such objection is interposed, a hearing with respect thereto shall be conducted at a regularly-scheduled omnibus hearing, provided that the Debtors shall pay any undisputed portion of such fees, costs and expenses on the first business day following fifteen (15) days after the initial presentment to the Debtors of such invoice.  (b)    Without limiting the foregoing, in consideration for providing a backstop of the DIP Facility, each Backstopper will receive an irrevocable fee in the amount of its pro rata share (based on commitments for the DIP Facility on the initial funding date of the DIP Facility) of 7.5% of the new common equity of the reorganized DIP Borrower that is granted to the Senior Noteholders in exchange for their Senior Notes Claims (such fee, the "Backstop Fee"); provided, however, that to the extent the Plan (as defined in the RSA) is not consummated, the Backstop Fee will be paid in cash when the principal amounts outstanding under the DIP Facility come due and owing, and will be equal to 7.5% of the total committed amount of the DIP Facility (provided, however, that, to the extent the RSA terminates and the Backstop Fee is paid in cash, the "total committed amount" shall be deemed to exclude the amount of the commitments available to the Debtors after the Third Borrowing Funding Availability Date (as defined in the DIP Credit Agreement) unless (i) the conditions set forth in section 3.3 of the DIP Credit Agreement are satisfied or waived in

accordance with the DIP Credit Agreement and (ii) the DIP Facility loans available thereafter are actually funded), to be paid in cash. The Backstop Fee will be fully earned upon the entry of this Interim Order and payable pursuant to the terms of the RSA and the DIP Documents. Notwithstanding anything in this paragraph 26 to contrary, it is acknowledged and agreed that to the extent that the Backstop Fee is paid through the issuance of new common stock pursuant to the Plan (as defined in the RSA), such issuance of common stock shall not dilute any common stock issued by the Borrower or its reorganized or successor company pursuant to (i) any management incentive plan approved by the Bankruptcy Court in the Bankruptcy Cases, or (ii) the Plan (as defined in the RSA) to current holders of the Borrower's Capital Stock (as defined in the DIP Credit Agreement).

27.    Indemnification.  The Debtors shall indemnify and hold harmless the DIP Agent, the DIP Lenders, the Indenture Trustee, the Senior Noteholders, the RBL Lenders, and the RBL Agent, and each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investor funds, advisors, attorneys, professionals, representatives, investment bankers, and consultants, each in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Documents, the   Prepetition Financing Documents, and/or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Documents and the Prepetition Financing Documents, and as further described therein and herein, except to the extent resulting from such

indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Agent's, RBL Agent's, Indenture Trustee's, and any of the DIP Lenders', RBL Lenders', and/or Senior Noteholders' exercise of discretionary rights granted under the DIP Documents and/or the Prepetition Financing Documents, as the context makes applicable. In all such litigation, or the preparation therefor, the DIP Agent and the DIP Lenders, the RBL Agent and the RBL Lenders, and the Indenture Trustee and the Senior Noteholders, respectively, shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to promptly pay the reasonable fees and expenses of such counsel.

28.     <u>Released Parties</u>. Without limiting the rights of the parties in interest as set forth in paragraph 35 hereof, the Debtors hereby waive any and all actions related to, and hereby release, each of (a) the DIP Agent and the DIP Lenders, (b) the RBL Agent and the RBL Lenders, (c) the Indenture Trustee and the Senior Noteholders, and (d) each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (d) of this paragraph 28, a "<u>Released Party</u>" and, collectively, the "<u>Released Parties</u>") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge (as defined herein), whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Financing Documents, the DIP Credit Agreement, or this Interim

Order, any documents related to the Prepetition Financing Documents, the DIP Credit Agreement, or this Interim Order, any aspect of the prepetition relationship with the Released Parties, any Debtor, or any other acts or omissions by the Released Parties in connection with the Prepetition Financing Documents, the DIP Credit Agreement, or this Interim Order, any documents related to the Prepetition Financing Documents, the DIP Credit Agreement, or this Interim Order, or any aspect of their prepetition relationship with any Debtor.

29.    <u>Proofs of Claim</u>.  The DIP Agent, the DIP Lenders, the RBL Agent, the RBL Secured Parties, the Indenture Trustee, and the Senior Noteholders shall not be required to file proofs of claim in any of these chapter 11 cases or Successor Cases for any claim allowed herein.  Any proof of claim filed by the DIP Agent, the RBL Agent, and/or the Indenture Trustee shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the DIP Lenders, RBL Lenders, and/or Senior Noteholders.  Any order entered by this Court in relation to the establishment of a bar date in any of these cases or Successor Cases shall not apply to the DIP Agent, the DIP Lenders, the RBL Agent, the RBL Secured Parties, the Indenture Trustee, or the Senior Noteholders.

30.    <u>Access to Collateral; No Landlord's Liens</u>.  Subject to applicable state law, and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents and this Interim Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Documents, the DIP Agent may (but shall not be obligated to), subject to any separate agreement by and between such landlord and the DIP Agent (a "<u>Separate Agreement</u>"), enter upon any leased premises of the Debtors for the purpose of exercising any

remedy with respect to DIP Collateral located thereon and, subject to any Separate Agreement or as permitted by applicable law, shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord; provided, however, that, subject to any such Separate Agreement, the DIP Agent shall only pay rent of the Debtors that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent, calculated on a per diem basis. Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph.

   31.  Carve-Out. Upon the DIP Agent's issuance of a Carve-Out Trigger Notice (as defined below), the DIP Collateral and the RBL Collateral and all liens, claims and other security interests held by the DIP Agent, DIP Lenders and the RBL Secured Parties shall be subject to the payment of the Carve-Out. For purposes of this Interim Order, "Carve-Out" means the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and 31 U.S.C. §3717, (ii) all accrued and unpaid claims for unpaid fees, costs, disbursements, charges and expenses incurred at any time before the Carve-Out Trigger Date (as defined below), or any monthly or success or transaction fees payable to estate professionals, in each case by persons or firms retained by the Debtors or a Committee whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the "Professional Persons," and the fees, costs and expenses of Professional Persons, the "Carve-Out Expenses"), to the extent such Carve-Out Expenses are allowed by the Bankruptcy Court at any time (i.e., before or after the Carve-Out Trigger Date) on an interim or final basis; and (iii) all Carve-Out Expenses incurred on and after the Carve-Out Trigger Date by Professional Persons

and allowed by the Bankruptcy Court at any time, whether before or after the Carve-Out Trigger Date, whether by interim order, procedural order or otherwise; provided, that, other than with respect to any success or transaction fees that may become due and payable to Professional Persons, which shall not be included in the Professional Expense Cap (as defined below), the payment of any Carve-Out Expenses of the Professional Persons (but excluding fees and expenses of third party professionals employed by individual members of the Committee) incurred on or after the Carve-Out Trigger Date and allowed by the Bankruptcy Court at any time, whether before or after the Carve-Out Trigger Date, on a final basis, shall not exceed *an amount of up to* $2,500,000 in the aggregate (the "Professional Expense Cap") *which shall be agreed upon prior to the Final Hearing* provided, that (A) after the Carve-Out Trigger Date, any payments actually made in respect of Carve-Out Expenses of the Professional Persons (but excluding fees and expenses of third party professionals employed by individual members of the Committee) incurred on or after the Carve-Out Trigger Date and allowed by the Bankruptcy Court at any time, on a final basis, shall reduce the Professional Expense Cap on a dollar-for-dollar basis and (B) for the avoidance of doubt, so long as no Carve Out Trigger Date has occurred, the payment of Carve-Out Expenses shall not reduce the Professional Expense Cap.

32.     For the purposes of the foregoing, "Carve-Out Trigger Date" means the first business day after (i) the occurrence and during the continuance of (x) an Event of Default under the DIP Credit Agreement, (y) the occurrence of the Termination Date or (z) a default by any Loan Party in any of its obligations under any DIP Order and (ii) delivery of written notice thereof (the "Carve-Out Notice") by the DIP Agent or, only in the case of default of the RBL Adequate Protection Obligations, the RBL Agent to (i) the U.S. Trustee, (ii) the DIP Borrower and counsel to the Loan Parties, (iii) the DIP Agent or the RBL Agent, as applicable, and (iv)

counsel for the Committee. Immediately upon receipt of a Carve-Out Notice, the Borrower shall transfer to a segregated account (the "Carve-Out Account") not subject to the control of the DIP Agent, the DIP Lenders or any of the RBL Secured Parties an amount equal to the Professional Expense Cap plus an amount equal to the aggregate unpaid fees, costs and expenses described in clause (ii) of the definition of "Carve Out," in each case as reasonably determined by a good faith estimate of the applicable Professional Person. The proceeds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent and/or the DIP Lenders and/or RBL Agent and/or RBL Lenders (i) shall not sweep or foreclose on cash of the Loan Parties necessary to fund the Carve-Out Account, and (ii) shall only have a lien on any residual interests in the Carve-Out Account available following satisfaction in full of all obligations benefitting from the Carve-Out. For the avoidance of doubt, the Carve-Out shall be senior to any claims arising under or relating to and liens securing the DIP Facility and the RBL Facility and the RBL Replacement Liens, including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests.

33.      Payment of Compensation. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, or of any person, or shall affect the rights of the DIP Agent, the DIP Lenders, the RBL Secured Parties, or the Ad Hoc Committee to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

34.      Limitation on Investigation.

(a)      No DIP Collateral, Cash Collateral, other RBL Collateral, proceeds of the DIP Facility, portion of the Carve-Out, or any other amounts may be used directly or

47

indirectly by any of the DIP Borrower or any other Loan Party, the Committee, if any, or any trustee or other estate representative appointed in these chapter 11 cases or any Successor Cases or any other person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) for any of the following actions or activities (the "Proscribed Actions"):

      (i)      to seek authorization to obtain liens or security interests or priority claims that are senior to, or on a parity with, the liens and claims granted under the DIP Documents, this Interim Order, or the Final Order (including, the DIP Superpriority Claims and the RBL 507(b) Claim) (except (i) with the prior written consent of the Required DIP Lenders and RBL Agent or (ii) to the extent such priority claims, liens or security interests are granted in respect of financing that shall provide for the payment in full in cash of the DIP Obligations, and with respect to a refinancing described in paragraph 18(a), the RBL Obligations and the RBL Adequate Protection Obligations); or

      (ii)      subject to paragraph 23, to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the DIP Agent, the DIP Lenders, the Indenture Trustee, Senior Noteholders, or the RBL Secured Parties, and each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals,

48

officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens granted under the DIP Documents, the RBL Replacement Liens, the RBL 507(b) Claim, or the claims or liens granted under the RBL Documents, (D) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the Senior Notes Obligations, or the RBL Obligations; (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any of (1) the DIP Agent or the DIP Lenders under this Interim Order or under any of the DIP Documents, (2) the Indenture Trustee or the Senior Noteholders, or (3) the RBL Secured Parties under this Interim Order (in each case, as applicable, including, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the DIP Collateral and Cash Collateral in accordance with the DIP Documents, this Interim Order, and the Final Order); or (F) objecting to, consenting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred (as set forth in the DIP

Documents) or the RBL Agent's and the RBL Lenders' enforcement or realization upon any of the RBL Collateral and collateral subject to the RBL Replacement Liens in accordance with the terms of this Interim Order.

(b)    Notwithstanding anything to the contrary herein, the Committee may use up to $50,000.00 in the aggregate amount of the Carve-Out, any Cash Collateral, or proceeds of the DIP Facility to investigate the RBL Secured Parties and the Senior Notes Parties (the "Committee Investigation Budget"). Any and all claims incurred by the Committee related to or in connection with any Proscribed Actions other than up to the Committee Investigation Budget shall not, in the absence of sufficient unencumbered assets, be considered for purposes of determining compliance with section 1129(a)(9)(A) of the Bankruptcy Code and shall not be satisfied by the Carve-Out, any Cash Collateral, or proceeds of the DIP Facility, and shall be satisfied solely from the unencumbered assets of the Debtors (if any) (the "Unencumbered Assets"), thereby reducing recoveries to the holders of general unsecured claims; provided, however, that to the extent there are no Unencumbered Assets available to satisfy such claims, then such claims shall be automatically disallowed without further action by any party or Court order and shall not receive a recovery in these chapter 11 cases and any Successor Cases.

35.    Challenge Period.

(a)    Subject only to the terms of this paragraph 35, the grant of adequate protection to the RBL Secured Parties, and the various stipulations and waivers contained in paragraph E hereof shall be without prejudice to the rights of any party with requisite standing to seek to disallow the Prepetition Financing Parties' claims in respect of the Prepetition Financing Documents, pursue any claims or seek appropriate remedies

against Prepetition Financing Parties in connection with the Prepetition Financing Documents or avoid all or substantially all of the security interests or liens in the RBL Collateral or in any other asset or property of Debtors in which RBL Secured Parties claim an interest, including any claim, action, or proceeding brought against the RBL Secured Parties in accordance with this paragraph 35 that requires RBL Secured Parties to give up adequate protection liens, to disgorge adequate protection payments received or accruals credited, or to disgorge as repaid pursuant to this Interim Order as a result of any of the RBL Secured Parties' claims against Debtors or liens upon and security interests in the assets and properties of Debtors (including the RBL Collateral) being invalidated, avoided, subordinated, impaired or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement. Any party with requisite standing (other than the Debtors, which have waived all such rights), including the Committee, must commence, as appropriate, a contested matter or adversary proceeding raising any objection, claim, defense, suit or other challenge (a "Challenge") with respect to any claim, security interest, or any other rights of the Prepetition Financing Parties under the Prepetition Financing Documents, including in the nature of a setoff, counterclaim, or defense on or before (i) with respect to the Committee, sixty (60) calendar days from the date the U.S. Trustee appoints the Committee and (ii) with respect to all other parties, seventy-five (75) calendar days following the date of entry of the Final Order (the "Challenge Period"). The Challenge Period may only be extended (x) with the consent of the applicable Prepetition Financing Party or (y) by consent of the Court for good cause shown. In the event of a timely and successful Challenge to the repayment of any Prepetition Financing Obligations, this

Court shall fashion the appropriate remedy with respect to the applicable Prepetition Financing Party or Prepetition Financing Parties after hearing from all parties in interest.

(b)    Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge: (i) any other possible Challenge, whether such Challenge is separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever waived and barred; (ii) all of the Debtors', RBL Agent's and Required Senior Noteholders' respective agreements, acknowledgments, stipulations, waivers, releases, and affirmations as to the priority, extent, and validity of the RBL Secured Parties' and Senior Notes Parties' respective claims, liens, and interests, of any nature, under the RBL Documents and Senior Notes Indentures, as applicable, or otherwise incorporated or set forth in this Interim Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, the RBL Agent, the Required Senior Noteholders and all creditors, interest holders, and other parties-in-interest in these chapter 11 cases and any Successor Cases without further action by any party or this Court, and any Committee and any other party in interest, and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (iii) the liens and security interests granted pursuant to the RBL Documents shall (to the extent not otherwise satisfied in full) be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable bankruptcy law; and (iv) without further order of the Court, (x) the claims and obligations under the RBL Documents shall (to the extent not otherwise satisfied in full) be finally

allowed as fully secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these chapter 11 cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, amount, or otherwise, and (y) the claims and obligations under the Senior Indentures shall be finally allowed as unsecured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these chapter 11 cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, amount, or otherwise.

        (c)     Nothing in this Interim Order vests or confers on any person, including any Committee or any other statutory committee that may be appointed in these chapter 11 cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.  For the avoidance of doubt, entry of this Interim Order shall not grant standing or authority to any party in interest or Committee to pursue any cause of action, claim, defense, or other right on behalf of the Debtors or their estates.

        (d)     For the avoidance or doubt, in the event the case is converted to chapter 7 or a chapter 11 trustee is appointed prior to the expiration of the Challenge Period  described in this paragraph 35, the Challenge Period shall not expire until 60 days after the trustee's appointment.  In the event the Committee or any other party in  interest with requisite standing has commenced a Challenge prior to the conversion to chapter 7 or  appointment of a chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge.  In either event, until the later of the expiration of the Challenge Period without commencement of a Challenge or the entry of a final,

non-appealable order or judgment on account of any Challenge, the trustee shall not be bound by the Debtors' acknowledgments, admissions, confirmations, stipulations and waivers in this Interim Order.

36.     No Third Party Rights.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

37.     Section 506(c) Claims.   Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these cases at any time shall be charged against the DIP Agent, the DIP Lenders, the RBL Secured Parties or any of their respective claims, the DIP Collateral, or the RBL Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agent, the DIP Lenders, and the RBL Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

38.     Section 552(b).   The RBL Agent shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the RBL Agent (on behalf of itself and the RBL Lenders), with respect to proceeds, products, rents, or profits of any of the RBL Collateral; provided, that the foregoing shall be subject to entry of the Final Order with respect to parties in interest other than the Debtors.

39.     No Marshaling; Application of Proceeds.   Subject to the entry of the Final Order, the DIP Agent, the DIP Lenders, and the RBL Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP

Collateral and/or the RBL Collateral, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Documents and the RBL Documents and this Interim Order.

40.    <u>Joint and Several Liability</u>.    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for all obligations hereunder, including without limitation, the RBL 507(b) Claim and DIP Superpriority Claim and in accordance with the terms of the DIP Facility and the DIP Documents.

41.    <u>Limitation of Liability</u>.    Subject to the entry of the Final Order, in determining to make extensions of credit under the DIP Facility, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Documents, or the Prepetition Financing Documents, as applicable, none of the DIP Agent, the DIP Lenders, the Indenture Trustee, the Senior Noteholders, the RBL Secured Parties, or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).    Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Indenture Trustee, the Senior Noteholders, the RBL Secured Parties, or any successor of any of

the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

42.    Credit Bidding.  Subject to and effective upon entry of the Final Order, and subject to the rights of the RBL Secured Parties set forth in paragraph 47, the DIP Agent, acting at the direction of the Required DIP Lenders, shall have the unqualified right to credit bid up to the full amount of the outstanding DIP Obligations in any sale of the DIP Collateral (or any part thereof, including amounts funded, earned, incurred or otherwise owed) without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

43.    Intercreditor Issues.  Except as expressly otherwise set forth herein, nothing in this Interim Order shall be construed to convey on any individual DIP Lender, Senior Noteholder, or RBL Lender any consent, voting or other rights beyond those (if any) set forth in the DIP Documents, the RBL Documents, and the Senior Notes Indentures, as applicable.

44.    Discharge Waiver.  Subject to the rights of the RBL Secured Parties set forth in paragraph 47, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in these cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash or otherwise satisfied with the consent of the DIP Lenders on or before the effective date of such confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash or other treatment acceptable to the DIP Lenders on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

45.    Rights Preserved.  The entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Agent's, the DIP Lenders', Indenture Trustee's, Senior Noteholders', and/or the RBL Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agent, the DIP Lenders, the Indenture Trustee, Senior Noteholders, and/or the RBL Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, DIP Lenders, the Indenture Trustee, Senior Noteholders, and/or the RBL Secured Parties.

46.    No Waiver by Failure to Seek Relief.  The failure of the DIP Agent, the DIP Lenders, the Indenture Trustee, Senior Noteholders, and/or the RBL Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Financing Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, the Indenture Trustee, the Senior Noteholders, and/or the RBL Secured Parties.

47.    Protection of RBL Agent's and RBL Lenders' Rights.  Notwithstanding anything herein to the contrary, until the RBL Obligations (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid) are paid in full in cash and all issued and undrawn letters of credit under the RBL Documents are 103% cash collateralized pursuant to arrangements satisfactory to the issuer(s) thereof or receive such treatment under a plan of reorganization (i) to which the holders of the RBL Obligations

have consented or (ii) that has been confirmed by the Court, the DIP Obligations may not be paid in full in cash or deemed paid in full in cash (including from any refinancing of the DIP Facility unless such refinancing complies with paragraph 18(b) hereof or from any other source). If the DIP Agent or any DIP Lender receives any payments, distributions or other amounts in violation of this paragraph 47, then the DIP Agent or such DIP Lender, as applicable, shall hold such amounts in trust for the benefit of the RBL Agent and the RBL Lenders and shall promptly turn over such amounts to the RBL Agent.

48.    <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Indenture Trustee, Senior Noteholders, the RBL Secured Parties, all other creditors of the Debtors, the Committee, any other statutory committee that may be appointed in these chapter 11 cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these cases, any Successor Cases, or upon dismissal of any of these cases or Successor Cases.

49.    <u>Effect on Certain Prepetition Agreements</u>.  Except as expressly set forth in this Interim Order, the terms and conditions, validity, and enforceability of the Prepetition Financing Documents shall not be affected by this Interim Order.

50.    <u>No Right to Seek Modification</u>.  Unless requested by the DIP Agent, the Debtors irrevocably waive any right to seek any material modification or extension of this Interim Order (in whole or in part) without the prior consent of the DIP Agent and the RBL Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent or the RBL Agent.

51.     Survival.

(a)     The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in any of these chapter 11 cases, (ii) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of these chapter 11 cases or any Successor Cases, or (iv) pursuant to which this Court abstains from hearing any of these chapter 11 cases or Successor Cases.

(b)     The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, and the RBL Secured Parties, pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in these cases, in any Successor Cases, or following dismissal of these cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full or otherwise satisfied with the DIP Lenders' consent and all commitments to extend credit under the DIP Facility are terminated and (ii) in respect of the RBL Facility, all of the RBL Obligations have been indefeasibly paid in full in cash.  The terms and provisions concerning the indemnification of the DIP Agent and the DIP Lenders shall continue in these chapter 11 cases, in any Successor Cases, following dismissal of these chapter 11 cases or any Successor Cases, termination of the DIP Documents, and/or the indefeasible repayment or other acceptable satisfaction of the DIP Obligations.

52.     <u>Interim Order Controls; Priority of Terms</u>.  To the extent of any conflict between or among the Motion, the DIP Documents, and this Interim Order, the terms and provisions of this Interim Order shall govern.

53.     <u>Waiver of Applicable Stay</u>.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

54.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for February 1, 2016, at 11:30 a.m. before the Honorable Mary F. Walrath, United States Bankruptcy Judge, in Courtroom 4 at the United States Bankruptcy Court for District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801. No later than two (2) business days after entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on (a) the parties having been given notice of the Interim Hearing, (b) any party which has filed prior to such date a request for notices with this Court, and (c) counsel for the Committee (if and when appointed).  The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on ⟨Jan 25⟩ , 2015, at 4:00 p.m. (prevailing Eastern time), which objections shall be served so as to be **actually received** on or before such date on: (a) proposed counsel for the Debtors, (i) Jones Day, 2727 North Harwood Street, Dallas, Texas 75201, Attn: Gregory M. Gordon, Esq. and 77 West Wacker Drive, Chicago, Illinois 60601, Attn: Steven A. Domanowski, Esq. and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn:  Daniel J. DeFranceschi, Esq.;

(b) counsel for the Ad Hoc Committee, the DIP Agent, and DIP Term Lenders, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua Sussberg, Esq. and Matthew Kapitanyan, Esq., (ii) Klehr Harrison Harvey Branzburg, LLP, 919 Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti, Esq., (iii) Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103-1919, Attn: Nathan Z. Plotkin, Esq. and (iv) Potter Anderson & Corroon LLP, 1313 North Market Street, P.O. Box 951, Wilmington, DE 19899-0951, Attn: Jeremy W. Ryan, Esq.; (c) counsel for the RBL Agent (i) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Elisha Graff, Esq. and Kathrine A. McLendon, Esq., and (ii) Fox Rothschild LLP, Citizens Bank Center, 919 North Market Street, Suite 300, Wilmington, DE 19899, Attn: Jeffrey M. Schlerf, Esq.; and (d) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Timothy J. Fox, Jr., Esq. and Natalie M. Cox, Esq.

55.     *Nunc Pro Tunc* Effect of this Interim Order.     This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.

56.     Retention of Jurisdiction.     The Court has retained and will retain jurisdiction to implement, interpret, and enforce this Interim Order according to its terms.

Dated: January ___5___, 2016
      Wilmington, Delaware

THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE