## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| SWIFT ENERGY COMPANY, *et al.*,[1] | : Case No. 15-12670 (MFW) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| | : **Hearing:  Feb. 1, 2016 at 11:30 a.m. (ET)** |
| | : **Obj. Deadline:  Jan. 25, 2016 at 4:00 p.m. (ET)** |

## MOTION FOR AN ORDER (A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' LOUISIANA ASSETS, (B) APPROVING THE ASSUMPTION, ASSIGNMENT AND SALE OF CERTAIN CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively,

the "Debtors") move the Court, pursuant to sections 105, 363 and 365 of the Bankruptcy Code,

Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court

for the District of Delaware (the "Local Rules"), for the entry of an order (the "Sale Order"),

substantially in the form attached hereto Exhibit A:

(a)        authorizing the sale (the "Sale") of certain of the Debtors'

Louisiana oil and gas assets; in particular, the South Bearhead Creek and Burr Ferry Fields and

associated mineral rights (the "Assets"), pursuant to the terms of the Purchase and Sale

Agreement (the "PSA") by and between Swift Energy Operating, LLC ("Operating"), GASRS

LLC ("GASRS") and SWENCO-Western, LLC (together with Operating and GASRS, the

---

[1]        The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Swift Energy Company (0661); Swift Energy International, Inc. (6721); Swift Energy Group, Inc. (8150); Swift Energy USA, Inc. (8212); Swift Energy Alaska, Inc. (6493); Swift Energy Operating, LLC (2961); GASRS LLC (4381); SWENCO-Western, LLC (0449); and Swift Energy Exploration Services, Inc. (2199).  The address of each of the Debtors is 17001 Northchase Drive, Suite 100, Houston, Texas 77060.

"Sellers") and Texegy LLC (the "Buyer") free and clear of all liens, claims and encumbrances, except for certain assumed seller obligations and permitted encumbrances;

(b)     authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Contracts") in connection with the Sale; and

(c)     granting certain related relief as described herein.

In support of this motion, the Debtors incorporate the statements contained in the Declaration of Dean E. Swick In Support of the Texegy Sale, attached hereto as Exhibit E, and respectfully represent as follows:

## Preliminary Statement

1.     Pursuant to the PSA, the Debtors are seeking to sell a 75% working interest in the Assets to the Buyer, leaving the Debtors with a 25% non-operating working interest, for a purchase price of $48.75 million subject to certain closing adjustments.  The Sale provides the Debtors with two primary benefits.  First, the Sale will permit the Debtors to consolidate their business operations by eliminating their duties and associated costs as operator with respect to a material portion of their assets in Louisiana.  This is consistent with the Debtors' long term business plan, which concentrates on the Debtors' assets and operations in the Eagle Ford trend in South Texas.  Second, as a result of the favorable purchase price, the Sale will generate substantial proceeds for the Debtors' estates, and will do so from a sale of assets that, if retained, would produce only immaterial revenue in the near future.  In that regard, the Assets are projected to generate only approximately three percent of the Debtors' full year 2016 revenue.

2.     The Debtors have marketed the Assets since August 2013.  Although the Debtors have received a number of offers to purchase the Assets or a portion thereof since that

NAI-1500722846v9

time, the Debtors have been unable to consummate any prior sales of the Assets primarily because the proposed buyers were unable to fund the purchase price on their own and could not secure the requisite financing.  Given the lengthy marketing history with respect the Assets, the Debtors believe there is no benefit to be derived from conducting an in-court auction process for the Assets.  To the contrary, because of (a) the continued uncertainty in the commodity markets and (b) the need for the Debtors to minimize the length and expense of this proceeding in order to maximize their prospects for a successful reorganization, the Debtors believe that a post-petition auction process could actually be detrimental to their estates and stakeholders.

3.      Despite their earlier unsuccessful attempts to sell some or all of these non-core Assets, the Debtors, in the weeks leading up to these chapter 11 cases, were able to negotiate a sale of the Assets with the Buyer on terms that the Debtors believe are very favorable, particularly given the current state of the oil and gas commodity markets.  Because, in addition to a fair price, the transaction would also enable the Debtors to focus on their core operations in South Texas and substantially reduce secured debt obligations that need to be restructured or refinanced in order for the Debtors to emerge from this proceeding, the Debtors respectfully submit that the proposed transaction is in the best interests of their estates and should be approved by the Court.

**Pre-Petition Marketing Process**

4.      Consistent with their objective to focus on their core South Texas operations, the Debtors have been attempting to sell their oil and gas assets in Central Louisiana (the "CLATEX Assets") for over two years.  In August 2013, the Debtors commenced their efforts to sell the CLATEX Assets, engaging Scotia Waterous (USA) Inc. ("Scotia") to market the assets and identify potential purchasers.  Scotia, the oil and gas arm of Scotiabank, is a global

leader in oil and gas mergers and acquisitions, asset acquisitions and divestitures, and debt and equity financings.  In connection with that engagement, Scotia prepared a virtual data room with engineering, geological, financial accounting and land data.  Scotia invited over 400 companies to access the data room.  In response to those invitations, 20 parties signed confidentiality agreements and were permitted access to the data room.  Scotia also distributed written presentations containing information from the data room to 12 of the 20 companies.  Although 20 entities signed confidentiality agreements, only one submitted a bid by the bid deadline in November 2013.  That potential purchaser later lost its financial backer and withdrew its bid.

5.        Shortly after the bid deadline, two other entities in the group of 20 that signed confidentiality agreements submitted offers for the CLATEX Assets.  After negotiations, one of the parties withdrew its offer, and the other was unable to obtain financing.

6.        In January 2014, the only timely bidder from the Scotia bidding process resurfaced with a different entity providing financial support.  After negotiations, the new financial supporter declined to pursue the transaction.  In June 2014, the bidder reemerged a second time with yet a different financial partner.  That bid failed when the financial partner was not able to obtain financing.  In September 2014, the bidder reappeared a final time with its fourth different financial backer.  Extensive negotiations ensued through the Thanksgiving holiday in 2014 when OPEC met and announced that the cartel would no longer constrain production in order to support oil prices.  Immediately following that announcement, the financial backer withdrew and discussions with that bidder regarding a purchase of the Assets terminated.

7.        The Debtors continued their efforts to sell the CLATEX Assets in early 2015.  The Masters Creek Field, one of the Debtors' Louisiana properties, was put into an auction

at The Oil and Gas Asset Clearinghouse, a highly respected on-line, live auction and negotiated sale broker-dealer for oil and gas assets, in May 2015.  No bids were received for the property.[2]  Further, the Debtors entered into discussions with three private equity/investment firms regarding a "Drill-Co" or joint venture transaction with respect to the South Bearhead Creek Field, but none of the firms made a definitive proposal.[3]

8.      Prior to the expiration of its engagement letter in July 2015, Scotia reached out again to one of the original 20 parties who signed confidentiality agreements and convinced that party to submit another bid.  That party did, in fact, submit a letter of intent to purchase the Assets.   After negotiations, the potential buyer, which did not have the financial wherewithal to fund the purchase price, was unable to secure financing for the transaction, but verbally offered to proceed at a considerably lower price.  The Debtors declined to pursue a transaction at that price point.

9.      In August 2015, the Buyer submitted a proposal to buy certain of the CLATEX Assets and certain conventional assets in Texas, subject to access to geological, engineering and financial data.  The Sellers and the Buyer signed a confidentiality agreement and the Buyer began its diligence review.  Thereafter, the parties entered into negotiations, and those discussions culminated in the signing of the PSA, attached hereto as Exhibit D, on December 31, 2015.  Under the terms of the PSA, the Buyer has agreed to pay the Sellers $48.75 million (the "Purchase Price") to acquire a 75% interest in the Assets.   Because the Debtors are retaining a 25% non-operating working interest in the Assets, the Purchase Price reflects a total valuation for the Assets of $65 million.

---

[2]      The Debtors shut-in the field in December 2015.

[3]      In a Drill-Co transaction, an investor provides capital for drilling in exchange for an agreed rate of return and a residual working interest in the property.

10.     The Debtors, in consultation with their advisors, have determined in their business judgment that the proposal submitted by the Buyer for the Sale of the Assets and the assumption of related liabilities associated with the Assets represents the highest and best offer attainable for the Assets.  The Assets have been extensively marketed by the Debtors since August 2013.  The Debtors retained an experienced mergers and acquisitions advisor with broad experience in the oil and gas industry to conduct a thorough and proper sale process, and that advisor was engaged by and working for the Debtors for two years from August 2013 through July 2015.  Following the termination of that engagement, the Debtors continued to solicit proposals for the Assets, ultimately reaching an agreement with the Buyer.  Notwithstanding the extensive marketing of the Assets and the combined efforts of Scotia and the Debtors, the Buyer is the only party who ever presented a viable bid for the Assets.

11.     Further, an analysis of key metrics related to the proposed sale demonstrates the fairness of the price.[4]  The proposed sale price is above current market multiples, including market multiples based on barrels of oil equivalent ("BOEs") and monthly cash flow.  Significantly, with respect to cash flow, the Sale of the Assets will have only a de minimis effect on the Debtors' revenue in the near term.  Based on their current business plan, the Debtors project that, if retained, the Assets would contribute only approximately three percent of the Debtors' full year 2016 revenue.

12.     Finally, the amount of the proposed purchase price reflects that the Buyer is likely attributing material value to proved undeveloped reserves ("PUDs").  In the current market environment, reserve based financers are not attributing any material value to PUDs, but

---

[4]     Prior to the Board's approval of the transaction, the Debtors obtained an independent third party market analysis of the Sale.  That analysis concluded that the Purchase Price exceeded every metric examined by the analyst.

rather are attributing value only to proved developed producing reserves ("PDPs").  That the price likely includes value for PUDs further confirms the fairness of the price and the overall benefits of the Sale.

**Proposed Sale Terms**

13.     The principal terms of the PSA are as follows:[5]

| Seller:<br><br>*PSA, Introduction* | Swift Energy Operating, LLC, GASRS LLC and SWENCO-Western, LLC |
|---|---|
| Buyer:<br><br>*PSA, Introduction* | Texegy LLC |
| Assets:<br><br>*PSA, §§ 1.12, 2.1* | Subject to the terms and conditions of the PSA, the Seller agrees to sell, transfer and convey an undivided 75% interest in the following:<br><br>• All of the oil and gas leases; oil, gas and mineral leases; subleases and other leaseholds; overriding royalty interests; net profits interests; carried interests; farmout rights; options; and other properties and interests described on Exhibit A to the PSA, (collectively, the "Leases"), together with each and every kind and character of right, title, claim, and interest that Seller has in and to the Leases or the lands covered thereby on currently pooled, unitized therewith (the "Lands");<br><br>• All mineral servitudes and executive rights covering the lands described on Exhibit A-1 to the PSA, (collectively the "Mineral Rights");<br><br>• All oil, gas, water, disposal, or injection wells located on or used in connection with the Lands and/or the Mineral Rights, whether producing, shut in, or temporarily or permanently abandoned, including the wells shown on Exhibit A 2 attached to the PSA (the "Wells");<br><br>• All interest derived from the Leases and/or Mineral Rights in or to any currently existing pools or units which include any Lands or all or a part of any Leases and/or Mineral Rights or include any Wells, including those pools or units shown on Exhibit A 2 to the PSA (the "Units"); the Units, the Leases, the Mineral Rights, the Lands and the Wells, being hereinafter referred to as the "Properties", and including all interest of Seller derived from the Leases and/or Mineral Rights in production from any such Unit, whether such Unit production comes from Wells located on or off of a Lease or a Mineral Right, and all tenements, hereditaments and appurtenances belonging to the Leases and Units;<br><br>• All contracts, agreements and instruments by which the Properties are |

---

[5]     This summary is qualified in its entirety by the provisions of the PSA.  Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the PSA.

bound, or that relate to or are otherwise applicable to the Properties, only to the extent applicable to the Properties rather than Seller's other properties, including but not limited to, operating agreements, unitization, pooling and communitization agreements, declarations and orders, joint venture agreements, farming and farmout agreements, water rights agreements, exploration agreements, participation agreements, exchange agreements, transportation or gathering agreements, agreements for the sale and purchase of oil, gas or casinghead gas or processing agreements to the extent applicable to the Properties or the production of oil or gas and other minerals and products produced in association therewith from the Properties, including, without limitation, those identified on Schedule 1.12(e) to the PSA (collectively, the "Contracts"), and provided that Contracts shall not include the instruments constituting the Leases or the Mineral Rights;

- All easements, permits, licenses, servitudes, rights-of-way, surface leases and other surface rights ("Surface Contracts") appurtenant to, and used or held for use in connection with the Properties, only to the extent applicable to the Properties rather than Seller's other properties, including those identified on Schedule 1.12(f) of the PSA;

- All equipment, machinery, fixtures and other tangible personal property and improvements located on the Properties or used or held for use in connection with the operation of the Properties, only to the extent applicable to the Properties rather than Seller's other properties, including without limitation any wells, tanks, boilers, buildings, fixtures, injection facilities, saltwater disposal facilities, compression facilities, pumping units and engines, platforms, flow lines, pipelines, gathering systems, gas and oil treating facilities, machinery, power lines, telephone and telegraph lines, roads, and other appurtenances, improvements and facilities, but excluding (i) vehicles, (ii) equipment, machinery, fixtures and other tangible personal property and improvements located at or used in connection with any field office of Seller, (iii) any computers and related peripheral equipment, (iv) communications equipment, and (v) communications licenses granted by the Federal Communications Commission or other Governmental Body (subject to such exclusions, the "Equipment");

- All Hydrocarbons produced from or attributable to the Properties from and after the Effective Time, together with Imbalances associated with the Properties (subject to the provisions of Article 17 of the PSA);

- The office leases described on Exhibit A 4 of the PSA;

- Amounts payable to owners of working interests, royalties and overriding royalties and other interests in the Properties held in suspense by Seller as of the Closing Date as set forth in Schedule 1.12(k) of the PSA;

- All rights of Seller to audit the records of any Person and to receive refunds or payments of any nature, and all amounts of money relating thereto, after the Effective Time, to the extent relating to obligations assumed by Buyer pursuant to the PSA; and

- To the extent transferrable without payment of any fee by Seller (unless Buyer has agreed in writing to pay such fee) or the assumption of any obligation by Seller, all franchises, licenses (but excluding any licensed data, including, without limitation, licensed seismic data), permits, approvals, consents, certificates and other authorizations, and other rights granted by third Persons, and all certificates of convenience or necessity,

<table>
<tr>
<td></td>
<td>immunities, privileges, grants, and other such rights that relate to, or arise from, the Assets or the ownership or operation thereof.<br><br>Subject to the terms and conditions of the PSA, the Seller agrees to sell, transfer and convey an undivided 100% interest in the following:<br><br>• Copies of all lease files; land files; well files; gas and oil sales contract files; gas processing files; division order files; abstracts; title opinions; land surveys; non-confidential logs; maps; engineering, geological and geophysical files, data and reports, to the extent not restricted by third party agreement or otherwise; reserve studies and evaluations (insofar as they cover and exist within the boundaries of the Leases, Lands or Mineral Rights); and all other books, records, data, files, maps and accounting records, in each case to the extent related primarily and directly to the Assets, or used or held for use primarily and directly in connection with the maintenance or operation thereof, but excluding (i) any files, books, records, data, logs, reports, studies, evaluations, maps and accounting records to the extent disclosure or transfer is restricted by any third party agreement or Law and the necessary consents to transfer are not obtained, (ii) computer or communications software or intellectual property (including tapes, codes, data and program documentation and all tangible manifestations and technical information relating thereto), (iii) attorney client privileged communications and work product of Seller's legal counsel (other than title opinions), and (iv) any files, records, contracts or documents relating to this transaction (or any other discussions or negotiations regarding the sale or other disposition of any of the Assets), including any bids or offers received by Seller or any Affiliate of Seller for the sale of the Assets in competition with the Buyer's bid or offer and any files, records, contracts or documents relating to any negotiations and/or consummation of the sale of the Assets (subject to such exclusions, the "Records").</td>
</tr>
<tr>
<td><strong>Excluded Assets</strong><br><br><em>PSA § 1.46</em></td>
<td>The Assets do not include:<br><br>• All corporate, financial, income and franchise Taxes and legal records of Seller that relate to Seller's business generally (whether or not relating to the Assets), (ii) all books, records and files that relate to the Excluded Assets, (iii) those records, software, intellectual property and other items excluded or retained by Seller pursuant to Section 1.12(j) of the PSA, and (iv) copies of any other records retained by Seller pursuant to Section 2.5 of the PSA;<br><br>• The vehicles, equipment, machinery, licenses, fixtures and other tangible personal property described in Sections 1.12(g)(i), (ii), (iii), (iv), (v) and (vi) of the PSA;<br><br>• All rights to any refund of Taxes or other costs or expenses borne by Seller or Seller's predecessors in interest and title attributable to periods prior to the Effective Time;<br><br>• Claims and causes of action described in Schedule 4.7(a) of the PSA, except insofar as they are attributable or relate to the Assets for periods after the Effective Time;<br><br>• All of Seller's bonds (including any area wide bonds) or other financial instruments, permits and licenses or other permits, licenses or authorizations used in the conduct of Seller's business generally;<br><br>• All trade credits, account receivables, note receivables, take or pay</td>
</tr>
</table>

|  | amounts receivable, and other receivables attributable to the Assets with respect to any period of time prior to the Effective Time;

- All production, proceeds, income, receipts and credits to which Seller is entitled under Sections 2.3 and 2.4 of the PSA;

- Items of the type described in Sections 1.12(e), (f), (g) and (j) of the PSA to the extent applicable to Seller's properties other than the Properties;

- An assignable easement and right of way on, over, across and through the Leases and Lands as reasonably necessary for access to or the exploration, development, production, operation or use of Seller's other properties which are adjacent to or in the vicinity of any Leases or Lands as more fully provided in the Conveyance, including but not limited to the right to drill and complete wells across or through the Leases and Lands and to construct, repair, maintain, abandon, remove, operate and/or use pipelines, telephone and other communications lines or facilities, and roads;

- All rights, titles, claims and interests of Seller or any Affiliate of Seller (i) to or under any policy or agreement of insurance or any insurance proceeds, except to the extent provided in Article 14 of the PSA, (ii) to or under any bond or bond proceeds, or (iii) to or under any condemnation or eminent domain damages or awards, except to the extent provided in Article 14 of the PSA;

- All properties excluded from the Assets pursuant to Section 8.4(d)(ii) of the PSA, together with a pro rata share of all of Seller's right, title and interest in, to and under all Contracts, Surface Contracts, Equipment, Hydrocarbon production and Records included in the Assets that are directly related or attributable to such properties;

- All proceeds received by Seller after the Effective Time on account of which the Purchase Price is reduced pursuant to Section 3.3 of the PSA;

- All claims, demands and causes of action (including any claims, rights or agreements of or for guaranty, indemnity, contribution or reimbursement) of Seller against any Seller Indemnitee;

- Any patents, patent applications, logo, service mark, copyright, trade name or trademark of or associated with Seller or any Affiliate of Seller or any business of Seller or of any Affiliate of Seller;

- Right to freely use any logs, maps, engineering data and reports, reserve studies and evaluations, and other data and information being transferred as a part of the Assets;

- Any licensed data (including, without limitation, licensed seismic data); and

- The Mineral Rights described on Exhibit A-7 of the PSA. |

| **Consideration:**

*PSA §§ 3.1, 16.3* | Subject to certain price adjustments, the Purchase Price for the Assets is $48,750,000.

Further, the PSA imposes on the Buyer certain obligations, including, but not limited to, obligations to:

- Furnish makeup gas and/or settle Imbalances according to the terms of applicable gas sales, processing, gathering or transportation contracts, and to satisfy all other obligations relating to Future Delivery/Payment Obligations and/or Imbalances (including, without limitation, the matter |

| | involving those certain disputed charges invoiced by the operator of certain Burr Ferry interests as described in Schedule 4.8 of the PSA), |
|---|---|
| | • Pay working interests, royalties, overriding royalties and other interests held in suspense as set forth in Schedule 1.12(k) of the PSA, |
| | • Properly plug and abandon any and all wells, including inactive wells or temporarily abandoned wells, drilled on the Properties or otherwise relating to the Assets, |
| | • Replug any well, wellbore, or previously plugged well on the Properties to the extent required or necessary, |
| | • Dismantle or decommission and remove any equipment, structures, materials, platforms, flowlines, and property of whatever kind related to or associated with operations and activities conducted on the Properties or otherwise relating to the Assets, |
| | • Clean up, restore and/or remediate the premises covered by or related to the Assets in accordance with applicable agreements and Laws, and |
| | • Perform all obligations applicable to or imposed on the lessee, owner, or operator under the Leases and related contracts, or as required by Laws. |
| **Good Faith Deposit**<br><br>*PSA § 3.2* | Buyer, on behalf of Seller, will, by bank wire transfer pursuant to written instructions provided to Buyer by Escrow Agent, deposit funds as follows:<br><br>• Simultaneously with the execution and delivery of the PSA, the amount of $2,437,500 (such amount, together with any amount deposited pursuant to Section 3.2(a)(ii) of the PSA and any interest accrued thereon, the "<u>Deposit</u>"); and<br><br>• On the first Business Day following the entry of the Sale Order, the amount of $2,437,500.<br><br>The Deposit shall be held pursuant to this Agreement and an escrow agreement dated as of the date hereof in the form attached as Exhibit C to the PSA (the "<u>Escrow Agreement</u>") shall be applied as a credit against the Closing Payment as provided in Section 3.3 of the PSA.  If the PSA is terminated without a Closing, then the distribution of the Deposit shall be governed by the provisions of Section 15.3 of the PSA.  Notwithstanding delivery of the Deposit to the Escrow Agent, the Parties stipulate and agree that (i) the Deposit shall be held in escrow by the Escrow Agent until distributed in accordance with the terms of the Escrow Agreement; and (ii) the Deposit shall not become part of the Seller's assets or estate until distributed to Seller, if ever, in accordance with the terms of the Escrow Agreement. |

### Local Rule 6004-1

14.    Rule 6004-1 of the Local Rules requires that certain provisions contained in the PSA or Sale Order be highlighted and that the Debtors provide the justification for the inclusion of any such highlighted provisions.

15.    Local Rule 6004-1(b)(iv) provides that a sale motion must highlight certain material terms, including whether the following provisions are included:  (a) a sale to an

insider, (b) agreements with management, (c) releases, (d) private sale/no competitive bidding, (e) closing and other material deadlines, (f) good faith deposit, (g) interim arrangements with the proposed buyer, (h) use of proceeds, (i) tax exemptions, (j) record retention, (k) sales of avoidance actions, (l) requested findings as to successor liability, (m) sales free and clear of unexpired leases, (n) credit bid rights and (m) relief from Bankruptcy Rule 6004(h). Each of these subparts of Local Rule 6004-1(b)(iv) is discussed below.

### *Local Rule 6004-1(b)(iv)(A)*

16.     Local Rule 6004-1(b)(iv)(A) requires that, if the proposed sale is to an insider as defined in section 101(31) of the Bankruptcy Code, the Debtors must (a) identify the insider, (b) describe the insider's relationship to the debtor, and (c) set forth any measures taken to ensure the fairness of the sale process and the proposed transaction. The proposed Buyer is not an insider as defined in section 101(31) of the Bankruptcy Code.

### *Local Rule 6004-1(b)(iv)(B)*

17.     Local Rule 6004-1(b)(iv)(B) requires that, if a proposed buyer has discussed or entered into any agreements with management or key employees regarding compensation or future employment, the Debtors must disclose (a) the material terms of any such agreements, and (b) what measures have been taken to ensure the fairness of the sale and the proposed transaction in the light of any such agreements. The proposed Buyer has not discussed or entered into any agreements with management or key employees regarding compensation or future employment.

### *Local Rule 6004-1(b)(iv)(C)*

18.     Local Rule 6004-1(b)(iv)(C) requires that the Debtors must highlight any provisions pursuant to which an entity is being released or claims against any entity are being

waived or otherwise satisfied.  Subject to certain exceptions, Section 16.6 of the PSA releases the Sellers from claims relating directly or indirectly to the Assets.  Further, the same section of the PSA provides that the Buyer covenants and agrees that it will not attempt to avoid the effect of this release by later arguing that at the time of the release it did not fully appreciate the extent of any such claims, including, without limitation, claims under environmental laws or relating to environmental liabilities.  As well, Section 7 of the PSA contains additional releases regarding environmental matters and related issues.  The Debtors believe that they have provided sufficient disclosure regarding potential liabilities that are the subject of the releases, and all parties are sophisticated and have been represented by counsel and other advisors.

***Local Rule 6004-1(b)(iv)(D)***

19.     Local Rule 6004-1(b)(iv)(D) provides that the Debtors must disclose whether an auction is contemplated, and highlight any provision in which the Debtors have agreed not to solicit competing offers for the property subject to this Motion or to otherwise limit shopping of the property.  As discussed above, no auction is contemplated because the Debtors conducted a robust sale process that included extensive marketing over a lengthy period of time prior to the Petition Date.

***Local Rule 6004-1(b)(iv)(E)***

20.     Local Rule 6004-1(b)(iv)(E) provides that the Debtors must highlight any deadlines for the closing of the proposed sale or deadlines that are conditions to closing the proposed transaction.  Section 15.1 of the PSA provides that the PSA terminates on its own terms if the Sale has not closed on or before March 15, 2016.  Further, Section 13.1 of the PSA provides that, unless otherwise agreed in writing by the Sellers and the Buyer, the closing date of the sale shall be a date that is not later than the tenth business day following the satisfaction or

waiver of the conditions to closing in Section 12 of the PSA.  These deadlines do not prejudice either the Sellers or the Buyer, and are consistent with the Debtors' objective to emerge from chapter 11 in the first quarter of 2016.  The Debtors submit that the deadlines are, therefore, justified under the circumstances of these cases.

***Local Rule 6004-1(b)(iv)(F)***

21.     Local Rule 6004-1(b)(iv)(F) provides that the Debtors must highlight whether the proposed purchaser has submitted or will be required to submit a good faith deposit and, if so, the conditions under which such deposit may be forfeited.  As noted above, Section 3.2 of the PSA provides that the Buyer will provide a deposit (a "<u>Deposit</u>") to an escrow agent as follows:  (i) simultaneously with the execution and delivery of the PSA, the amount of $2,437,500, which amount was deposited on December 30, 2015, and (ii) on the first business day following the entry of the Sale Order, the amount of $2,437,500.  Section 15.3 of the PSA provides that the Sellers may retain the deposit as liquidated damages if (i) any condition in Section 12.1 of the PSA has not been satisfied as a result of the Buyer's material breach of its representations or warranties as of the date of the PSA or any act or willful or negligent failure to act by Buyer of any affiliate of the Buyer after the date of the PSA or (ii) the Buyer commits a material default or breach of its obligations under the PSA.  If, in contrast, the PSA is terminated for any reason other than the reasons set forth above, the Sellers are required to return the deposit to the Buyer, free of any claims by the Sellers or any other person with respect thereto.  As the provisions outlined above afford appropriate protections to both the Sellers and the Buyer in the event of a breach of the PSA, the Deposit and the associated forfeiture provisions in the PSA are justified.

***Local Rule 6004-1(b)(iv)(G)***

22.     Local Rule 6004-1(b)(iv)(G) provides that the Debtors must highlight any provision pursuant to which a debtor is entering into any interim agreements or arrangements with the proposed purchaser, such as interim management arrangements, and the terms of such agreements.  The Sellers are not entering into any such interim agreements or arrangements with the Buyer.

***Local Rule 6004-1(b)(iv)(H)***

23.     Local Rule 6004-1(b)(iv)(H) provides that the Debtors must highlight any provision pursuant to which a debtor proposes to release sale proceeds on or after the closing without further Court order, or to provide for a definitive allocation of sale proceeds between or among various sellers or collateral.  Schedule 3.1 of the PSA provides the agreed allocation of the Purchase Price among the Assets.  As the sale does not involve any allocation of proceeds among non-consenting third parties, and because both the Sellers and the Buyer have consented to the proposed allocation of sale proceeds, the proposed allocation is appropriate.

***Local Rule 6004-1(b)(iv)(I)***

24.     Local Rule 6004-1(b)(iv)(I) provides that the Debtors must highlight any provision seeking to have the sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code and the type of tax for which the exemption is sought.  The PSA and the Sale Order do not seek to exempt the sale from any taxes.

***Local Rule 6004-1(b)(iv)(J)***

25.     Local Rule 6004-1(b)(iv)(J) provides that, if the debtor proposes to sell substantially all its assets, the debtor must highlight whether the debtor will retain, or have reasonable access to, its books and records to enable it to administer its bankruptcy case.  The

proposed Sale is not a sale of substantially all of the Debtors' assets and there is no issue regarding access to books and records.

***Local Rule 6004-1(b)(iv)(K)***

26.     Local Rule 6004-1(b)(iv)(K) provides that the Debtors must highlight any provision pursuant to which they seek to sell or otherwise limit rights to pursue avoidance claims under chapter 5 of the Bankruptcy Code ("<u>Avoidance Claims</u>").  The PSA and the Sale Order do not seek to sell or limit rights to pursue Avoidance Claims.

***Local Rule 6004-1(b)(iv)(L)***

27.     Local Rule 6004-1(b)(iv)(L) provides that the Debtors must highlight any provision limiting the proposed purchaser's successor liability.  Paragraphs 16-18 of the Sale Order provide protections to the Buyer regarding successor liability claims.  However, as the Sale is not a sale of substantially all of the Debtors' assets and the parties' intent is that the Assets be sold free and clear of liens, claims and encumbrances, the Debtors submit that the proposed limitations on successor liability are justified.

***Local Rule 6004-1(b)(iv)(M)***

28.     Local Rule 6004-1(b)(iv)(M) provides that the Debtors must highlight any provision by which they seek to sell property free and clear of a possessory leasehold interest, license or other right.  Paragraphs 7-11 of the Sale Order provide that the sale of the Assets is free and clear of all interests, licenses or other rights, except for the Assumed Seller Obligations and Permitted Encumbrances.  As described below, these provisions are appropriate because the sale satisfies the requirements of section 363(f) of the Bankruptcy Code.

***Local Rule 6004-1(b)(iv)(N)***

29.     Local Rule 6004-1(b)(iv)(N) provides that the Debtors must highlight any provision by which they seek to allow, disallow or affect in any manner, credit bidding pursuant to Bankruptcy Code section 363(k).  The Sale Order and the PSA do not address credit bidding rights.

***Local Rule 6004-1(b)(iv)(O)***

30.     Local Rule 6004-1(b)(iv)(O) provides that the Debtors must highlight any provision whereby they seek relief from the 14-day stay imposed by Bankruptcy Rule 6004(h). Paragraph 28 of the Sale Order provides for a waiver of the 14-day stay period for the effectiveness of the order under Bankruptcy Rule 6004(h), as well as the 14-day stay period provided for in Bankruptcy Rule 6006(d).  Because time is of the essence in these cases, the Debtors submit that these waivers are justified.

## Approval of the Sale Is Warranted Under Section 363 of the Bankruptcy Code

31.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  See, e.g., In re Martin, 91 F.3d 389 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513 (7th Cir. 1991)); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).

32.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

a.     whether a sound business justification exists for the sale;

b.    whether adequate and reasonable notice of the sale was given to interested parties;

c.    whether the sale will produce a fair and reasonable price for the property; and

d.    whether the parties have acted in good faith.

In re Decora Indus., Inc., 2002 WL 32332749, at * 2 (D. Del. May 20, 2002) (citing Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991)).

33.    When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

34.    In the instant case, a strong business justification exists for the Sale.  As previously discussed, the Debtors are seeking to streamline their operations and focus their efforts on their primary assets in the Eagle Ford trend in South Texas, where they have significant experience and a technology and engineering advantage.  By divesting the Assets, the Debtors will be relieved of their obligations as operator on the vast majority of their assets in Louisiana, but they will retain a 25% nonoperating working interest, which the Debtors believe could yield considerable value in the future.  In addition, the Assets have been marketed for years, and the Debtors have secured a purchase price that is very favorable, particularly in the current commodity price environment.

35.    Second, the Debtors have already provided and will provide additional notice of the Sale to interested parties.  In addition to the widespread marketing of the Assets that occurred prior to the commencement of these cases, the Debtors, through a press release issued

on the Petition Date and an 8-K filed on January 4, 2016, have provided broad public notice of their intent to consummate the Sale. Further, the Debtors will provide notice of the Sale to all interested parties in accordance with the Bankruptcy Rules. In view of the long marketing history of the Assets, the publicity that has already occurred by reason of the press release and 8-K filing, and the extensive notice that will be provided in connection with this motion, the Debtors submit that adequate notice will be given to interested parties.

36.     Third, the proposed purchase price for the Assets is fair and reasonable. Given the extensive exposure of the Assets to the market, the Debtors are confident that most, if not all, parties with an interest in purchasing the Assets have had a full and fair opportunity to submit an offer. In addition, based on an independent  third party market analysis obtained by the Debtors prepetition, the proposed Purchase Price, which reflects a $65 million valuation for the Assets, exceeds various market metrics.

37.     Finally, the PSA and the terms of the Sale have been heavily negotiated in good faith and at arm's length. Based on the foregoing, the Debtors submit that there is a sound business purpose for the proposed Sale, and the Sale is in the best interest of the Debtors' estates and creditors.

## Approval of the Sale Free and Clear of Liens, Claims and Encumbrances

38.     The Debtors request approval to sell the Assets free and clear of any and all liens, claims, and other interests, except for the Assumed Seller Obligations and Permitted Encumbrances (each as defined in the PSA), in accordance with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

a.      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

b.      such entity consents;

c.      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.      such interest is in bona fide dispute; or

e.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

39.      Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtor.  In re TWA Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of §363(f)); United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573 (4th Cir. 1996) (same).

40.      The Debtors submit that the sale of the Assets free and clear of liens, claims and other interests, except for the Assumed Seller Obligations and Permitted Encumbrances, will satisfy the requirements of section 363(f) of the Bankruptcy Code because any known entities holding liens, claims, encumbrances, or other interests on the Assets will have received notice of this Motion.  All known parties in interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the Sale should be deemed to have consented.  See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions

under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted) (emphasis in original); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Penn. 1988) (same).

41.     Accordingly, the Debtors request that the Assets be transferred to the Buyer, free and clear of all liens, claims, encumbrances, and other interests except for Assumed Liabilities and Permitted Encumbrances, with such liens, claims, encumbrances, and other interests to attach to the net sale proceeds of the Assets.

### An Auction of the Assets Is Not Required

42.     Bankruptcy Rule 6004(f)(1) permits private sales or sales conducted without an auction.  Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").  Further, courts have generally held that a debtor has broad discretion in determining the manner in which assets are sold.  Berg v. Scanlon (In re Alisa P'ship), 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of sale is within the discretion of the trustee . . . ."); In re Bakalis, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property.") (citing In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991)).  As long as a debtor maximizes the return to its estate, a court should defer to a debtor's business judgment regarding how to structure an asset sale.  Bakalis, 220 B.R. at

532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); In re NEPSCO, Inc., 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate."). Accordingly, if the Debtors conclude that conducting a private sale, as opposed to a public auction, is in the best interests of their estates, the Debtors should be permitted to do so. See Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship), 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

43.    The Debtors' decision to pursue the Sale without an auction is supported by the fact that the Debtors have fully explored potential sales of the Assets with a wide range of interested parties over an extended period of time. Since August 2013, the Debtors have been marketing the Assets, and the Buyer is the only interested party who has presented a viable bid for the Assets. In addition, based upon the prior offers received by the Debtors and the continuing decline in the oil and gas commodity market, the Debtors believe that the proposed Purchase Price is very favorable under the circumstances. As further discussed above, the time, effort, and expense associated with marketing the Assets for sale at a public auction would needlessly duplicate the Debtors' previous efforts and would likely exceed the value of any marginal increase in purchase price or other benefits provided. Accordingly, the Debtors' decision to sell the Assets to the Buyer pursuant to the PSA is supported by the Debtors' sound business judgment and should be approved.

## Buyer Entitled to Good Faith Protections

44.     The Buyer is purchasing the Assets in good faith and is entitled to the full

protection of section 363(m) of the Bankruptcy Code.  Section 363(m) of the Bankruptcy Code

protects a good-faith purchaser's interest in property purchased from a debtor, notwithstanding

that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically,

section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b) of the Bankruptcy Code] of a sale . . . of property
> does not affect the validity of a sale . . . to an entity that
> purchased . . . such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

45.     Section 363(m) fosters the "policy of not only affording finality to the

judgment of the bankruptcy court, but . . . give[s] finality to those orders and judgments upon

which third parties rely."  In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986)

(quoting Hoese Corp. v. Vetter Corp. (In re Vetter Corp.), 724 F.2d 52, 55 (7th Cir. 1983));

see Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . .

provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the

appeal."); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11

U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless

there is a stay pending appeal").

46.     The Debtors request a finding that the Buyer is a good faith purchaser

entitled to the protections of section 363(m).  The terms and conditions of the PSA have been

negotiated by the Debtors and the Buyer at arm's length and in good faith.  The Buyer was

represented by qualified counsel and other advisors the Debtors believe that the Buyer has not engaged in any conduct that would indicate or constitute a lack of good faith.  See In re Gucci, 126 F.3d 380, 392 (2d Cir. 1997) ("Good faith of a purchaser is shown by the integrity of his conduct during the course of sale proceedings . . . ."); In re Tempo Tech. Corp., 202 B.R. 363, 367 (D. Del. 1996) (stating that a purchaser's good faith status would be destroyed only by conduct involving "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).  Accordingly, the Debtors believe that the Buyer is entitled to the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

### Approval of the Assumption and Assignment
### of Executory Contracts and Unexpired Leases

47.    Pursuant to section 365 of the Bankruptcy Code, the Debtors seek authority to assume and assign the Debtors' right, title and interest, to and under the Contracts to the Buyer.  Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

NAI-1500722846v9

48.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially.  See Richmond Leasing Co. v. Capital Bank, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. 365(b)(1).

49.    Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); see also In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets). Section 365(f)(2)(B) requires, however, that adequate assurance of future performance by an assignee exist.  11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment.  Cinicola v. Scharffeberger, 248 F.3d 110, 120 (3d Cir. 2001).  Adequate assurance of future performance is not required for every term of an executory contract or

unexpired lease, but only such terms that are "material and economically" significant.  In re Fleming Cos., Inc., 499 F.3d 300, 305 (3d Cir. 2007).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009); see also In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc. 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

50.     The assumption and assignment of the Contracts (including, without limitation, the right to act as operator under the relevant joint operating agreements) will benefit the estate because such assumption and assignment is an integral component of the PSA and is necessary to successfully complete the Sale.  Additionally, the Buyer has agreed under the PSA to provide adequate assurance of future performance regarding the assigned Contracts, and, to the extent necessary, will demonstrate as much at the Sale Hearing (as defined below).  The assumption and assignment of the Contracts should therefore be approved.

**Proposed Assumption and Assignment Notice**

51.     Attached hereto as Exhibit B and Exhibit C, the Debtors are filing schedules of cure obligations (the "Cure Schedules") for the Contracts.  The Cure Schedules will include a description of each Contract potentially to be assumed and assigned by the Buyer and the amount, if any, the Debtors believe is necessary to cure such Contract pursuant to section 365

of the Bankruptcy Code (the "Cure Costs").  A copy of the Cure Schedules, together with a notice of the proposed assumption and assignment of the Contracts (the "Assumption and Assignment Notice"), substantially in the form attached as Exhibit F to this Motion, will be served on each of the nondebtor parties listed on the Cure Schedules by first class mail contemporaneously with the filing of this Motion.  The Debtors propose that any objections to the Cure Costs set forth on such schedule, must: (a) be in writing, (b) set forth the specific monetary amount the objector asserts to be due, and the specific types of the alleged defaults, pecuniary losses, accrued amounts and conditions to assignment and the support therefor, (c) be filed with the Clerk of the Bankruptcy Court and (d) be served so as to be actually received by (i) the Debtors, c/o Swift Energy Company, 17001 Northchase Drive, Suite 100, Houston, Texas 77060 (Attn: Office of the General Counsel); (ii) Debtors' counsel, Jones Day, 2727 N. Harwood Street, Dallas, Texas 75201 (Attn:  Gregory M. Gordon, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.); and (iii) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, no later than January 25, 2016 at 4:00 p.m. (prevailing Eastern Time) (the "Assumption/Assignment Objection Deadline").

52.     If no objections are received by the Objection Deadline, then the proposed assumption and assignments will be authorized and the Cure Costs set forth in the Cure Schedules will be binding upon the counterparty for all purposes and will constitute a final determination of the total Cure Costs to be paid to the counterparty in connection with the assumption and assignment to Buyer.

53.     The Debtors request that any party failing to timely object to the proposed transactions be deemed to consent to the treatment of its executory contract and/or unexpired

lease under section 365 of the Bankruptcy Code.  See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its executory contract and/or unexpired lease notwithstanding any anti-alienation provision or other restriction on assignment.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).  The Cure Costs set forth in the Cure Schedules will be controlling, notwithstanding anything to the contrary in any Contract or any other document, and the counterparty to the Contract will be deemed to have consented to the Cure Costs and will be forever barred from asserting any other claims related to such Contract against the Debtors or the Buyer, or the property of any of them.

54.     If a timely objection is received and such objection cannot otherwise be consensually resolved by the parties, such objection will be heard at the hearing on this Motion, which is scheduled for February 1, 2016 at 11:30 a.m. (prevailing Eastern Time) (the "Sale Hearing").

**Proposed Notice of the Sale Hearing**

55.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested in the this Motion.  The Debtors propose that the deadline for objecting to approval of the proposed Sale be 4:00 p.m. (prevailing Eastern Time) on January 25, 2016.

56.    Contemporaneously with the filing of this Motion, the Debtors intend to serve a notice of the Sale Hearing (the "Hearing Notice"), substantially in the form attached as Exhibit G to this Motion, by first-class mail, postage prepaid upon the following parties:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (c) Kirkland & Ellis LLP, as counsel to the ad hoc committee of a majority of holders of the Debtors' prepetition unsecured notes; (d) counsel to JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the senior secured lenders; (e) counsel to Wilmington Trust, National Association, in its capacity as the trustee under the respective prepetition indentures governing the unsecured notes; (f) counsel to Cantor Fitzgerald Securities LLC, in its capacity as administrative agent under the proposed debtor in possession financing; (g) all parties entitled to notice pursuant to Bankruptcy Rule 2002; (h) all parties known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Assets; (i) all parties known to the Debtors to have asserted any lien, claim, encumbrance or other interest in the Assets (for whom identifying information and addresses are available to the Debtors); (j) any Governmental Body (as defined in the PSA) which has a known interest in the relief requested; (k) the Office of the Attorney General in Delaware and in each state in which the Debtors operate; (l) the Securities and Exchange Commission; (m) the Internal Revenue Service; and (n) all parties to the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (collectively, the "Notice Parties").  In addition, the Debtors will serve this Motion on those persons in categories (a) through (g), above.  Finally, within five business days after filing this Motion, or as soon as practicable thereafter, the Debtors will place a publication version of

the Hearing Notice, substantially in the form attached hereto as <u>Exhibit H</u>, for one day in the national edition of *USA Today*.

57.    The Hearing Notice will include, among other things, the proposed date, time and place of the Sale Hearing and the deadline for filing any objections to the relief requested in this Motion and will therefore comply with Bankruptcy Rule 2002(c).  The Debtors submit that the methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Assets.

### Waiver of Rules 6004(h) and 6006(d)

58.    Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order.  Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 14 days, unless the court orders otherwise.

59.    The Debtors request that, upon entry of the Sale Order, the Court waive the 14 day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The waiver of the 14 day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) will allow any Sale to close as soon as possible and prevent further delay in the administration of these cases.  The Debtors respectfully submit that the Court waive the 14 day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

### Consent to Jurisdiction

60.    Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

**Notice**

61.     Notice of this motion will be provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (c) Kirkland & Ellis LLP, as counsel to the ad hoc committee of a majority of holders of the Debtors' prepetition unsecured notes; (d) counsel to JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the senior secured lenders; (e) counsel to Wilmington Trust, National Association, in its capacity as the trustee under the respective prepetition indentures governing the unsecured notes; (f) counsel to Cantor Fitzgerald Securities LLC, in its capacity as administrative agent under the proposed debtor in possession financing; and (g) all parties entitled to notice pursuant to Bankruptcy Rule 2002.

**No Prior Request**

62.     No prior request for the relief sought herein has been made to this Court or any other Court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Sale Order, in a form attached hereto as Exhibit A and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

*[The remainder of this page is left intentionally blank.]*

NAI-1500722846v9

Dated:  January 11, 2016
      Wilmington, Delaware

Respectfully submitted,

*/s/ Brendan J. Schlauch*
Daniel J. DeFranceschi (DE 2732)
Zachary I. Shapiro (DE 5103)
Brendan J. Schlauch (DE 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

Gregory M. Gordon (TX 08435300)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

Thomas A. Howley (TX 24010115)
Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

NAI-1500722846v9