IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| SWIFT ENERGY COMPANY, *et al.*, | : | Chapter 11 |
| | : | |
| Reorganized Debtors. | : | Bankr. Case No. 15-12670 (MFW) |
| | : | |
| MORRIS PROPP II and MORRIS PROPP II FOUNDATION, | : | |
| | : | |
| Appellants, | : | Civ. No. 16-404 (GMS) |
| | : | |
| v. | : | |
| | : | |
| SWIFT ENERGY COMPANY, *et al.*, | : | |
| | : | |
| Appellees. | : | |

**MEMORANDUM OPINION**

**I.  INTRODUCTION**

Presently before the court is Appellants' emergency motion for a stay pending appeal (D.I. 4) ("Motion to Stay"). For the reasons that follow, the court will deny the Motion to Stay.

**II.  BACKGROUND**

This appeal arises from a Bankruptcy Court order entered on May 26, 2016 (B.D.I. 640)[1] ("Enforcement Order"), which granted the above-captioned appellees' ("Debtors") motion to enforce the Bankruptcy Court's prior orders approving a restructuring support agreement and confirming Debtors' plan of reorganization. Appellants timely filed a notice of appeal from the Enforcement Order on May 31, 2016, along with the Motion to Stay. (D.I. 1, 4.)

**A.  The RSA**

On December 31, 2015, Debtors commenced a case under Chapter 11 of the Bankruptcy Code. On the same day, Debtors and certain of their noteholders entered into a Restructuring

---

[1]The docket of the Chapter 11 cases, captioned *In re Swift Energy Company, et al.*, Case No. 15-12670 (MFW) (Bankr. D. Del.), is cited herein as "B.D.I. __."

1

Support Agreement (the "RSA"). (*See* B.D.I. 77.) Under the terms of the RSA, the "Consenting Noteholders" agreed to support confirmation of a plan of reorganization proposed by Debtors (the "Plan"). Section 3.01(a) of the RSA provides that "[e]ach of the Consenting Noteholders hereby covenants and agrees to support the Plan, including the solicitation, confirmation, and consummation of the Plan, as may be applicable, and will not take any actions materially inconsistent with this Agreement or the Plan." Section 3.01(e) provides that "[e]ach of the Consenting Noteholders hereby covenants and agrees (i) not to object to, or vote or cause to be voted (to the extent applicable) any of the Senior Notes Claims that it holds, controls, or has the ability to control, to reject the Plan or (ii) otherwise commence any proceeding to oppose the Plan or object to confirmation thereof." Section 3.01(f) further provides that "[e]ach of the Consenting Noteholders hereby covenants and agrees to not directly or indirectly . . . take any . . . action that is materially inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation or consummation of the Plan." Section 9.18 of the RSA provides that:

> This Agreement is intended as a binding commitment enforceable in accordance with its terms against the Parties. It is understood and expressly agreed by each of the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled solely to specific performance and injunctive or other equitable relief as a remedy of any such breach without the necessity of proving the inadequacy of money damages as a remedy and without posting security for such relief, including seeking an order of the Bankruptcy Court requiring the breaching Party to comply promptly with its obligations hereunder.

On February 2, 2016, the Bankruptcy Court entered an order approving a debtor-in-possession financing facility (B.D.I. 224) (the "DIP Facility"). The DIP Facility provided, among other things, a 7.5% "backstop fee" paid to the initial DIP Lenders in respect of the agreement by certain senior noteholders to backstop the entire $75 million DIP Facility in the event that the syndication was unsuccessful. No party appealed the Order approving the DIP Facility.

2

## B. Plan Confirmation

On March 23, 2016, Appellants filed an objection to confirmation of Debtors' Plan (B.D.I. 460) (the "Plan Objection"). In the Plan Objection, Appellants indicated that they held $1,070,000 of Debtors' unsecured notes and objected to the classification of their claim under the Plan on the basis that they were not able to participate in the syndication of Debtors' DIP Facility. Debtors subsequently provided all of their unsecured noteholders with an opportunity to participate in the DIP Facility syndication, and extended the deadline to do so until April 4, 2016. (*See* B.D.I. 499.) As of the date of the confirmation hearing, on March 30, 2016, Appellants had not elected to participate in the DIP Facility syndication. At the confirmation hearing, Debtors announced to the Bankruptcy Court that they had decided to permit all noteholders, including Appellants, to participate in the syndication of the DIP Facility, and the Bankruptcy Court entered an order confirming the Plan (B.D.I. 513) (the "Confirmation Order"), which, among other things, overruled Appellants' Plan Objection. Paragraph HH of the Confirmation Order provides in part that "[a]ll documents and agreements necessary to implement the Plan . . . including, but not limited to, the Restructuring Support Agreement . . . are essential elements of the Plan and have been negotiated in good faith and at arm's-length with the Creditors' Committee, the Restructuring Support Parties, the Exit Agent, the Exit Lenders and their respective officers, directors, employees, advisors, members and professionals, and shall, upon completion of documentation and execution, be valid, binding and enforceable agreements and not be in conflict with any federal, state or local law."

Following the entry of the Confirmation Order, Appellants elected to participate in the syndication of the DIP Facility. On April 4, 2016, Debtors' claims and noticing agent received subscription documents (the "Subscription Documents") from Appellants indicating their intent to participate in the DIP Facility on account of their $1,070,000 in bonds. As part of the Subscription

3

Documents, Morris Propp, on behalf of Appellants, signed Joinder Agreements to the RSA (collectively, the "Joinder Agreements"). The Joinder Agreements provide that "[t]he Joining Party hereby agrees to be bound by all of the terms of the Restructuring Support Agreement." The Joinder Agreements further provide that "[t]he Joining Party shall hereafter be deemed to be a 'Consenting Noteholder' and a 'Party' for all purposes under the Restructuring Support Agreement."

### C. The First Appeal and Motion to Enforce

Despite their execution of the Joinder Agreements, on April 14, 2016, Appellants filed a notice of appeal with respect to the Plan Confirmation Order based on the Bankruptcy Court's overruling of their Plan Objection (the "First Appeal"). (*See* Civ. No. 16-265 (GMS), D.I. 1.) The thrust of the First Appeal, as described in Appellants' papers, is that there were two syndication offers with respect to the DIP Facility; Appellants were shut out of a first syndication offer, which was made only to certain creditors and included, among other things, the 7.5% back stop fee to certain senior noteholders in respect of their agreement to backstop the entire $75 million DIP Facility; the terms of the second syndication offer, which was made to all unsecured noteholders prior to the Confirmation Hearing (and which Appellants accepted pursuant to the Subscription Documents), were not as favorable as the terms of the first syndication offer; and the Bankruptcy Court did not properly consider the merits of Appellants' Plan Objection. (*See* D.I. 8 at 2; B.D.I. 614 at 1-2; B.D.I. 652 at 2.)

In response to the First Appeal, on May 6, 2016, Debtors filed a motion to enforce the RSA and Confirmation Order (B.D.I. 593) ("Motion to Enforce") based on Appellants' obligation, as a Consenting Noteholder and Party to the RSA, to support the Plan, including the confirmation and consummation of the Plan, and not to directly or indirectly take any actions inconsistent with the RSA or Plan. Appellants' objection to the Motion to Enforce raised three primary arguments: (1)

4

the Bankruptcy Court lacked jurisdiction to hear the Motion to Enforce by virtue of the First Appeal; (2) the RSA did not prohibit appeal of the Confirmation Order; and (3) if it did, the RSA was unconscionable. (*See* B.D.I. 614.) Following briefing and oral argument held on May 26, 2016, the Bankruptcy Court granted the Motion to Enforce, finding that an appeal from the Confirmation Order is a proceeding to oppose the Plan or object to confirmation thereof, that Appellants were "sophisticated investors," and that despite counsel's contention that Appellants executed the Subscription Documents without consulting their counsel, "ignorance of the law is no defense." (*See* B.D.I. 640; D.I. 6 at Ex. H, 5/26/16 Hr'g. Tr. at 33:1-34:15, 43:16-44:12.)

### D. The Second Appeal and Motion to Stay

Subsequently, Appellants filed the instant appeal with respect to the Enforcement Order (D.I. 1) (the "Second Appeal"). On May 31, 2016, Appellants filed a motion with the Bankruptcy Court to stay the Enforcement Order pending appeal (B.D.I. 652), which the Bankruptcy Court denied on June 2, 2016 (B.D.I. 656). On May 31, 2016, Appellants filed the Motion to Stay with this court. (D.I. 4.)

### III. PARTIES' CONTENTIONS

Appellants' Motion to Stay makes no attempt to demonstrate a likelihood of success on the merits; it merely listed bases on which Appellants believe the grounds on which the Bankruptcy Court entered the Enforcement Order constituted reversible error and asserts that denial of a stay will result in irreparable harm. (*See* D.I. 4 at 2-3.) In their reply, Appellants argue the Bankruptcy Court erred in finding jurisdiction to enforce the RSA and Confirmation Order, notwithstanding the First Appeal of the Confirmation Order, on the basis that the Bankruptcy Court was merely enforcing, not modifying, those orders. (D.I. 8 at 4.) Appellants do not argue that the Enforcement Order modified the Confirmation Order, but rather that the Bankruptcy Court erred in failing to recognize the "inviolability of the appellate process." (*Id.* at 4-5.) Appellants further argue that

5

even if the Bankruptcy Court had jurisdiction to enter the Enforcement Order, "it is more likely than not that the appeal does not violate the RSA." (*Id.* at 5.) Appellants contend that the RSA does not specifically prohibit appeals, and further contend that the First Appeal is not a "commence[ment of a] proceeding to oppose the Plan," as prohibited by the RSA, but rather a continuation of the Plan Objection they filed prior to their joinder to the RSA. (*See id.*) Appellants state it is similarly "a stretch to argue" that the prosecution of the First Appeal – which seeks to reverse confirmation of the Plan – "would delay or obstruct . . . consummation of the Plan," as prohibited by the RSA, because success on the First Appeal is still speculative. (*Id.* at 6-7.) Finally, Appellants argue that to the extent that the RSA does prohibit an appeal of the Confirmation Order, such a prohibition is unconscionable and against public policy. In support thereof, Appellants assert that they "had no choice but to sign the RSA" and no indication that participating in the DIP Facility syndication would require them to forfeit their right to appeal. (*Id.* at 7.) Appellants contend that any waiver of such a right must be knowing, intentional, and made in exchange for a privilege or right that otherwise would not be granted. (*See id.* at 8.)

Conversely, Debtors argue that Appellants have failed to establish any likelihood of success on the merits of their appeal of the Enforcement Order, let alone a "substantial" chance of success, which is their burden in seeking a stay of this appeal. Debtors argue that Appellant's entry into the RSA was a settlement of their Plan Objection, which both resolved the substance of Appellants' objection to Plan confirmation and barred Appellants from continuing their opposition to the Plan. (*See* D.I. 5 at 2.) Debtors argue that the Bankruptcy Court clearly had jurisdiction to enforce its prior orders pursuant to section 105(a) of the Bankruptcy Code and under the plain terms of the RSA, pursuant to which Appellants agreed the Bankruptcy Court would have exclusive jurisdiction over all matters arising out of, or in connection with, the RSA. (*See id.* at 7-8.) Debtors assert that although the Bankruptcy Court may be prohibited from altering the terms

6

of an order on appeal, it had full authority to enforce its own orders. (*See id.* at 8.) Here, the First Appeal related to the Bankruptcy Court's consideration of the Plan Objection, did not challenge the validity or enforceability of the RSA or Confirmation Order, and the Bankruptcy Court's entry of the Enforcement Order did not expand or alter either of those prior orders. (*See id.*) Thus, Debtors contend that Appellants are unlikely to prevail on the merits of their jurisdictional arguments. (*Id.*)

Debtors further argue that the First Appeal violated the plain language of several provisions of the RSA, including that which provided the Consenting Noteholders would "not directly or indirectly take any . . . action that is materially inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation or consummation of the Plan." (*See* D.I. 6 at Ex. A, RSA at § 3.01(f).) Thus, Debtors contend that Appellants are unlikely to prevail on their arguments that such language does not include an appeal seeking to reverse the Confirmation Order. (*See* D.I. 5 at 9.) Finally, Debtors argue there is no evidence before the court that Appellants, who were sophisticated investors and represented by counsel, did not read or understand the RSA, and Appellants' argument that the RSA is unconscionable is meritless in light of the benefits Appellants received thereunder. (*See id.* at 9-11.)

### IV.  STANDARD OF REVIEW

"The granting of a motion for stay pending appeal is discretionary with the court." *See In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2-3 (Bankr. D. Del. Mar. 27, 2001). Appellants bear the burden of proving that a stay of the Enforcement Order is warranted based on the following criteria: (1) whether the movant has made "a strong showing" that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) where the public interest lies. *Republic of Phil. v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). "When

7

considering the above factors in a preliminary injunction case, [this Court has] discussed that 'equal weight for each factor is not required since the formula cannot be reduced to a set of rigid rules.'" *In re Tribune,* 477 B.R. 465, 475 (Bankr. D. Del. 2012) (quoting *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 548 (D. Del. 2005)). "Thus the analysis is flexible." *Id.*

The Third Circuit recently took the opportunity to "provide guidance on how to conduct a balancing of the four stay factors" and adopted a "sliding-scale approach" to balancing the factors. *In re Revel AC, Inc.*, 802 F.3d 558, 567-68 (3d Cir. 2015). As an initial matter, the *Revel* court noted that the most critical factors, according to the Supreme Court, are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm – the latter referring to harm that cannot be prevented or fully rectified by a successful appeal. *Id.* at 568 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks and internal citations omitted).

With respect to the first factor – a strong showing of the likelihood of success – the *Revel* court noted, "a sufficient degree of success for a strong showing exists if there is a reasonable chance, or probability of winning. Thus, while it is not enough that the chance of success on the merits be better than negligible, the likelihood of winning on appeal need not be more likely than not." *Id.* at 568-69 (internal quotation marks and internal citations omitted). "On the second factor the applicant must demonstrate that irreparable injury is *likely* [not merely possible] in the absence of a stay. While a reference to 'likelihood' of success on the merits has been interpreted by courts to cover the generic range of outcomes, for irreparable harm we understand the Supreme Court's use of 'likely' to mean more apt to occur than not." *Id.* at 569 (emphasis in text) (internal quotation marks and internal citations omitted).

8

Under the "sliding scale" approach, "the necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors. Stated another way, the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in its favor; the less likely it is to win, the more need it weigh in its favor." *Id.* (internal quotation marks and internal citations omitted). "Keeping in mind that the first two factors are the most critical, if the chance of success on the merits is only better than negligible and the possibility of irreparable injury is low, a stay movant's request fails." *Id.* at 570 (internal quotations and internal citations omitted). "Likewise, even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the stay opponent if a stay is granted, it is still required to show, at a minimum, serious questions going to the merits." *Id.*

The Third Circuit concluded its guidance by noting that all four stay factors are interconnected, and the analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) will suffer irreparable harm absent a stay? If it has, we balance the relative harms considering all four factors using a 'sliding scale' approach. However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*Id.* at 571 (emphasis in text) (internal quotation marks and internal citations omitted).

## V. DISCUSSION

### A. Likelihood of Success on the Merits

With respect to Appellants' first argument that the Bankruptcy Court lacked jurisdiction over the Motion to Enforce, Appellants have not met their burden of making "a strong showing" that they are likely to succeed on the merits. Pursuant to section 105(a) of the Bankruptcy Code, the Bankruptcy Court has broad equitable powers to take action or make any determination necessary to implement court orders or rules. *See* 11 U.S.C. § 105(a). Section 9.08 of the RSA

provided that "the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with th[e] Restructuring Support Agreement." An appealed order that is not stayed remains in full force and effect. *See In re VII Holdings Co.*, 362 B.R. 663, 666, n.3 (Bankr. D. Del. 2007). Appellants did not move for a stay pending appeal of the RSA or Confirmation Order, thus the Bankruptcy Court retains jurisdiction to implement and enforce both orders. *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243 (S.D.N.Y. 1994) (citing *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987)) ("The mere pendency of an appeal does not, in itself, disturb the finality of a judgment.")

Appellants are also unlikely to succeed on the merits of their argument that the Bankruptcy Court misinterpreted the difference between enforcement and alteration of an order. "Courts have ... recognized a distinction in the divestment of jurisdiction between acts undertaken to enforce the judgment and acts which expand upon or alter it; the former being permissible and the latter prohibited." *Id.* As Debtors note, courts have held that this distinction is particularly important in the context of plan confirmation:

> The application of this distinction is most germane in the context of a Chapter 11 bankruptcy case which involves the court's issuance of innumerable orders involving a myriad of issues, one or more of which may be on appeal at any given moment. Permitting a court to enforce its orders, while prohibiting it from expanding upon them, allows the least disruption of the court's administration of a bankruptcy plan. Thus, it has long been held that in the absence of a stay pending appeal of the plan confirmation, the bankruptcy court is entitled to implement the plan.

*Id.* at 244. Here, the Enforcement Order did not alter the terms of either the RSA or Confirmation Order but merely enforced those terms. As the Bankruptcy Court had full authority to enforce its prior orders, Appellants are not likely to succeed on the merits of their appeal of the Enforcement Order on a jurisdictional basis.

With respect to Appellants' second argument that appeal of the Confirmation Order did not violate the RSA, Appellants have not met their burden of making "a strong showing" that they are

likely to succeed on the merits. Appellants do not dispute that they executed the Joinder Agreements, became "Consenting Noteholders," and "agree[d] to be bound by all of the terms of the Restructuring Support Agreement." The RSA required Consenting Noteholders not to "take any [ a]ction that is materially inconsistent with or that would delay or obstruct the proposal, solicitation, confirmation or consummation of the Plan." It is clear that the First Appeal, a proceeding seeking reversal of confirmation of the Plan, is an action that "is materially inconsistent with . . . confirmation or consummation of the Plan" and "would delay or obstruct ... confirmation or consummation of the Plan." If successful, the First Appeal will reverse the Confirmation Order or, at a minimum, require some modification of the Plan, and either result would unquestionably "delay or obstruct" consummation of the Plan. Based on a plain reading of its provisions, Appellants are unlikely to succeed on the merits of their argument that appeal of the Confirmation Order was not "materially inconsistent with . . . confirmation or consummation of the Plan" and, thus, a violation of the RSA.

With respect to Appellants' third argument that any limitation on a party's right to appeal the Confirmation Order contained in the RSA was unconscionable, Appellants have not met their burden of making "a strong showing" that they are likely to succeed on the merits of this argument either. Appellants argue that under the applicable test under New York law,[2] such a provision would meet both elements of procedural and substantive unconscionability. (*See* D.I. 8 at 7, citing *Ally Financial Inc. v. Wells Fargo Bank, N.A.*, 531 B.R. 25, 49 (Bankr. S.D.N.Y. 2015).) To evaluate the procedural element of unconscionability, the court looks to the contract formation process and the alleged "lack of meaningful choice," including: the size and commercial setting of the transaction, whether deceptive or high-pressure tactics were employed, the use of fine print in

---

[2] The question of whether the RSA is unconscionable is governed by New York law. *See* RSA, ¶ 9.08; *Finney v. Spyra (In re Finney)*, 130 Fed. Appx. 527, 530 n.3 (3d Cir. 2005) ("Whether or not a contract is unconscionable is quintessentially a question of state law.")

11

the contract, the experience and education of the party claiming unconscionability, and whether there was a disparity in bargaining power. *See Ally Financial*, 531 B.R. at 49. To evaluate the substantive element of unconscionability, the court conducts an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged. *See id.* Findings of unconscionability are usually based on satisfaction of both of these elements. *See id.*

Appellants argue that the RSA is procedurally unconscionable because Appellants were given limited time to review the Subscription Documents and RSA ("a week and a weekend"); Appellants did not draft the documents themselves; and, "while the Appellants were free not to participate in the syndication opportunity, of course, had they wanted to participate, there was no other choice with respect to the RSA" – a "textbook example of 'lack of meaningful choice.'" (*See* D.I. 8 at 7-8.) However, the record reflects that Appellants – who are sophisticated investors, are represented by counsel, and have invested over $1 million in the Debtors' bonds – freely chose to enter the execute the Subscription Documents in order to participate in the DIP Facility syndication. The record does not reflect high-pressure tactics. To the contrary, the opportunity to participate in the DIP Facility syndication was made to any noteholder willing to enter into the RSA, which agreement expressly incorporated the Plan, and many parties committed to supporting the Plan under the RSA prior to the Plan's confirmation. (*See* B.D.I. 77 (executed RSA dated Dec. 31, 2015); B.D.I. 513 (confirmed Plan dated March 30, 2016).) Unlike these many other Consenting Noteholders, Appellants had the benefit of having the final, court-approved Plan in hand and prior to deciding whether to join the DIP Facility syndication and execute the Subscription Documents. In view of the foregoing, Appellants are unlikely to succeed in arguing that these circumstances satisfy the procedural element of unconscionability. *See Ally Financial*, 531 B.R. at 49.

In connection with the substantive element of unconscionability, Appellants argue that the idea that a "vague provision in a contract" can be used to supersede the fundamental right to appeal, or that the right to an appeal can be forfeited without the party's knowledge or intent to do so, makes the RSA unconscionable. However, the provisions of the RSA requiring Consenting Noteholders to support the Plan are unambiguous, and Appellants present no evidence that they did not read or understand their obligations under the RSA. Appellants contend that the idea that a party can give up a right in exchange for a benefit "provided to everyone in any event" is similarly unconscionable. However, the fact that the syndication offer was made to other noteholders gives the court no pause. Contrary to Appellants' argument, the benefits of participating in the DIP Facility were not provided to "everyone"; rather, the benefits were offered to those who agreed to the associated burdens, which included an obligation to support the Plan under the RSA. In view of the foregoing, the court finds Appellants are unlikely to succeed in arguing that these circumstances satisfy the substantive element of unconscionability. Despite Appellants' position that, pursuant to the Plan, they "were treated differently from those in their class . . . [n]onetheless, the Appellants decided to participate in the second syndication opportunity because the alternative of not participating could have led to even more potential losses down the line." (B.D.I. 652 at 2.) Appellants are not victims of an unconscionable agreement but rather their own attempt to hedge their bets. Having committed to support the Plan under the RSA, Appellants cannot now have it both ways: Appellants cannot maintain their appeal of the Confirmation Order, in an attempt to receive more favorable treatment, while at the same time maintaining the benefits they will receive under the RSA and Plan should their appeal be unsuccessful.

### B. Irreparable Injury Absent a Stay

Appellants have also failed to establish that they would suffer irreparable harm if they are not granted stay relief. To do so, Appellants would have to establish a resulting injury "that cannot

13

be redressed by a legal or equitable remedy." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Appellants argue that the First Appeal will be moot if no stay is imposed by the court because the Enforcement Order required Appellants to withdraw the First Appeal within two business days; if stay of the Enforcement Order is not granted, and the First Appeal is withdrawn, Appellants will not be permitted to refile it. (*See* D.I. 4 at 3.) Therefore, Appellants argue they will be irreparably harmed if their Motion to Stay is not granted. However, it is well established that the possibility that an appeal may become moot does not constitute irreparable harm for purposes of obtaining a stay. *See e.g., Regal Ware, Inc. v. Global Home Prods., LLC*, 2006 WL 2381918, at *1 (D. Del. Aug. 17, 2006) ("[T]he fact that [the movant's] appeal could be rendered moot . . . does not in and of itself constitute irreparable harm.").

## VI. CONCLUSION

Having evaluated Appellants' likelihood of success on the merits and irreparable injury absent a stay, and having determined that Appellants have failed to carry their burden as to either element, the court is satisfied no further analysis is required. "If the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis." *See Revel AC, Inc.*, 802 F.3d at 571. For the foregoing reasons, the court will DENY Appellants' Motion to Stay.

June 29, 2016

UNITED STATES DISTRICT JUDGE

14